# EXHIBIT A
## to Notice of Removal

*Morgan & Morgan, P.A. v. Trump Panama Hotel Management LLC, et al.*




### IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| MORGAN & MORGAN, P.A., ) <br>                        **Plaintiff,** ) <br> ) <br> **v.** ) <br> ) <br> TRUMP PANAMA HOTEL MANAGEMENT LLC, and ) <br> TRUMP INTERNATIONAL HOTELS MANAGEMENT, LLC, ) <br> ) <br>                       **Defendants.** ) | C.A. No. 2018-0031- <br><br> **SUMMONS** |

**THE STATE OF DELAWARE**

**TO:   SPECIAL PROCESS SERVERS – Reliable Companies:**

**YOU ARE COMMANDED:**

    To summon the above named defendants so that, within 20 days after service hereof upon defendants, exclusive of the day of service, defendants shall serve upon <u>Jamie L. Edmonson</u>, Esquire, Plaintiff's counsel, whose address is <u>Venable LLP, 1201 North Market Street, Suite 1400, Wilmington, Delaware 19801</u>, an answer to the verified complaint.

    To serve upon defendants a copy hereof and of the complaint.

TO THE ABOVE NAMED DEFENDANTS:

    In case of your failure, within 20 days after service hereof upon you, exclusive of the day of service, to serve on plaintiff's attorney named above an answer to the complaint, judgment by default will be rendered against you for the relief demanded in the complaint.

Dated:      January 17, 2018

                                                **Register in Chancery**

C.A. # 2018-0031-

MORGAN & MORGAN, P.A.,

Plaintiff,

v.

TRUMP PANAMA HOTEL MANAGEMENT LLC, and
TRUMP INTERNATIONAL HOTELS MANAGEMENT, LLC,

Defendants.

**SUMMONS**

Please effectuate service upon:

1.    Trump Panama Hotel Management LLC
2.    Trump International Hotels Management, LLC

      By serving their registered agent:

      National Registered Agents, Inc.
      160 Greentree Dr., Suite 101
      Dover, DE 19904

Pursuant to 6 Del.C. Sec. 18-105

SERVICE TO BE COMPLETED BY SPECIAL PROCESS SERVER -
Reliable Companies

Jamie L. Edmonson, Esquire
Plaintiff's Attorney

**EFiled:  Jan 17 2018 10:26AM EST**
**Transaction ID 61575833**
**Case No. 2018-0031-**

## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| MORGAN & MORGAN, P.A., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )  C.A. No. 2018-0031 |
| | ) |
| TRUMP PANAMA HOTEL | ) |
| MANAGEMENT LLC, and TRUMP | ) |
| INTERNATIONAL HOTELS | ) |
| MANAGEMENT, LLC, | ) |
| | ) |
| Defendants. | ) |

## PLAINTIFF'S MOTION FOR EXPEDITED PROCEEDINGS

Plaintiff Morgan & Morgan, P.A. ("Plaintiff"), by and through its undersigned counsel, hereby moves this Court for the entry of an order, in the form attached hereto, expediting proceedings in this matter.

The grounds for this motion are set forth fully in Plaintiff's Opening Brief in Support of Its Motion for Preliminary Injunction and Motion for Expedited Proceedings, filed contemporaneously herewith.

Dated:      Wilmington, Delaware
            January 17, 2018

                                        VENABLE LLP

OF COUNSEL:                              _/s/  Jamie L. Edmonson_
                                        Jamie L. Edmonson (#4247)
Edward P. Boyle                         Daniel A. O'Brien (#4897)
Kevin J. White                          1201 North Market Street
Rockefeller Center                      Suite 1400
1270 Avenue of The Americas, 24th Floor  Wilmington, Delaware 19801
New York, New York 10020                Telephone: 302-298-3535
Telephone: 212-307-5500                 Facsimile: 302-298-3550
Facsimile: 212-307-5598                 jledmonson@venable.com
epboyle@venable.com                     daobrien@venable.com
kjwhite@venable.com

                                        *Attorneys For Plaintiff Morgan &*
                                        *Morgan, P.A.*

                                        Words: 61

2

EFiled:  Jan 17 2018 10:26AM EST
Transaction ID 61575833
Case No. 2018-0031-

## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| MORGAN & MORGAN, P.A., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) C.A. No. 2018-0031 |
| | ) |
| TRUMP PANAMA HOTEL | ) |
| MANAGEMENT LLC, and TRUMP | ) |
| INTERNATIONAL HOTELS | ) |
| MANAGEMENT, LLC, | ) |
| | ) |
| Defendants. | ) |

### [PROPOSED] ORDER GRANTING
### PLAINTIFF'S MOTION FOR EXPEDITED PROCEEDINGS

**THIS MATTER** having come before the Court upon the motion of Plaintiff

Morgan & Morgan, P.A. ("Plaintiff"), by and through its attorneys Venable LLP,

for expedited proceedings; the Court having considered the submissions of the

parties, and for good cause shown;

**IT IS** on this _____ day of _____, 2018;

**ORDERED** that Plaintiff's motion for expedited proceedings be and is

hereby GRANTED; and it is further

**ORDERED** that Defendants Trump Panama Hotel Management LLC and

Trump International Hotels Management, LLC shall file an Answer to Plaintiff's

complaint by _____, 2018; and it is further

**ORDERED** that a hearing on Plaintiff's Motion for Preliminary Injunction be and is hereby scheduled for _____, 2018, at _____ in the ____ m.; and it is further

**ORDERED** that the parties shall confer in good faith on an appropriate scheduling order and present same to the Court within five (5) business days of the date of this Order.

_____

[Vice] Chancellor

EFiled: Jan 17 2018 10:26AM EST
Transaction ID 61575833
Case No. 2018-0031-

## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

MORGAN & MORGAN, P.A.,                    )
                                          )
     Plaintiff,        -        )
                                          )
     v.                          )   C.A. No. 2018-0031
                                          )
TRUMP PANAMA HOTEL                        )
MANAGEMENT LLC, and TRUMP                  )
INTERNATIONAL HOTELS                      )
MANAGEMENT, LLC,                          )
                                          )
     Defendants.               )

## PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

Pursuant to Court of Chancery Rule 65, Plaintiff Morgan & Morgan, P.A.

("Morgan & Morgan"), by and through its undersigned counsel, hereby moves this

Court for the entry of an order, in the form attached hereto, enjoining Defendants

Trump Panama Hotel Management Inc. and Trump International Hotels

Management, LLC, and their managers, members, affiliates, employees, officers,

directors, agents, and any other person or entity acting on their behalf, pending a

further Order of the Court, from arbitrating, or attempting to arbitrate, any claims

against Morgan & Morgan before the International Chamber of Commerce.

The grounds for this motion are set forth fully in Plaintiff's Opening Brief in

Support of Its Motion for Preliminary Injunction and Motion for Expedited

Proceedings, filed contemporaneously herewith.

Dated:        Wilmington, Delaware
              January 17, 2018

                                        VENABLE LLP

OF COUNSEL:                                  /s/ Jamie L. Edmonson
     \                                   Jamie L. Edmonson (#4247)
Edward P. Boyle                          Daniel A. O'Brien (#4897)
Kevin J. White                           1201 North Market Street
Rockefeller Center                       Suite 1400
1270 Avenue of The Americas, 24th Floor  Wilmington, Delaware 19801
New York, New York 10020                 Telephone: 302-298-3535
Telephone: 212-307-5500                  Facsimile: 302-298-3550
Facsimile: 212-307-5598                  jledmonson@venable.com
epboyle@venable.com                      daobrien@venable.com
kjwhite@venable.com

                                         *Attorneys For Plaintiff Morgan &*
                                         *Morgan, P.A.*

                                         Words: 122

2

EFiled:  Jan 17 2018 10:26AM EST
Transaction ID 61575833
Case No. 2018-0031-

## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| MORGAN & MORGAN, P.A., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )   C.A. No. 2018-0031 |
| | ) |
| TRUMP PANAMA HOTEL | ) |
| MANAGEMENT LLC, and TRUMP | ) |
| INTERNATIONAL HOTELS | ) |
| MANAGEMENT, LLC, | ) |
| | ) |
| Defendants. | ) |

### [PROPOSED] ORDER GRANTING
### PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

**THIS MATTER** having come before the Court upon the motion of Plaintiff

Morgan & Morgan, P.A. ("Plaintiff"), by and through its attorneys Venable LLP,

for a preliminarily injunction, pursuant to Court of Chancery Rule 65, against

Defendants Trump Panama Hotel Management Inc. and Trump International

Hotels Management, LLC (collectively, "Defendants"); the Court having

considered the submissions of the parties, and for good cause shown;

**IT IS** on this _____ day of _____, 2018;

**ORDERED** that Plaintiff's motion for preliminary injunction be and is

hereby GRANTED; and it is further

**ORDERED** that Defendants and their managers, members, affiliates,

employees, officers, directors, agents, and any other person or entity acting on their

behalf, are hereby enjoined, pending further Order of the Court, from further

pursuing or prosecuting any claims against Plaintiff in the arbitration commenced

before the International Chamber of Commerce titled *HOTEL TOC, INC.*

*(Panama) vs/ 1. TRUMP PANAMA HOTEL MANAGEMENT LLC (U.S.A.) 2.*

*TRUMP INTERNATIONAL HOTELS MANAGEMENT, LLC (U.S.A.) vs. 1. Orestes*

*Fintiklis (Cyprus) 2. Gary Lundgren (Panama) 3. ITHACA CAPITAL*

*INVESTMENTS 1, S.A. (Panama) 4. ITHACA CAPITAL INVESTMENTS II, S.A.*

*(Panama) 5. MORGAN & MORGAN (Panama) 6 OWNERS MEETING OF THE*

*P.H. TOC (Panama) 7. HOTEL TOC FOUNDATION (Panama) 8 ZacGary*

*Lundgren (Panama)*, ICC Case No. 23149/MK.


_____

[Vice] Chancellor


2

**EFiled:  Jan 17 2018 10:26AM EST**
**Transaction ID 61575833**
**Case No. 2018-0031-**

## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| MORGAN & MORGAN, P.A., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 2018-0031 |
| | ) | |
| TRUMP PANAMA HOTEL | ) | |
| MANAGEMENT LLC, and TRUMP | ) | |
| INTERNATIONAL HOTELS | ) | |
| MANAGEMENT, LLC, | ) | |
| | ) | |
| Defendants. | ) | |

## PLAINTIFF MORGAN & MORGAN, P.A.'S OPENING BRIEF IN SUPPORT OF ITS MOTION FOR PRELIMINARY INJUNCTION AND MOTION FOR EXPEDITED PROCEEDINGS

OF COUNSEL:

Edward P. Boyle
Kevin J. White
Venable LLP
Rockefeller Center
1270 Avenue of The Americas, 24th Floor
New York, New York 10020
Telephone: 212-307-5500
Facsimile: 212-307-5598
epboyle@venable.com
kjwhite@venable.com

Jamie L. Edmonson (#4247)
Daniel A. O'Brien (#4897)
Venable LLP
1201 North Market Street
Suite 1400
Wilmington, Delaware 19801
Telephone: 302-298-3535
Facsimile: 302-298-3550
jledmonson@venable.com
daobrien@venable.com

*Attorneys For Plaintiff Morgan & Morgan, P.A.*

# **TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ...............................................................................1

FACTS RELEVANT TO THIS MOTION.................................................................3

    The Hotel Management Agreement Between Hotel TOC
and Trump.........................................................................................................3

    Hotel TOC Commences Arbitration Against Trump. ......................................4

    Trump Asserts Claims in the Arbitration Against Its
Adversary's Counsel........................................................................................5

    Trump Alleges Arbitral Jurisdiction Solely Based on the
Agency Relationship Between Plaintiff and Hotel TOC..................................5

    Plaintiff Has Refused to Participate in the Arbitration....................................6

ARGUMENT ..........................................................................................................7

POINT I...................................................................................................................7

THIS COURT SHOULD PRELIMINARILY ENJOIN
DEFENDANTS FROM CONTINUING TO PROSECUTE
THEIR CLAIMS AGAINST PLAINTIFF IN ARBITRATION ..............................7

    A.    Preliminary Injunction Standard ...........................................................7

    B.    Plaintiff Is Likely to Succeed On The Merits of Its
Claims...................................................................................................7

        1.    This Court, Not an Arbitral Tribunal, Should Decide
Whether Trump's Claims Against Plaintiff Are
Arbitrable. ................................................................................7

        2.    Plaintiff Is Not Bound To Arbitrate Any Dispute
With Defendants. ......................................................................9

            (a)    Trump Cannot Force Plaintiff to Arbitrate in
the Absence of an Arbitration Agreement......................10

(b)    Trump's Agency Theory Is Baseless and Cannot Bind Plaintiff to Arbitration.................................11

3.    Plaintiff Has Not Participated in the Arbitration and No Prior Applications to Compel Arbitration Have Been Made.........................................................................14

C.    Plaintiff Will Suffer Irreparable Injury Absent Injunctive Relief. ..................................................................15

D.    The Balance of Equities Favors Granting Preliminary Injunctive Relief. ..................................................................17

POINT II ...........................................................................................17

PLAINTIFF IS ENTITLED TO EXPEDITED PROCEEDINGS ............17

CONCLUSION..................................................................................18

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Angus v. Ajio, LLC,*
  No. 11895-VCG, 2016 WL 2894246 (Del. Ch. May 13, 2016)...................10, 11

*Arhontisa Mar. Ltd. v. Twinbrook Corp.,*
  No. 01-cv-5044 (GEL), 2001 WL 1142136
  (S.D.N.Y. Sept. 27, 2001)...........................................................................12

*Bel-Ray Co., Inc. v. Chemrite (Pty) Ltd.,*
  181 F.3d 435 (3d Cir. 1999) ...............................................................12, 13

*Box v. Box,*
  697 A.2d 395 (Del. 1997) ..........................................................................17

*C & J Energy Servs., Inc. v. City of Miami Gen. Employees',*
  107 A.3d 1049 (Del. 2014) ...........................................................................7

*City of Wilmington v. Wilmington FOP Lodge#1,*
  No. 20244-NC, 2004 WL 1488682 (Del. Ch. June 22, 2004)...........................15

*Deuley v. DynCorp Int'l, Inc.,*
  8 A.3d 1156 (Del. 2010) ..............................................................................8

*First Options of Chicago, Inc. v. Kaplan,*
  514 U.S. 938, 115 S. Ct. 1920, 131 L. Ed. 2d 985 (1995) ............................8, 15

*Granite Rock Co. v. Int'l Bhd. of Teamsters,*
  561 U.S. 287, 130 S. Ct. 2847, 177 L. Ed. 2d 567 (2010) .................................10

*James & Jackson, LLC v. Willie Gary, LLC,*
  906 A.2d 76 (Del. 2006) ...........................................................................7, 10

*Jensen v. U-Haul Co. of California,*
  18 Cal. App. 5th 295 (Cal. Ct. App. 2017)........................................................13

*LEI Packaging, LLC v. Emery Silfurtun Inc.,*
  No. 15-2446 ADM/BRT, 2015 WL 9412524
  (D. Minn. Dec. 22, 2015)..............................................................................13

*LG Elecs., Inc. v. InterDigital Commc'ns, Inc.*,
    114 A.3d 1246 (Del. 2015) ...................................................8, 10

*Lonergan v. EPE Holdings, LLC*,
    5 A.3d 1008 (Del. Ch. 2010) ..............................................17

*Maryland Cas. Co. v. Realty Advisory Bd. on Labor Relations*,
    107 F.3d 979 (2d Cir. 1997) ...............................................16

*McLaughlin v. McCann*,
    942 A.2d 616 (Del. Ch. 2008) ............................................11

*Merrill Lynch Inv. Managers v. Optibase, Ltd.*,
    337 F.3d 125 (2d Cir. 2003) ...............................................12

*PaineWebber, Inc. v. Hartmann*,
    921 F.2d 507 (3d Cir. 1990) .............................................15-16

*Parfi Holding AB v. Mirror Image Internet, Inc.*,
    842 A.2d 1245 (Del. Ch. 2004) ..........................................15

*Primavera Labs., Inc. v. Avon Prods., Inc.*,
    297 A.D.2d 505 (N.Y. Sup. Ct. App. Div. 2002) ................9

*RBC Capital Markets Corp. v. Thomas Weisel Partners, LLC*,
    No. 4709-VCN, 4760-VCN, 2010 WL 681669
    (Del. Ch. Feb. 25, 2010) ....................................................14

*RDP Techs., Inc. v. Cambi AS*,
    800 F. Supp. 2d 127 (D.D.C. 2011).....................................8

*Sphere Drake Ins. Ltd. v. All Am. Ins. Co.*,
    256 F.3d 587 (7th Cir. 2001) ................................................9

*UBS Sec. LLC v. Voegeli*,
    684 F. Supp. 2d 351 (S.D.N.Y. 2010) ................................16

*Walker v. Collyer*,
    9 N.E.3d 854 (Mass. App. Ct. 2014) ..............................13, 14

**Statutes and Rules**

9. U.S.C. §§ 1-16..................................................................8, 16

10 *Del. C.* §§ 5701-25 ........................................................................8

10 *Del. C.* § 5702(a) ..........................................................................8

10 *Del. C.* § 5702(c) ..........................................................................8

18 U.S.C. § 1962(c) ...........................................................................5

18 U.S.C. § 1962(d) ...........................................................................5

Ct. Ch. R. 4 .......................................................................................1

Ct. Ch. R. 6 .......................................................................................1

Ct. Ch. R. 12 .....................................................................................1

Ct. Ch. R. 26 .....................................................................................1

Ct. Ch. R. 30 .....................................................................................1

Ct. Ch. R. 33 .....................................................................................1

Ct. Ch. R. 34 .....................................................................................1

Ct. Ch. R. 65 .....................................................................................1

N.Y. C.P.L.R. § 7503(b) ...................................................................9

**Other Authorities**

Restatement (Second) of Agency § 140 (1958) ................................12

Restatement (Second) of Agency § 320 (1958) ................................12

Restatement (Second) of Agency § 321 (1958) ................................12

Restatement (Second) of Agency § 322 (1958) ................................12

Restatement (Second) of Agency § 326 (1958) ................................12

Restatement (Second) of Agency § 328 (1958) ................................12

Plaintiff Morgan & Morgan ("Plaintiff") respectfully submits this Opening Brief in support of its (1) Motion for a Preliminary Injunction against Defendants Trump Panama Hotel Management LLC ("Trump Panama"), and Trump International Hotels Management, LLC ("Trump International") (together, "Trump" or "Defendants"), pursuant to Court of Chancery Rule 65; and (2) Motion for Expedited Proceedings, pursuant to Court of Chancery Rules 4, 6, 12, 26, 30, 33, and 34.

## PRELIMINARY STATEMENT

Trump is trying to bully its adversary in an arbitration addressing a hotel management dispute by adding bogus claims against Trump's adversary's counsel in the arbitration – Plaintiff. There is no arbitration agreement between Trump and Plaintiff, and these arbitration claims should be preliminarily enjoined.

Plaintiff is the largest law firm in Panama. One of Plaintiff's clients is Hotel TOC, Inc. ("Hotel TOC"), the owner of a luxury hotel condominium in Panama City. The hotel is currently managed by Trump pursuant to a hotel management agreement that contains an arbitration clause. In October 2017, Hotel TOC commenced arbitration against Trump, alleging that Trump has mismanaged the hotel, and seeking to remove Trump as hotel manager and to recover $15 million in damages. Plaintiff is co-counsel of record for Hotel TOC in that arbitration.

Trump has responded by throwing food. In December 2017, Trump asserted claims directly against Plaintiff (Hotel TOC's counsel), even though Trump has no arbitration agreement with Plaintiff. The claims themselves are nonsense: Trump asserts that Plaintiff's representation of Hotel TOC and individual unit owners in their effort to remove Trump as Hotel manager somehow violates the civil Racketeering Influenced and Corrupt Organizations ("RICO") Act – claims that require a showing of underlying criminal behavior.

Trump's assertion of arbitral jurisdiction over Plaintiff is as frivolous as the RICO claims. Plaintiff has never agreed to arbitrate any disputes with Trump, and Trump tacitly concedes as much. Trump's sole basis to try to force Plaintiff to defend claims in the arbitration is that Plaintiff, as the agent of Hotel TOC and related parties, is bound by the arbitration clause in Hotel TOC's management agreement with Trump. This is absurd. No court in Delaware or New York has held that a principal who agrees to arbitrate with a third party thereby binds its agents to arbitrate their own disputes with that third party. Such a rule would turn agency law on its head.

Trump cannot abuse the arbitration process in this manner. If Trump wants to pursue civil RICO claims against Plaintiff, it must do so in a court of law, where a judge may punish frivolous pleading with sanctions.

2

Accordingly, this Court should enter a preliminary injunction barring

Trump from prosecuting its third-party claims against Plaintiff in the arbitration.

## FACTS RELEVANT TO THIS MOTION

Plaintiff is a Panamanian law firm with offices in Panama City.  *See* Verified

Compl. ("Compl.") ¶¶ 1, 6.[1]  Trump Panama and Trump International are

Delaware limited liability companies whose principal places of business are

located in New York.  *Id.* ¶¶ 7-8.

Non-party Hotel TOC is a Panama corporation that owns a hotel

condominium in Panama City (the "Hotel").  *Id.* ¶¶ 13-14.  The Hotel consists of

369 hotel units, each of which may be individually owned, as well as 13 hotel

amenities units.  *Id.* ¶ 13.  Hotel TOC is wholly owned by non-party Hotel TOC

Foundation (the "Foundation"), formed under Panama law to collectively exercise

the rights of its beneficiaries, the Hotel's unit owners.  *Id.* ¶ 14.

### The Hotel Management Agreement Between Hotel TOC and Trump

On April 13, 2011, Hotel TOC entered into an agreement with Trump for the

operation and maintenance of the Hotel (the "Management Agreement").  *Id.* ¶ 12

& Ex. A.

Under the Management Agreement, Hotel TOC agreed to pay Trump annual

fees in exchange for its operation of the Hotel for an initial period of 20 years.  Ex.

---

[1] Citations herein to "Ex. __" refer to exhibits appended to the Verified Complaint.

A §§ 2.1, 2.2, 3.1.  In addition, the Management Agreement sets forth conditions

under which a party may terminate the agreement if, among other things, an "Event

of Default" occurs.  *Id.* § 5.2.2.  As defined, an "Event of Default" includes "the

failure of any Party to fulfill any of the other material . . .  obligations . . . set forth

in this Agreement, and the continuance of any such default for a period of thirty

(30) days after written notice of the failure; . . . ."  *Id.* § 5.2(a).

The Management Agreement requires that "all disputes" between the parties

"arising out of or relating to" that agreement be submitted to binding arbitration

before the ICC.  *Id.* §§ 9.1, 9.1.1.  The Management Agreement is governed by

New York law.  *Id.* § 12.3.

**Hotel TOC Commences Arbitration Against Trump.**

On October 14, 2017, Hotel TOC commenced an arbitration against Trump

before the ICC (the "Arbitration") by filing a Request for Arbitration – the initial

pleading in an ICC arbitration.  Compl. ¶ 16 & Ex. B at 1.  The Request for

Arbitration claims breach of contract, among other causes of action, and seeks a

declaration that Hotel TOC may terminate the Management Agreement on account

of an Event of Default, as well as $15 million in damages.  Compl. ¶ 17 & Ex. B ¶¶

130-31, 134-36, 166, 170-71, 174-75, 181-83, 189-92.

Plaintiff is co-counsel of record for Hotel TOC in the Arbitration.  Compl. ¶

18.

4

**Trump Asserts Claims in the Arbitration Against Its
Adversary's Counsel.**

On December 5, 2017, Trump filed its Answer, Counterclaims, Request for

Joinder and Third-Party Claims ("Third-Party Claims") in the Arbitration. *Id.* ¶ 19

& Ex. C at 76.  Trump asserted several counterclaims against Hotel TOC, as well

as multiple claims against third parties.  Relevant here, Trump has asserted two

claims against Plaintiff: one for violation of civil RICO, under 18 U.S.C. §

1962(c), and one for civil RICO conspiracy under 18 U.S.C. § 1962(d).  Compl. ¶

20 & Ex. C ¶¶ 153-55, 189, 191.

The claims against Plaintiff are based entirely on Plaintiff's role as legal

counsel to Hotel TOC and related parties.  Compl. ¶ 20 & Ex. C ¶¶ 17, 20, 35, 37,

38, 76, 95, 98-99, 101-04, 119, 149.  Specifically, Trump asserts that Plaintiff

violated RICO by (i) advising some of the owners of units in the Hotel on their

purchase of those units, Ex. C ¶¶ 76, 149; (ii) advising those parties on their votes

to remove and appoint directors and officers of the Foundation and Hotel TOC, *id.*

¶¶ 17, 20, 37, 38, 95, 98-99, 101-04, 119; and (iii) advising and representing Hotel

TOC in relation to the Arbitration, *id.* ¶¶ 20, 35, 119.

**Trump Alleges Arbitral Jurisdiction Solely Based on the
Agency Relationship Between Plaintiff and Hotel TOC.**

In seeking to add Plaintiff as a party in the Arbitration, Trump's Third-Party

Claims do not allege that Plaintiff has ever agreed to arbitrate any disputes with

Trump.  Compl. ¶ 21.  Instead, Trump alleges that arbitral jurisdiction exists solely

because Plaintiff acts as agent for Hotel TOC, which agreed in the Management

Agreement to arbitrate disputes with Trump concerning the Hotel, and related

parties.  *Id.* ¶ 22 & Ex. C ¶ 57.  Trump does not allege any other basis to join

Plaintiff as a party in the Arbitration.  Compl. ¶ 23.

**Plaintiff Has Refused to Participate in the Arbitration.**

Plaintiff received service of the Third-Party Claims on December 26, 2017.

Compl. ¶ 24.  By letter dated January 2, 2018, the ICC stated that Plaintiff and

other putative third-party respondents must respond to the Third-Party Claims

within 30 days of receipt, or by January 25, 2018.  *Id.* & Ex. D at 3.

By letter dated January 16, 2018, Plaintiff informed the ICC that it would

not participate in the Arbitration as a party because there is no agreement to

arbitrate between Plaintiff and Trump.  Compl. ¶ 25 & Ex. E at 1.  Plaintiff further

informed the ICC that it would seek judicial relief enjoining Trump from claiming

against Plaintiff in the Arbitration.  Compl. ¶ 25 & Ex. E at 1.  Plaintiff suggested

that the ICC refrain from proceeding with Trump's claims, or at least extend all

deadlines relating to such claims, until a court has decided whether the ICC has

jurisdiction to hear these claims.  Ex. E at 2.  The ICC has not yet responded.

6

# ARGUMENT

## POINT I

### THIS COURT SHOULD PRELIMINARILY ENJOIN DEFENDANTS FROM CONTINUING TO PROSECUTE THEIR CLAIMS AGAINST PLAINTIFF IN ARBITRATION.

**A.     Preliminary Injunction Standard**

Plaintiff seeks a preliminary injunction barring Trump from prosecuting third-party claims against Plaintiff in the Arbitration.  "To obtain a preliminary injunction, [a] plaintiff[] must demonstrate: (1) a reasonable probability of success on the merits, (2) that [it] will suffer irreparable harm without an injunction; and (3) that [its] harm without an injunction outweighs the harm to the defendants that will result from the injunction."  *C & J Energy Servs., Inc. v. City of Miami Gen. Employees'*, 107 A.3d 1049, 1066 (Del. 2014) (citing *Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc.*, 506 A.2d 173, 179 (Del. 1986)).

**B.     Plaintiff Is Likely to Succeed On The Merits of Its Claims.**

    **1.     This Court, Not an Arbitral Tribunal, Should Decide Whether Trump's Claims Against Plaintiff Are Arbitrable.**

As a threshold matter, the question of whether Trump's claims against Plaintiff are arbitrable should be decided by this Court, not the ICC.  As the Delaware Supreme Court has held, "[t]he question of whether . . . parties agreed to arbitrate is generally one for the courts to decide and not for the arbitrators."  *James & Jackson, LLC v. Willie Gary, LLC*, 906 A.2d 76, 79 (Del. 2006) (quoting

*DMS Properties-First, Inc. v. P.W. Scott Assocs., Inc.*, 748 A.2d 389, 392 (Del.

2000)) (internal quotation marks omitted).[2] Following U.S. Supreme Court

precedent, *see First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 115 S. Ct.

1920, 131 L. Ed. 2d 985 (1995), Delaware courts have concluded that issues of

substantive arbitrability should be decided by a court unless there "clear and

unmistakable evidence" that "the parties agreed to arbitrate arbitrability." *LG*

*Elecs., Inc. v. InterDigital Commc'ns, Inc.*, 114 A.3d 1246, 1260 (Del. 2015)

(quoting *DMS Properties-First, Inc.*, 748 A.2d at 392) (internal quotation marks

omitted).

    Federal courts interpreting the FAA have reached a similar conclusion. *See,*

*e.g.*, *RDP Techs., Inc. v. Cambi AS*, 800 F. Supp. 2d 127, 139 (D.D.C. 2011)

(noting that "disputes over . . . whether the parties ever agreed to submit anything

to arbitration in the first place" are "properly for the courts to decide" (citation and

---

[2] This Brief treats Delaware law as governing the issue of whether Plaintiff is bound to arbitrate Trump's claims against it. Under § 5702(a) and (c) of the Delaware Uniform Arbitration Act ("DUAA"), 10 *Del. C.* §§ 5701-25, an "application . . . to enjoin . . . an arbitration," *id.* § 5702(c), that is purportedly brought pursuant to an arbitration agreement which does not "specifically referenc[e] the [DUAA]," *id.* § 5702(a), "shall be decided by the Court of Chancery in conformity with the Federal Arbitration Act, [9. U.S.C. §§ 1-16,] and such general principles of law and equity as are not inconsistent with that Act," *id.* § 5702(c). As this Brief demonstrates, there is no conflict between Delaware law, federal common law and New York law, the law that governs the Management Agreement. Consequently, this Court need not determine which sovereign's law applies to the issue of whether Plaintiff is bound to arbitrate with Trump at all. *See Deuley v. DynCorp Int'l, Inc.*, 8 A.3d 1156, 1161 (Del. 2010).

internal quotation marks omitted)); *Sphere Drake Ins. Ltd. v. All Am. Ins. Co.*, 256 F.3d 587, 591 (7th Cir. 2001) (holding that "as arbitration depends on a valid contract an argument that the contract does not exist can't logically be resolved by the arbitrator").

Courts in New York have also held that the existence of an arbitration agreement is a matter for judicial resolution. *See Primavera Labs., Inc. v. Avon Prods., Inc.*, 297 A.D.2d 505, 505 (N.Y. Sup. Ct. App. Div. 2002) (holding that "[t]he threshold determination of whether there is a clear, unequivocal and extant agreement to arbitrate the disputed claims is to be made by the court and not the arbitrator" (citation and internal quotation marks omitted)); *see also* N.Y. C.P.L.R. § 7503(b) (authorizing courts to stay an arbitration on the ground that "a valid agreement was not made").

Here, there is no evidence – and certainly no "clear and unmistakable" evidence – of any arbitration agreement between Plaintiff and Trump, much less an agreement that the ICC would decide issues of arbitral jurisdiction.  Accordingly, this Court, not the ICC, should decide the threshold question of arbitrability.

## 2.    Plaintiff Is Not Bound To Arbitrate Any Dispute With Defendants.

The only purported agreement to arbitrate mentioned in Trump's Third-Party Claims is the arbitration provision in the Management Agreement between Trump and Hotel TOC.  Plaintiff is not a party to the Management Agreement.  Even so,

9

Trump contends that Plaintiff is bound by the Management Agreement's

arbitration clause solely because Plaintiff acts as agent of Hotel TOC and owners

of units in the Hotel.  This baseless theory should be rejected as a matter of law.

> **(a)   Trump Cannot Force Plaintiff to Arbitrate in the Absence of an Arbitration Agreement.**

It is hornbook law that "arbitration is a matter of contract and a party cannot

be required to submit to arbitration any dispute which he has not agreed so to

submit." *Willie Gary, LLC*, 906 A.2d at 78 (quoting *Howsam v. Dean Witter*

*Reynolds, Inc.*, 537 U.S. 79, 83, 123 S. Ct. 588, 154 L. Ed. 2d 491 (2002)) (internal

quotation marks omitted).  As the Delaware Supreme Court has held, although "the

public policy of Delaware favors arbitration," that policy "does not trump basic

principles of contract interpretation." *LG Elecs., Inc.*, 114 A.3d at 1267 (citation

and internal quotation marks omitted); *see Granite Rock Co. v. Int'l Bhd. of*

*Teamsters*, 561 U.S. 287, 301, 130 S. Ct. 2847, 177 L. Ed. 2d 567 (2010) (holding

that "the presumption favoring arbitration" under the FAA "appl[ies] . . . only

where . . . a[n] arbitration agreement" is "validly formed and enforceable" but

"ambiguous about whether it covers the dispute at hand").

Here, as explained above, no agreement to arbitrate has ever been formed

between Plaintiff and Trump, and Trump does not claim otherwise.

An illustrative case is *Angus v. Ajio, LLC*, No. 11895-VCG, 2016 WL

2894246 (Del. Ch. May 13, 2016).  In *Angus*, the defendants sought to enforce an

arbitration agreement against persons who had not signed it. *Id.* at *1. This Court granted the non-signatories' motion for preliminary injunction, determining that "it is more likely than not that [the Court] will ultimately find that [plaintiffs], as non-signatories to the Operating Agreement, are not bound to arbitration," *id.*, and concluding that "to force [plaintiffs] to arbitrate absent a contractual obligation to do so involves a quantum of irreparable harm that outweighs the risk of improvidently granting a preliminary injunction," *id.*

Like the non-signatory plaintiffs in *Angus*, Plaintiff is not, and has never been, a party to the Management Agreement, which contains the arbitration provision that Trump seeks to enforce. Indeed, Trump's Third-Party Claims do not allege otherwise. Thus, like the defendants in *Angus*, Trump will not be able to demonstrate that Plaintiff is bound to arbitrate Trump's claims.

### (b) Trump's Agency Theory Is Baseless and Cannot Bind Plaintiff to Arbitration.

Absent an express agreement to arbitrate, courts are loath to force parties to arbitrate disputes. *See, e.g., Merrill Lynch Inv. Managers v. Optibase, Ltd.*, 337 F.3d 125, 131 (2d Cir. 2003) (instructing courts to be "wary of imposing a contractual obligation to arbitrate on a non-contracting party" (citation and internal quotation marks omitted)). As this Court has observed, a non-signatory may only be bound to an arbitration agreement "if so dictated by the ordinary principles of

contract and agency." *McLaughlin v. McCann*, 942 A.2d 616, 627 n.42 (Del. Ch. 2008) (citation and internal quotation marks omitted).

Trump claims that Plaintiff's role as agent of Hotel TOC and related parties binds Plaintiff to the arbitration clause in the Management Agreement between Hotel TOC and Trump.  Trump has it backwards.  Under agency law, a non-signatory *principal* may be bound by an agreement entered into by its *agent*, not the other way around.  *See* Restatement (Second) of Agency §§ 140, 320 (1958); *see also Bel-Ray Co., Inc. v. Chemrite (Pty) Ltd.*, 181 F.3d 435, 445 (3d Cir. 1999) (observing that "[g]enerally, of course, an agent of a disclosed principal, even one who negotiates and signs a contract for her principal, does not become a party to the contract" (citations omitted)); *Arhontisa Mar. Ltd. v. Twinbrook Corp.*, No. 01-cv-5044 (GEL), 2001 WL 1142136, at *4 (S.D.N.Y. Sept. 27, 2001) (noting "the well-established principle that an agent for a disclosed principal is not a party to and is not personally bound by a contract that he signs on behalf of a disclosed principal—a principle that has consistently been applied in the arbitration context").

Consistent with these principles, no Delaware court has held that an unwilling non-signatory agent is bound to an arbitration agreement between the agent's principal and a third party.  Indeed, under agency law, an agent is not contractually bound to a third party unless that agent purported to make a contract

12

on behalf of an undisclosed, partially disclosed, non-existent, or incompetent principal. *See* Restatement (Second) of Agency §§ 321-22, 326, 328 (1958). Those circumstances obviously do not exist here: Plaintiff has not entered into any arbitration agreement with Trump, let alone on behalf of an undisclosed principal.

Courts that have considered this exact question of agency law, in the context of a demand to arbitrate, have reached the same conclusion. In *Bel-Ray Co., Inc.*, for example, the U.S. Court of Appeals for the Third Circuit concluded that "an employee or agent who did not agree to arbitrate" could not be "compelled to arbitrate his personal liability on the basis of a commitment made by the corporation he serves." *Bel-Ray Co., Inc.*, 181 F.3d at 445. Similarly, in *LEI Packaging, LLC v. Emery Silfurtun Inc.*, No. 15-2446 ADM/BRT, 2015 WL 9412524 (D. Minn. Dec. 22, 2015), a federal district court held that two subcontractors who were agents of a general contractor that had entered into an arbitration agreement with a third party were not bound under that agreement to arbitrate claims brought by the third party. *Id.* at *5. Another example is *Jensen v. U-Haul Co. of California*, 18 Cal. App. 5th 295 (Cal. Ct. App. 2017), where the appellate court recently determined that a non-signatory employee of a real estate lessee was not bound to arbitrate claims brought by the lessor against the employee under an arbitration clause contained in the lease between the employee's principal, the lessee, and the lessor. *Id.* at 4. Finally, in *Walker v. Collyer*, 9

N.E.3d 854 (Mass. App. Ct. 2014), the appellate court found that a physician agent of a medical facility was not bound to arbitrate claims brought by a patient under an arbitration agreement between the patient and the medical facility. *Id.* at 864.

In each of these cases, the courts rejected the argument that Trump proffers here. Indeed, in *Walker*, the court explained that "it is immaterial" whether a non-signatory party seeking to avoid arbitration "was an agent of [a signatory] because the exception only allows agents to bind principals by their actions, rather than vice versa." *Id.* The court noted that "[u]nder ordinary principals of contract and agency law, . . . an agency relationship itself is insufficient to compel a nonsignatory agent to arbitrate in accordance with an agreement signed by the principal." *Id.*

Accordingly, as a matter of law, Trump's agency argument in favor of arbitral jurisdiction is meritless.

### 3. Plaintiff Has Not Participated in the Arbitration and No Prior Applications to Compel Arbitration Have Been Made.

Plaintiff has refused to participate as a party in the Arbitration. Compl. ¶¶ 4, 25 & Ex. D. Instead, Plaintiff has informed the ICC that it does not have jurisdiction to hear Trump's claims because no arbitration agreement exists between Plaintiff and Trump. Ex. D at 1. Plaintiff also informed the ICC that it would seek relief from this Court. *Id.* As the U.S. Supreme Court has held, and Delaware courts have found, objecting to the jurisdiction of an arbitral tribunal

14

does not constitute participation in the arbitration. *See, e.g., RBC Capital Markets Corp. v. Thomas Weisel Partners, LLC*, No. 4709-VCN, 4760-VCN, 2010 WL 681669, at *6 (Del. Ch. Feb. 25, 2010) ("Simply contesting arbitrability before an arbitration panel does not indicate a clear willingness to submit that issue to the arbitrator" (citation omitted)); *see also Kaplan*, 514 U.S. at 946 (holding that "merely arguing the arbitrability issue to an arbitrator does not indicate a clear willingness to arbitrate that issue"). Neither Plaintiff nor Trump has made a prior judicial application to with respect to arbitration. Compl. ¶¶ 26-27.

## C.    Plaintiff Will Suffer Irreparable Injury Absent Injunctive Relief.

"It is well settled that . . . the procession of an unwarranted arbitration poses the threat of irreparable injury to the party rightfully resisting arbitration." *Parfi Holding AB v. Mirror Image Internet, Inc.*, 842 A.2d 1245, 1259 (Del. Ch. 2004). This Court has found on numerous occasions that "a party facing the imminent prospect of arbitrating a non-arbitrable claim" is "threatened by sufficiently irreparable harm to justify an injunction." *City of Wilmington v. Wilmington FOP Lodge#1*, No. 20244-NC, 2004 WL 1488682, at *3 (Del. Ch. June 22, 2004) (quoting *Bd. of Educ. of Appoquinimink Sch. Dist. v. Appoquinimink Educ. Ass'n*, No. 16812, 1999 WL 826492, at *4 (Del. Ch. Oct. 6, 1999)) (internal quotation marks omitted).

Federal courts are in accord. *See, e.g., PaineWebber, Inc. v. Hartmann*, 921

15

F.2d 507, 515 (3d Cir. 1990) ("We think it obvious that the harm to a party would be *per se* irreparable if a court were to abdicate its responsibility to determine the scope of an arbitrator's jurisdiction and, instead, . . . compel the party, who has not agreed to do so, to submit to an arbitrator's . . . determination of his authority."), *overruled on other grounds by Howsam*, 537 U.S. at 85; *see also, e.g., Maryland Cas. Co. v. Realty Advisory Bd. on Labor Relations*, 107 F.3d 979, 985 (2d Cir. 1997) (finding that "time and resources [that the plaintiff] would expend in arbitration is not compensable by any monetary award of attorneys' fees or damages pursuant to the provisions of the [Arbitration] Agreement or the [Federal] Arbitration Act"); *UBS Sec. LLC v. Voegeli*, 684 F. Supp. 2d 351, 354 (S.D.N.Y. 2010), *aff'd,* 405 Fed. Appx. 550 (2d Cir. 2011) ("It is beyond dispute that irreparable harm would result if [a plaintiff] were compelled to arbitrate defendants' claims without having agreed to arbitration.").

Here, Plaintiff will clearly suffer irreparable injury in the absence of a preliminary injunction. Without an injunction, Plaintiff faces the untenable dilemma of either (1) incurring the burden and expense of defending Trump's RICO claims in the Arbitration, even though Plaintiff never agreed to arbitrate such claims, and thereby abandoning its rights to have such claims decided in a court of law, or (2) continuing to abstain from the Arbitration and risking that the claims will be adjudicated against Plaintiff *in absentia*. There is no remedy at law

16

that would fully compensate Plaintiff for such irreparable harm.

**D.     The Balance of Equities Favors Granting Preliminary Injunctive Relief.**

While Plaintiff would face irreparable harm without a preliminary

injunction, issuing a preliminary injunction would not impact Trump except to

cause some delay in the prosecution of its claims against Plaintiff in the

Arbitration.  On balance, these equities favor granting the preliminary injunction.

**POINT II**

**<u>PLAINTIFF IS ENTITLED TO EXPEDITED PROCEEDINGS.</u>**

"Delaware courts are always receptive to expediting any type of

litigation in the interests of affording justice to the parties." *Box v. Box*, 697 A.2d

395, 399 (Del. 1997).  Courts will expedite proceedings if a plaintiff "has

articulated a sufficiently colorable claim and shown a sufficient possibility of a

threatened irreparable injury." *Lonergan v. EPE Holdings, LLC*, 5 A.3d 1008,

1016 (Del. Ch. 2010) (citation and internal quotation marks omitted).

As demonstrated above, Plaintiff has established that it has at least a

colorable claim for preliminary and permanent injunctive relief with respect to

Trump's claims against Plaintiff in the Arbitration.  *See* Part I.A, above.  And,

Plaintiff also faces the threat of irreparable injury in the absence of injunctive

relief.  Thus, the requirements for the expediting of proceedings are satisfied here.

## CONCLUSION

Accordingly, for the reasons set forth above and in the Complaint, Plaintiff respectfully requests that the Court grant its motion for a preliminary injunction and its motion to expedite proceedings.

Dated:     Wilmington, Delaware
           January 17, 2018

VENABLE LLP

OF COUNSEL:

VENABLE LLP
Edward P. Boyle
Kevin J. White
Rockefeller Center
1270 Avenue of The Americas, 24th Floor
New York, New York 10020
Telephone: 212-307-5500
Facsimile: 212-307-5598
epboyle@venable.com
kjwhite@venable.com

  _/s/  Jamie L. Edmonson_
Jamie L. Edmonson (#4247)
Daniel A. O'Brien (#4897)
1201 North Market Street
Suite 1400
Wilmington, Delaware 19801
Telephone: 302-298-3535
Facsimile: 302-298-3550
jledmonson@venable.com
daobrien@venable.com

*Attorneys For Plaintiff Morgan & Morgan, P.A.*

Words: 4,119

**EFiled:  Jan 16 2018 05:17PM EST**
**Transaction ID 61573970**
**Case No. 2018-0031-**

## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| MORGAN & MORGAN, P.A., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) C.A. No. ____2018-0031____ |
| | ) |
| TRUMP PANAMA HOTEL | ) |
| MANAGEMENT LLC, and TRUMP | ) |
| INTERNATIONAL HOTELS | ) |
| MANAGEMENT, LLC, | ) |
| | ) |
| Defendants. | ) |

## VERIFIED COMPLAINT TO ENJOIN ARBITRATION

Plaintiff Morgan & Morgan, P.A. ("Plaintiff"), by and through its

undersigned counsel Venable LLP, as and for its complaint in this action against

Defendants Trump Panama Hotel Management LLC ("Trump Panama") and

Trump International Hotels Management, LLC ("Trump International", together

with Trump Panama, "Trump") alleges as follows:

## NATURE OF THIS ACTION

1.     Plaintiff is the largest law firm in Panama.  Plaintiff represents the

owner of a Latin American hotel in an arbitration against Trump.  The claims in

arbitration seek to remove Trump as hotel manager and to recover $15 million in

damages for Trump's mismanagement.  The arbitral tribunal has jurisdiction over

the hotel owner and Trump because of an arbitration clause in the operative hotel management agreement.

2.      Trump has responded with an irrational abuse of the arbitration process. Trump has asserted claims in the arbitration directly against Plaintiff, alleging that Plaintiff's representation of the owner in the effort to remove Trump as hotel manager amounts to criminal activity in violation of the civil Racketeering Influenced and Corrupt Organizations Act ("RICO"). These claims are frivolous.

3.      Equally frivolous is Trump's attempt to assert arbitral jurisdiction over Plaintiff. Plaintiff has never entered into any arbitration agreement with Trump, and Trump tacitly concedes as much. Trump's sole basis for attempting to bring Plaintiff into the arbitration is that Plaintiff, as the hotel owner's agent, is bound by the arbitration clause in the hotel management agreement. This absurd theory turns agency law on its head. A principal's arbitration agreement with a third party does not bind an unwilling agent to arbitrate disputes with that third party. Agency law allows agents to bind principals, not the other way around.

4.      Plaintiff has not participated in the arbitration as a party. Instead, Plaintiff has informed the arbitral institution that it is seeking judicial relief and will not participate as a party in the proceeding before a court has decided whether the forum has jurisdiction over Plaintiff.

2

5.     Accordingly, Plaintiff brings this action pursuant to § 5702(c) and § 5703(b) of the Delaware Uniform Arbitration Act, 10 *Del. C.* §§ 5701 *et seq.*, and applicable state and federal common law, to enjoin Trump from proceeding with its third-party claims against Plaintiff in arbitration.  Plaintiff also seeks a declaratory judgment that (i) no arbitration agreement exists between Plaintiff and Trump; and that (ii) Plaintiff is not bound to arbitrate with Trump any of the claims described herein.

## **PARTIES**

6.     Plaintiff Morgan & Morgan is a Panamanian law firm with its principal place of business located in Panama City, Republic of Panama.

7.     Defendant Trump Panama is a limited liability company organized and existing under the laws of Delaware, with its principal place of business located in New York, New York.  Trump Panama's registered agent is National Registered Agents, Inc., located at 160 Greentree Drive, Suite 101, Dover, Delaware 19904.

8.     Defendant Trump International is a limited liability company organized and existing under the laws of Delaware, with its principal place of business located in New York, New York.  Trump International's registered agent is National Registered Agents, Inc., located at 160 Greentree Drive, Suite 101, Dover, Delaware 19904.

## JURISDICTION

9.     The Court has subject matter jurisdiction over this matter pursuant to

10 *Del. C.* §§ 5702 and 5703, which grant the Court of Chancery jurisdiction over

arbitration-related disputes; pursuant to 10 *Del. C.* § 341, which grants the Court of

Chancery jurisdiction "to hear and determine all matters and causes in equity"; and

pursuant to 10 *Del. C.* § 6501, which grants the Court the "power to declare rights,

status and other legal relations" between parties.

10.     The Court has personal jurisdiction over Defendant Trump Panama

because it is organized under the laws of the State of Delaware. *See 6 Del. C.* §

18-105.

11.     This Court has personal jurisdiction over Defendant Trump

International because it is organized under the laws of the State of Delaware. *See 6*

*Del. C.* § 18-105.

## FACTS

### The Dispute Between Plaintiff's Client, Hotel TOC, Inc., and Defendants

12.     On April 13, 2011, non-party Hotel TOC, Inc. ("Hotel TOC") entered

into the Amended and Restated Hotel Management Agreement for Trump Ocean

Club International Hotel & Tower (the "Management Agreement") with Trump

Panama, as assignee of Trump International, for the operation and maintenance of

the Trump International Hotel & Tower Panama (formerly known as Trump Ocean

Club International Hotel & Tower) (the "Hotel").  A true and accurate copy of the

Management Agreement is attached as Exhibit A.  The Management Agreement

was later amended, but the provisions at issue in this action were not changed.

13.     The Hotel is located within a 70-story mixed-use building in Panama

City, Panama.  The Hotel consists of 369 units, each of which may be individually

owned, and 13 hotel amenities units.

14.     Hotel TOC is a Panamanian corporation, wholly owned by Hotel TOC

Foundation (the "Foundation"), an entity formed under the laws of Panama.  The

beneficiaries of the Foundation are the Hotel's unit owners.

15.     The Management Agreement provides for arbitration before the ICC

of all disputes between Hotel TOC and Trump arising out of, or relating to, the

Management Agreement.  *See* Management Agreement § 9.1.

16.     On October 14, 2017, Hotel TOC commenced the Arbitration against

Trump by filing a Request for Arbitration with the ICC.  A true and accurate copy

of the Request for Arbitration (without exhibits) is attached as Exhibit B.

17.     Hotel TOC's Request for Arbitration sets forth the allegations and

claims against Trump in the Arbitration.  The Request for Arbitration alleges that

Trump has mismanaged the Hotel, in breach of the Management Agreement.

Among other things, the Request for Arbitration seeks a damages award of $15

million and a declaration that Hotel TOC is entitled to terminate the Management

Agreement.

19. Plaintiff represents Hotel TOC as co-counsel in the Arbitration.

**Trump's Baseless Attempt to Join Plaintiff as a Party to the Arbitration**

19. On December 5, 2017, Trump filed in the Arbitration an Answer,

Counterclaims, Request for Joinder and Third-Party Claims (the "Third Party

Claims"). A true and accurate copy of the Third Party Claims (without exhibits) is

attached as Exhibit C.

20. Included in Trump's Third Party Claims are two third-party claims

against Plaintiff and others: a claim for purported violation of the civil RICO Act,

under 18 U.S.C. § 1962(c), and a claim asserting civil RICO conspiracy, under 18

U.S.C. § 1962(d). These claims are legally and factually absurd. The only alleged

bases for these purported RICO violations are that Plaintiff advised Hotel TOC as

legal counsel with respect to its decision to seek damages and declaratory relief in

the Arbitration and that Plaintiff advised some of the owners of units in the Hotel

regarding their purchase of units and their votes to remove and appoint directors

and officers of the Foundation and Hotel TOC. In effect, Trump is alleging that

providing legal advice to its adversaries in business disputes is a crime.

21. Trump's premise for haling Plaintiff into the arbitration as a party is

equally absurd. Plaintiff is not and has never been a party to the Management

Agreement. Nor is Plaintiff a party to any other agreement with Trump that contains an arbitration clause. Indeed, Trump does not claim that any arbitration agreement exists between Trump and Plaintiff.

22.     Trump's sole alleged basis for joining Plaintiff as a party in the Arbitration is the following, quoted from Trump's Third Party Claims:

> "Joinder of Third-Party Respondent Morgan & Morgan is also lawful and justified because Morgan & Morgan acted as an agent of Third-Party Respondents . . . , each of whom is bound to arbitrate in these proceedings. As set forth below, Morgan & Morgan . . . deliberately acted in furtherance of a conspiracy to tortiously interfere with Respondents' rights under the [Management Agreement] and . . . related agreements. As such, Morgan & Morgan is properly joined in these proceedings and the ICC has jurisdiction over same, because Morgan & Morgan is an agent of parties that are themselves bound to arbitrate in this proceeding."

Third Party Claims ¶ 57.

23.     Trump has not alleged that any other basis exists to require Plaintiff to submit to the jurisdiction of the ICC for purposes of Trump's RICO claims.

**Plaintiff's Refusal to Participate in the Arbitration**

24.     Plaintiff received service of the Third Party Claims on December 26, 2017. By letter dated January 2, 2018, the ICC stated that Plaintiff and the other putative third-party respondents must respond to the Third Party Claims by January 25, 2018. A true and correct copy of the ICC's January 2, 2018, letter to Plaintiff is attached as Exhibit D.

25.     Plaintiff has refused to participate in the Arbitration.  In a letter to the

ICC dated January 16, 2018, counsel for Plaintiff informed the ICC that it lacks

jurisdiction over Trump's claims against Plaintiff, that Plaintiff would seek judicial

relief as to whether the ICC has jurisdiction to hear Trump's claims against

Plaintiff, and that Plaintiff would not participate in the Arbitration as a party during

the pendency of the court proceeding.  A true and accurate copy of Plaintiff's letter

to the ICC is attached as Exhibit E.

26.     Plaintiff has brought no previous action for the relief requested herein.

27.     Plaintiff has not been served with an application by Defendants to

compel arbitration.

## COUNT I

### (Declaratory Judgment)

28.     Plaintiff repeats and realleges each of the foregoing allegations.

29.     Plaintiff is not a party to the Management Agreement between Hotel

TOC and Trump.  There is no arbitration agreement between Plaintiff and Trump.

30.     There exists an actual controversy between Plaintiff and Trump

because Trump has asserted a right to join Plaintiff as a third-party respondent in

the Arbitration for the purposes of asserting claims against Plaintiff.

31.     Plaintiff is entitled to a judgment declaring that (i) Plaintiff is not

subject to any agreement to arbitrate any dispute with Trump; and that (ii) Plaintiff

8

is not bound to arbitrate any of the claims that Trump has asserted against Plaintiff in the Arbitration.

## COUNT II

### (Injunctive Relief)

32.   Plaintiff repeats and realleges each of the foregoing allegations.

33.   Trump has attempted to add Plaintiff as a third-party respondent in the Arbitration.

34.   Plaintiff will be irreparably harmed if it is forced to arbitrate a dispute with Trump in the Arbitration because Plaintiff has never agreed to submit such claims to arbitration and is not bound to arbitrate.

35.   Plaintiff also requires preliminary injunctive relief to protect against harm that could flow before this Court enters a permanent injunction.  The claims against Plaintiff in the Arbitration are going to proceed without Plaintiff defending them, which threatens irreparable harm to Plaintiff.

36.   Plaintiff has no adequate remedy at law.

37.   Plaintiff is entitled to a preliminary and permanent injunction enjoining Trump from pursuing any claim against Plaintiff in the Arbitration.

## **PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiff respectfully requests that this Court enter:

(a)     a judgment declaring that no arbitration agreement exists between

Plaintiff and Trump;

(b)     a judgment declaring that Plaintiff is not bound to arbitrate with

Trump;

(c)     orders preliminarily and permanently enjoining Trump from

proceeding with its claims against Plaintiff in the Arbitration; and

(d)     an order granting such other and further relief as the Court deems just

and proper, together with the costs and disbursements of this action.

Dated:      Wilmington, Delaware
            January 16, 2018

                                        **VENABLE LLP**


OF COUNSEL:                        _/s/ Jamie L. Edmonson_
                                   Jamie L. Edmonson (#4247)
Edward P. Boyle                    Daniel A. O'Brien (#4897)
Kevin J. White                     1201 North Market Street
Rockefeller Center                 Suite 1400
1270 Avenue of The Americas, 24th Floor   Wilmington, Delaware 19801
New York, New York 10020           Telephone: 302-298-3535
Telephone: 212-307-5500            Facsimile: 302-298-3550
Facsimile: 212-307-5598            jledmonson@venable.com
epboyle@venable.com                daobrien@venable.com
kjwhite@venable.com

                                   *Attorneys For Plaintiff Morgan &*
                                   *Morgan, P.A.*

## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| MORGAN & MORGAN, P.A., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) C.A. No. _____ |
| | ) |
| TRUMP PANAMA HOTEL | ) **CONFIDENTIAL FILING** |
| MANAGEMENT LLC, and TRUMP | ) |
| INTERNATIONAL HOTELS | ) |
| MANAGEMENT, LLC, | ) |
| | ) |
| Defendants. | ) |

## EXHIBIT A TO VERIFIED COMPLAINT TO ENJOIN ARBITRATION (MANAGEMENT AGREEMENT)

**YOU ARE IN POSSESSION OF A CONFIDENTIAL FILING FROM THE CHANCERY COURT OF THE STATE OF DELAWARE IN AND FOR NEW CASTLE COUNTY.**

**If you are not authorized by Court order to view or retrieve this document read no further than this page.  You should contact the following persons:**

**VENABLE LLP**

*/s/ Daniel A. O'Brien*
Jamie L. Edmonson (No. 4247)
Daniel A. O'Brien (No. 4897)
1201 N. Market Street, Suite 1400
Wilmington, DE 19801
Tel.: 302.298.3535
Fax: 302.298.3550
jledmoson@venable.com
daobrien@Venable.com

**Pursuant to Rule 5.1(d)(2) a public version in not required to be filed.**

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.
THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

# Exhibit A

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

EXECUTION VERSION

**AMENDED AND RESTATED
HOTEL MANAGEMENT AGREEMENT**

**FOR**

**TRUMP OCEAN CLUB® INTERNATIONAL HOTEL & TOWER**

**AMONG**

**TRUMP PANAMA HOTEL MANAGEMENT LLC,**

**NEWLAND INTERNATIONAL PROPERTIES CORP.,**

**HOTEL TOC INC.**

**And**

**OWNERS MEETING OF THE P.H. TOC**

---

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

# TABLE OF CONTENTS

**Page**

1. APPROVAL OF CO-OWNERSHIP REGULATIONS; APPROVAL OF ASSIGNMENTS; HOSPITALITY SERVICES; RENTAL PROGRAM ....................... 21
   1.1 Approval of Co-Ownership Regulations. ............................................. 21
   1.2 Approval of Assignment by Promoter/Developer to Owner ..................... 21
   1.3 Approval by Owners Meeting ........................................................... 22
   1.4 Operator Hotel Services and Other Operator Services ......................... 22
   1.5 Rental Program ........................................................................... 22
   1.6 Management of P.H. TOC and Hotel Common Areas ......................... 24
   1.7 Third Party Operated Areas ........................................................... 24
   1.8 Trump Brand Standards ................................................................ 25

2. GENERAL MANAGEMENT AND OPERATIONS ....................................... 25
   2.1 General Management Services ........................................................ 25
   2.2 Authority and Duty of Operator ...................................................... 26
   2.3 Annual Plan ................................................................................ 30
   2.4 Maintenance and Repair of Hotel .................................................... 37
   2.5 Books and Records; Financial Statements ........................................ 39
   2.6 Personnel .................................................................................... 40
   2.7 Centralized Services ..................................................................... 45
   2.8 Complimentary Rooms .................................................................. 46
   2.9 Limitations on Operator's Authority ................................................ 46
   2.10 Limitation on Operator's Duty ........................................................ 48
   2.11 Head Office Support ..................................................................... 49
   2.12 Food and Beverage ....................................................................... 49

3. MANAGEMENT FEE AND REIMBURSABLE EXPENSES ........................... 50
   3.1 Management Fee ........................................................................... 50
   3.2 Reimbursement of Expenses ........................................................... 52
   3.3 Interest ....................................................................................... 53
   3.4 Taxes ......................................................................................... 53
   3.5 Payment of Fees and Expenses ....................................................... 53

4. HOTEL ACCOUNTS .............................................................................. 54
   4.1 Operating Account ........................................................................ 54
   4.2 Capital Reserve Funds ................................................................... 56
   4.3 Hotel Asset Management Fee Account .............................................. 57
   4.4 Working Capital Reserve Account ................................................... 57
   4.5 Requests for Additional Funds from Hotel Unit Owners and Withdrawals from Hotel Asset Management Fee Account ....................................... 59
   4.6 Disbursement of Funds to Hotel Unit Owners and Hotel Amenities Units Owner ........................................................................................ 60
   4.7 Place and Means of Payment .......................................................... 61

5. TERM AND TERMINATION .................................................................... 62

i

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

## TABLE OF CONTENTS
### (CONTINUED)

Page

| | | |
|---|---|---|
| 5.1 | Term of Agreement | 62 |
| 5.2 | Default | 62 |
| 5.3 | Performance Test and Performance Termination | 64 |
| 5.4 | Wrongful Termination | 66 |
| 5.5 | Survival of Obligations After Termination | 66 |
| 5.6 | Actions To Be Taken on Termination | 66 |
| 5.7 | Deferral of Termination | 71 |
| **6.** | **INSURANCE** | **71** |
| 6.1 | Maintenance of Insurance Coverage | 71 |
| 6.2 | Parties Insured and Amounts of Coverage | 71 |
| 6.3 | Evidence of Insurance | 71 |
| 6.4 | Review of Insurance | 72 |
| 6.5 | Maintenance of Insurance Records | 72 |
| **7.** | **ASSIGNMENTS; MORTGAGES** | **72** |
| 7.1 | Assignment by Operator | 72 |
| 7.2 | Assignment by Promoter/Developer, Owner, Hotel Amenities Units Owner or Owners Meeting | 73 |
| 7.3 | Effect of Permitted Assignments | 75 |
| 7.4 | Mortgages. | 75 |
| **8.** | **DESTRUCTION; TAKING** | **77** |
| 8.1 | Partial Destruction | 77 |
| 8.2 | Total Destruction | 78 |
| 8.3 | Taking | 78 |
| 8.4 | Taking for Temporary Use | 79 |
| 8.5 | Reinstatement | 79 |
| **9.** | **DISPUTES** | **80** |
| 9.1 | Arbitration | 80 |
| 9.2 | Dispute Subject to Resolution by Expert | 82 |
| 9.3 | Survival and Severance | 83 |
| **10.** | **NAME OF HOTEL; LICENSE AGREEMENT AND TRUMP MARK** | **83** |
| 10.1 | Name of Hotel | 83 |
| 10.2 | License Agreement and Trump Mark | 83 |
| 10.3 | Proprietary Materials | 83 |
| 10.4 | Use of Trump Mark by Hotel Unit Owners and Hotel Amenities Units Owner | 85 |
| **11.** | **INDEMNIFICATION** | **85** |
| 11.1 | Owner's, Hotel Amenities Units Owner's, Owners Meeting and Promoter/Developer's Indemnification of Operator | 85 |

ii

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

## TABLE OF CONTENTS
## (CONTINUED)

Page

|  |  |  |  |
|---|---|---|---|
| | 11.2 | Operator's Indemnification of Owner, Owners Meeting, Hotel Amenities Units owner, Asset Manager and Promoter/Developer | 86 |
| | 11.3 | Survival; Claims Covered by Insurance | 86 |
| 12. | | MISCELLANEOUS | 86 |
| | 12.1 | Consents | 86 |
| | 12.2 | Use of Affiliates by Operator | 86 |
| | 12.3 | Governing Law | 87 |
| | 12.4 | Jurisdiction | 87 |
| | 12.5 | Waivers, Modifications, Remedies | 88 |
| | 12.6 | Interpretation/Severability | 88 |
| | 12.7 | Notices | 88 |
| | 12.8 | Successors and Assigns | 91 |
| | 12.9 | Purchasing | 91 |
| | 12.10 | Freedom of Action | 92 |
| | 12.11 | Entire Agreement | 92 |
| | 12.12 | Counterparts | 92 |
| | 12.13 | Relationship of the Parties; Nature of Agreement | 92 |
| | 12.14 | Confidentiality | 92 |
| | 12.15 | No Third Party Beneficiaries | 93 |
| | 12.16 | Time of the Essence | 93 |
| | 12.17 | Representations and Warranties of Parties | 93 |
| | 12.18 | Survival of Miscellaneous Provisions | 93 |
| | 12.19 | Taxes | 93 |
| 13. | | EXCLUSIVITY. | 94 |

| | |
|---|---|
| EXHIBIT A – | Hotel Unit Maintenance Agreement |
| EXHIBIT B – | Hotel Amenities Units Maintenance Agreement |
| EXHIBIT C – | Hotel Unit Rental Agreement |
| EXHIBIT D – | Condominium Management Agreement |
| EXHIBIT E – | Description of Punta Pacifica and Outer Region |
| EXHIBIT F – | Current Centralized Services |

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

7404892v25

## AMENDED AND RESTATED
## HOTEL MANAGEMENT AGREEMENT

**THIS AMENDED AND RESTATED HOTEL MANAGEMENT AGREEMENT** (this "**Agreement**") is made and entered into as of April 13, 2011 (the "**Effective Date**"), by and among **NEWLAND INTERNATIONAL PROPERTIES CORP.**, a Panamanian corporation, in its capacity as promoter and developer of the P.H. TOC (as defined in Recital A) ("**Promoter/Developer**") and in its capacity as owner of the Hotel Amenities Units (as defined in Recital A) ("**Hotel Amenities Units Owner**"), **OCEAN POINT DEVELOPMENT CORP.**, a Panamanian corporation ("**Hotel Asset Manager**"), **TRUMP PANAMA HOTEL MANAGEMENT LLC**, a Delaware limited liability company, as assignee of **TRUMP INTERNATIONAL HOTELS MANAGEMENT, LLC**, a Delaware limited liability company (together with its permitted successors and assigns, "**Operator**"), **HOTEL TOC INC.**, a Panamanian corporation ("**Owner**"), and Owners Meeting of the P.H. TOC, as defined in Recital B below (the "**Owners Meeting**"). Promoter/Developer, Hotel Asset Manager, Operator, Owner and Owners Meeting are sometimes referred to collectively in this Agreement as the "**Parties**" and individually as a "**Party**."

### RECITALS

A. . Promoter/Developer has registered with the Property Section, Panama Province, of the Public Registry, the Co-Ownership Regulations (the "**Co-Ownership Regulations**") of that certain Horizontal Property Regime known as the P.H. TOC (the "**P.H. TOC**"), established over that certain real property two hundred and thirty four thousand two hundred and forty (234240), registered in Document six hundred and seven thousand eight hundred and seventy (607870), location Code eight seven zero eight (8708) of the Property Section, Panama Province, of the Public Registry, in accordance with the Legal Provisions of Law thirty one (31) of June eighteenth (18), two thousand and ten (2010) and other pertinent legal provisions, (hereinafter the "**P.H. Law**"), improved and consisting of a 70 story building (the "**Building**") subdivided into casino units ("**Casino Units**"), commercial units ("**Commercial Units**"), hotel units ("**Hotel Units**"), a hotel administrative unit ("**Hotel Administrative Unit**"), hotel amenities units ("**Hotel Amenities Units**"), office units ("**Office Units**") and residential units ("**Residential Units**" and, collectively with the Casino Units, Commercial Units, Hotel Units, Hotel Administrative Unit, Hotel Amenities Units and Office Units, the "**Units**")), all as more particularly described in the Co-Ownership Regulations;

B. Pursuant to the Co-Ownership Regulations, an Owners Meeting, consisting of all owners of Units in the P.H. TOC, has been established as the supreme body of the P.H. TOC;

C. Owner has been established as an entity owned by the HOTEL TOC FOUNDATION, a private interest foundation formed under the laws of Panama (the "**Foundation**"), the beneficiaries of which are all of the owners of the Hotel Units ("**Hotel Unit Owners**"), for the purpose of collectively exercising the rights and performing the obligations of the Hotel Unit Owners in connection with the operation of the Hotel, and performing the operating, management and maintenance services required for the Hotel, subject to the supervision and direction of the Operator;

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

D.      Hotel Asset Manager has entered into a hotel asset management agreement with Owner, dated of even date herewith (the "**Hotel Asset Management Agreement**"), pursuant to which Hotel Asset Manager has agreed to provide certain services to Owner as described therein, and Owner has agreed, on behalf of the Hotel Unit Owners, to pay a hotel asset management fee (the "**Hotel Asset Management Fee**") to Hotel Asset Manager, which shall be deposited into a hotel asset management fee account (the "**Hotel Asset Management Fee Account**") subject to the terms of this Agreement;

E.      Promoter/Developer, as owner of the Hotel Amenities Units, has entered into a lease agreement, dated of even date herewith (the "**Hotel Amenities Units Lease**"), with Owner, pursuant to which Promoter/Developer has leased all of the Hotel Amenities Units to Owner, and Owner has agreed to be responsible for all costs and expenses of operation of the Hotel Amenities Units;

F.      Pursuant to the terms of the License Agreement, dated as of March 16, 2006 between Trump Marks Panama, LLC, a Delaware limited liability company, successor by assignment to Donald J. Trump, as licensor ("**Licensor**"), and Promoter/Developer's predecessor, as licensee, as amended from time to time thereafter (the "**Promoter/Developer License Agreement**"), Promoter/Developer has received a license to use the Trump Mark in connection with the sale of Units in the Building;

G.      Pursuant to the terms of the License Agreement, dated of even date herewith, among Trump Marks Panama LLC, a Delaware limited liability company ("**Licensor**"), Owners Meeting and Owner (the "**Owner License Agreement**"), Licensor has granted a license to Owner and Owners Meeting to identify the Building as the Trump Ocean Club® International Hotel & Tower, subject to the terms and conditions of the Owner License Agreement;

H.      Pursuant to the terms of the P.H. TOC Management Agreement, dated of even date herewith, (the "**Condominium Management Agreement**") between Owners Meeting and Trump Panama Condominium Management LLC, a Delaware limited liability company ("**Condominium Manager**"), Owners Meeting has engaged the Condominium Manager to manage the Common Areas of the Building and the Components  and to administer the affairs of Owners Meeting, the Board of Directors, the Committees and the Boards of Coordinators of each Component (as such terms are defined in the Co-Ownership Regulations);

I.      Pursuant to the terms of the Pre-Opening Services Agreement, dated as of even date herewith (the "**Pre-Opening Agreement**") between Promoter/Developer, Hotel Asset Manager and Operator, Operator has been engaged by Promoter/Developer to perform certain pre-opening services as more specifically set forth therein;

J.      Pursuant to the terms of the Hotel Management Agreement ("**Hotel Management Agreement**"), dated as of August 11, 2008, by and between Promoter/Developer and Operator, Operator agreed to operate the Hotel Units and Hotel Amenities Units as a first class, luxury hotel ("**Hotel**") and to provide additional services, including management of the Building and administration of the condominium association for the Building in accordance with the terms and conditions set forth in the Hotel Management Agreement, and the Promoter/Developer and Operator agreed to prepare and agree upon the additional condominium documents and

2

7404892v25

agreements necessary to establish the rights and obligations of the entities and parties that would own and operate the Hotel and the Building; and

K.      Operator and Promoter/Developer have now agreed upon the Co-Ownership Regulations and the other forms of condominium documents and agreements that will be entered into with respect to the ownership and operation of the Hotel and the Building, and they now desire to amend and restate this Agreement to be consistent with the terms of the Co-Ownership Regulations and the other condominium documents and agreements.      In addition, Promoter/Developer now desires to assign certain of its rights and obligations under the Hotel Management Agreement with respect to the operation of the Hotel to Owner, and Operator desires to assign certain of its rights and obligations under the Hotel Management Agreement with respect to the management and administration of the P.H. TOC to Condominium Manager. In addition, the Parties desire to amend and restate the Hotel Management Agreement in its entirety as set forth herein to establish the rights and obligations of each of the Parties hereunder with respect to the operation and management of the Hotel and the provision of services by Operator to other Units, in a manner consistent with the Co-Ownership Regulations.

NOW, THEREFORE, in consideration of the premises and the mutual promises set forth herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

## AGREEMENTS

## DEFINITIONS

### Key Definitions

The following terms shall have the meanings set forth below:

Affiliate – any entity which controls, is controlled by or is under common control with Operator or Owner, as the context may require. For such purposes, "**control**" shall refer to the direct or indirect (i) ownership of a majority of voting shares or interests in an entity or (ii) in the absence of such majority ownership, other effective control over the decision-making process of an entity. In addition, no entity shall be deemed an Affiliate of Promoter/Developer unless both one or more of (i) Roger Khafif (having an address at c/o P.O. Box 2017, Colon Free Zone, Colon, Republic of Panama), (ii) Carlos Alberto Serna Londoño (having an address at Gerente General, Espacios Urbanos, Consultores Inmobiliarios, Carrera 13 No. 82-74, Piso 3, Oficina - Espacios Urbanos, Bogotá, Republic of Colombia, South America), and (iii) Eduardo Saravia Calderón (having an address at Avenida Calle 82 # 7-80, Bogotá, Colombia, South America) (collectively, the "**Principals**"), or an entity controlled by any of the Principals, controls the day to day operations of such entity and participates in all major decisions of such entity, and such individuals have ultimate ownership of at least 51% of the beneficial interests in such entity. Notwithstanding the foregoing, an Affiliate of Operator shall be deemed to include any entity of which Donald J. Trump (and/or an entity or entities) established by Donald J. Trump for estate planning purposes of which Donald J. Trump and/or his spouse and/or the lineal descendants of his parents (including adopted descendants) own a majority of voting shares or interests therein)

3

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

owns a majority of voting shares or interests or, in the absence of majority ownership, has effective control over the decision-making process.

Annual Plan – as defined in **Section 2.3.1**.

Annual Report – as defined in **Section 2.5.5**.

Approval – as defined in **Section 12.1**.

arbitrator – as defined in **Section 9.1.1**.

Assessments – amounts charged to owners of Units for expenses of the Common Areas in accordance with the terms of the Co-Ownership Regulations.

Available Participating Unit – Participating Units that are, at the time in question, available for rent.

Base Fee – shall mean the Base Fee/Hotel together with the Base Fee/Hotel Amenities Units.

Base Fee/Hotel – as defined in **Section 3.1.1(a)**.

Base Fee/Hotel Amenities Units – as defined in **Section 3.1.1(c)**.

Base Fee Percentage – as defined in **Section 3.1.1**.

Beach Club – shall mean that certain beach club constructed by Beach Club Owner on Isla Viveros, Panama.

Beach Club Opening Date – as defined in **Section 4.6.2**.

Beach Club Owner – shall mean Ocean Club Pearl Island Corp., a Panamanian corporation.

Beach Club Standards – shall mean a first class, luxury standard consistent with the nature of the Building and the standards applicable thereto under the Owner License Agreement and this Agreement and such other standards that Hotel Operator (or its Affiliates) and Beach Club Owner shall mutually agree to in writing.

Benefit Programs – as defined in **Section 2.6.8(b)**.

Bidders – as defined in **Section 2.4.2**.

Branded Operator – as defined in **Section 5.3.6**.

Breach – as defined in **Section 1.5.3**.

Capital Budget – as defined in **Section 2.3.1(b)**.

4

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

7404892v25

Capital Expense – any item of expense pertaining to the Hotel that, according to GAAP, is not properly deducted as a current expense on the books of the Hotel, but rather should be capitalized.

Capital Improvement – an item of any nature incorporated into the Hotel, the cost of which is a Capital Expense.

Capital Reserve Funds – shall mean the capital reserve funds of the Hotel established to provide funds for Capital Expenses, including replacements of FF&E and periodic repair and refurbishment of the Hotel Units and Hotel Amenities Units, in accordance with **Section 4.2**. Capital reserves for replacements of FF&E in the Hotel Common Area and periodic repair and refurbishment of Hotel Common Area will be included within the Assessments charged to Hotel Unit Owners and to Owner, as lessee of the Hotel Amenities Units.

Casino Units – as defined in Recital A.

Centralized Charges – as defined in **Section 2.7.1**.

Centralized Services – as defined in **Section 2.7.1**.

Claims – any and all claims, actions, causes of action, suits, penalties, orders, demands, liens, litigation, liabilities, or judgments, and all losses, costs, damages, and expenses arising in connection with or as a result of the foregoing, of every kind and nature, whether based on tort, contract, strict liability, statute, or other legal or equitable theory of liability.

Commercial Units – as defined in Recital A.

Common Areas - the common areas of the Building and the Components, all as more particularly described in the Co-Ownership Regulations.

Comparable Trump Brand Hotels – those Trump Brand Hotels the parties determine are comparable to the Hotel. As of the date of this Agreement Trump International Chicago and Trump International Las Vegas are the Comparable Trump Brand Hotels. All determinations as to which hotels/condo-hotels are to be included in the Comparable Trump Brand Hotels from time to time shall be made by the mutual written agreement of Owner and Operator or, if the parties are unable to reach agreement, as determined by PriceWaterhouseCoopers or another recognized hospitality industry authority mutually acceptable to Owner and Operator.

Competitive Hotel Set – as of the Effective Date of this Agreement, the Hotel, the Marriott, Intercontinental, the Bristol Hotel, and the Radisson Hotel located in Panama City, Panama; provided, however, that: (i) if one of the hotels in the Competitive Hotel Set fails to report its data or would no longer be appropriate to include in the Competitive Hotel Set, that hotel shall be replaced in the Competitive Hotel Set by the El Panama hotel; (ii) if, in the future, any one or more hotels/condo-hotels branded as Four Seasons, Ritz Carlton, or Mandarin Oriental commences operation within the areas known as **"Punta Pacifica"** and **"Outer Region"**, as shown on the map attached hereto as **Exhibit E**, and if at the time of determination such hotel shall have substantially the same number of Available Participating Units as the Hotel, and shall compete for substantially similar price and market segments as the Available

5

Participating Units and which are the most comparable to the Hotel in location and quality of facilities, finishes and services (with due consideration given to hotel age, frequency of FF&E renovation or replacement, size and configuration of rooms and public space, recreational and other amenities, technology systems and similar differentiating characteristics), such hotel shall replace one or more of the original hotels in the Competitive Hotel Set. All determinations as to which hotels/condo-hotels are to be included in the Competitive Hotel Set from time to time shall be made by the mutual written agreement of Owner and Operator or, if the parties are unable to reach agreement, as determined by PriceWaterhouseCoopers or another recognized hospitality industry authority mutually acceptable to Owner and Operator.

Competitor – any Person that is engaged, or is an Affiliate of a Person engaged in the business of operating, licensing (as licensor) or franchising a hotel brand or lodging system with a minimum of four (4) hotels with at least two hundred (200) guest rooms.

Complimentary Services – as defined in **Section 2.8**.

Components – each of the use areas of the P.H. TOC, consisting of the Casino Component, the Commercial Component, the Hotel Component, the Office Component and the Residential Component, as more particularly described in the Co-Ownership Regulations.

Condominium Management Agreement – as defined in Recital H.

Condominium Manager– as defined in Recital H.

Co-Ownership Regulations - as defined in Recital A.

Cure Right – as defined in **Section 5.3.3**.

Cure Right Limitation – as defined in **Section 5.3.3**.

Current Centralized Services – as defined in **Section 2.7.1**.

Debt Reduction – as defined in **Section 8.1**.

Dispute – as defined in **Section 9.1**.

Equity Owners – respecting any Person that is not a natural person, the Persons holding all Ownership Interests in such other Person.

Event of Default – any of the events so defined in **Section 5.2.1**.

Expert – as defined in **Section 9.2.2**.

Extraordinary Assessments – as defined in the Co-Ownership Regulations.

FF&E– items of furniture, fixtures and equipment, and replacement thereof, used in the ordinary course of operating the Hotel, including FF&E for the Hotel Common Areas, Hotel Units and Hotel Amenities Units, the cost of which is a Capital Expense.

6

*Fiscal Year* – each calendar year; provided that, for the purposes of this Agreement, (i) any period of fewer than 365 days between the Opening Date and the next December 31 shall be included as part of the first Fiscal Year or shall constitute a separate first Fiscal Year, as Operator may determine, (ii) any period of fewer than 365 days beginning on January 1 and ending on the date of termination either shall be included as part of the last Fiscal Year or shall constitute a separate last Fiscal Year, as Operator may determine, and (iii) **"full Fiscal Year"** means a full calendar year (plus any stub period, if applicable).

*Force Majeure – Acts of Humans* – strikes, lockouts or other labor dispute, shortage of labor or materials, fire or other casualty, taking, civil commotion, riot, mob violence, insurrection, malicious mischief, sabotage, rebellion, act of public enemy, invasion, embargo, governmental preemption in the case of national emergency, suspension of governmental operations or other event beyond the reasonable control of the party claiming the benefit of the event, including acts of declared or undeclared war and acts of terrorism.

*Force Majeure –Fortuitous Case* – any act of God, earthquake, hurricane, flood, fire or other casualty or other event beyond the reasonable control of the party claiming the benefit of the event.

*Force Majeure* – either (i) Force Majeure – Acts of Humans, or (ii) Force Majeure – Fortuitous Case, as applicable.

*Funds Request* – as defined in **Section 4.5.1**.

*GAAP* – those generally accepted accounting principles, conventions, rules, procedures, and practices, consistently applied, affecting all aspects of recording and reporting financial transactions which are generally accepted and applied to the hospitality industry by major international independent accounting firms, which, in the Republic of Panama is the Financial Accounting Standards, or any successor standard.

*General Manager* – the general manager of the Hotel.

*GOP Test* – as defined in **Section 5.3.1(a)**.

*Gross Operating Profit* – shall mean the Gross Operating Profit/Hotel and Gross Operating Profit/Hotel Amenities Units, as applicable.

*Gross Operating Profit/Hotel* – with respect to any period, the amount by which Gross Operating Revenue/Hotel for such period exceeds Operating Expenses/Hotel for such period.

*Gross Operating Profit/Hotel Amenities Units* – with respect to any period, the amount by which Gross Operating Revenue/Hotel Amenities Units for such period exceeds Operating Expenses/Hotel Amenities Units for such period.

*Gross Operating Revenue* – shall mean Gross Operating Revenue/Hotel together with Gross Operating Revenue/Hotel Amenities Units.

7

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

Gross Operating Revenue/Hotel – with respect to any period, all revenue and income of any kind derived directly or indirectly from: (i) rental of each Hotel Unit, (ii) operations of the in room features (other than food and beverage operations) of each Hotel Unit such as high speed internet, telephone, television and movie services, and properly attributable to the period under consideration determined in accordance with GAAP, prior to distribution of any amounts to the applicable Hotel Unit Owner, (iii) Operator Hotel Services provided to Hotel Unit Owners and guests of Hotel Units (other than revenues from food and beverage services provided to Hotel Unit Owners and guests of Hotel Units) and (iii) Other Operator Services provided to owners and permitted occupants of other Units (other than revenues from food and beverage services provided to owners and permitted occupants of other Units); but expressly excluding the following:

(a)      applicable excise, sales, occupancy and use taxes, or similar government taxes, duties, levies or charges collected directly from patrons or guests, or as a part of the sales price of any goods, services, or displays;

(b)      receipts from the financing, sale or other disposition of capital assets not in the ordinary course of the Hotel's operations;

(c)      receipts from awards or sales in connection with any Taking, from other transfers in lieu of and under the threat of any Taking, and other receipts in connection with any Taking to the extent that such amounts are specifically identified as compensation for alterations or physical damage to the Hotel (excepting awards representing compensation for loss of Gross Operating Revenues/Hotel);

(d)      proceeds of any insurance (excepting use and occupancy and business interruption insurance or other insurance proceeds representing compensation for loss of Gross Operating Revenue/Hotel);

(e)      recoveries in legal actions for tortious conduct (other than the portion of such awards or receipts representing compensation for loss of Gross Operating Revenue/Hotel);

(f)      rebates, discounts, or credits of a similar nature (not including charge or credit card discounts, which shall not constitute a deduction from revenues in determining Gross Operating Revenue/Hotel, but shall constitute an Operating Expense/Hotel);

(g)      Assessments paid with respect to the Hotel Units.

Gross Operating Revenue/Hotel Amenities Units – with respect to any period, all revenue and income of any kind derived directly or indirectly from operations of the Hotel Amenities Units and properly attributable to the period under consideration determined in accordance with GAAP, expressly including (x) rentals (including percentage rental) or other payments from any licensees, lessees, operators or concessionaires of space in the Hotel Amenities Units, and expressly excluding gross revenue and income from such licensees, lessees, operators, managers or concessionaires of any Hotel Amenities Units (y) all payments made by Residential Unit Owners, Hotel Unit Owners, Hotel Amenities Unit Owner, Hotel Guests and other occupants of any Residential Unit or Hotel Unit for Operator Hotel Services for food and beverage service and

8

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

other services provided through the operation of the Hotel Amenities Units; and (z) all revenues received from the rental of all Hotel Amenities Units; but expressly excluding the following:

(a)    applicable excise, sales, occupancy and use taxes, or similar government taxes, duties, levies or charges collected directly from patrons or guests, or as a part of the sales price of any goods, services, or displays, including gross receipts, admission, cabaret, or similar or equivalent taxes;

(b)    receipts from the financing, sale or other disposition of capital assets not in the ordinary course of operations;

(c)    receipts from awards or sales in connection with any Taking, from other transfers in lieu of and under the threat of any Taking, and other receipts in connection with any Taking to the extent that such amounts are specifically identified as compensation for alterations or physical damage to the Hotel (excepting awards representing compensation for loss of Gross Operating Revenues/Hotel Amenities Units);

(d)    proceeds of any insurance (excepting use and occupancy and business interruption insurance or other insurance proceeds representing compensation for loss of Gross Operating Revenue/Hotel Amenities Units);

(e)    recoveries in legal actions for tortious conduct (other than the portion of such awards or receipts representing compensation for loss of Gross Operating Revenue/Hotel Amenities Units);

(f)    rebates, discounts, or credits of a similar nature (not including charge or credit card discounts, which shall not constitute a deduction from revenues in determining Gross Operating Revenue/Hotel Amenities Units, but shall constitute an Operating Expense/Hotel Amenities Units); and

(g)    Assessments paid with respect to Hotel Amenities Units.

Head Office Personnel – any member of Operator's head office personnel or regional office personnel having an office address at Operator's headquarters or satellite offices.

Hotel – the Hotel Units, Hotel Administrative Unit, Hotel Amenities Units and Hotel Common Areas comprising the Hotel Component and the operating business conducted within the Hotel Component.

Hotel Accounts – as defined in **Section 4.1.1**.

Hotel Accounts Pledge Agreement -- as defined in **Section 4.1.3**.

Hotel Administrative Unit – the Unit owned by the Condominium Manager, as more particularly described in the Co-Ownership Regulations and the Condominium Management Agreement.

Hotel Amenities Accounts Pledge Agreement -- as defined in **Section 4.1.3**.

9

Hotel Amenities Units – the hotel restaurants, main kitchen, swimming pools, swimming pool bar, lobby bar, and spaces for banquets, meetings, events and conventions, as more particularly described in the Co-Ownership Regulations.

Hotel Amenities Units Lease – the lease of the Hotel Amenities Units by Promoter/Developer, as lessor, to Owner, as lessee, or any subsequent lease of the Hotel Amenities Units.

Hotel Amenities Units Maintenance Agreement – as defined in **Section 1.4.1**.

Hotel Amenities Units Maintenance Budget – as defined in **Section 2.3.1(e)**.

Hotel Amenities Units Owner –the owner of the Hotel Amenities Units.

Hotel Asset Manager – as defined in the Introductory Paragraph.

Hotel Asset Management Agreement – as defined in **Recital D**.

Hotel Asset Management Fee – as defined in **Recital D**.

Hotel Asset Management Fee Account – as defined in **Section 4.3**.

Hotel Asset Management Fee Reserve Period – shall mean that period of time commencing on the Opening Date and expiring on the third (3rd) anniversary of the Opening Date, or such later date that all of the following conditions are met: (i) Promoter/Developer is current in payment of all Assessments owed for Units owned by Promoter/Developer, (ii) Promoter/Developer has complied with all of its then-current payment obligations under the Promoter/Developer Agreements, and (iii) the Beach Club has been completed and opened for use by Unit owners and guests of the Building in each case in accordance with the Beach Club Standards.

Hotel Common Areas – the Common Areas of the Hotel Component, as more particularly described in the Co-Ownership Regulations.

Hotel Component –the Hotel Units, the Hotel Amenities Units, the Hotel Administrative Unit and the Hotel Common Areas, as more particularly described in the Co-Ownership Regulations.

Hotel Executive Staff – the General Manager, the comptroller or chief financial officer and the director of sales and marketing of the Hotel.

Hotel Guest – any paying guest of a Hotel Unit.

Hotel Personnel – all individuals employed to perform services for the Hotel (including, without limitation, the Hotel Executive Staff), but not including any Head Office Personnel who may periodically perform services for the Hotel.

Hotel Staff – all Hotel Personnel other than Head Office Personnel.

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

7404892v25

<u>Hotel Units</u> – as defined in Recital A.

<u>Hotel Unit Maintenance Agreement</u> – as defined in **Section 1.4.1**.

<u>Hotel Unit Maintenance Budget</u> – as defined in **Section 2.3.1(d)**.

<u>Hotel Unit Owners</u> – the owners of the Hotel Units.

<u>House Rules</u> – the regulations for use of the Units and the Common Areas, as referred to in the Co-Ownership Regulations and as may be amended from time to time in accordance with the procedures set forth in the Co-Ownership Regulations.

<u>Incentive Fee</u> – shall mean the Incentive Fee/Hotel together with the Incentive Fee/Hotel Amenities Units.

<u>Incentive Fee/Hotel</u> – as defined in **Section 3.1.1(b)**.

<u>Incentive Fee/Hotel Amenities Units</u> – as defined in **Section 3.1.1(d)**.

<u>Incentive Income/Hotel</u> – For each Hotel Unit, Gross Operating Profit/Hotel less (i) insurance premiums for insurance obtained by or on behalf of Operator or Owner pursuant to **Article 6** in connection with the Hotel, as reasonably determined and prorated by Operator to each Hotel Unit and the Hotel Common Areas; (ii) real property taxes, if any, and ad valorem taxes in connection with the Hotel; and (iii) contributions to the Capital Reserve Funds pursuant to **Section 4.2** in connection with the Hotel.

<u>Incentive Income/Hotel Amenities Units</u> – Gross Operating Profit/Hotel Amenities Units less (i) insurance premiums for insurance obtained by or on behalf of Operator or Owner pursuant to Article 6 in connection with the Hotel Amenities Units; (ii) real property taxes, if any, and ad valorem taxes in connection with the Hotel Amenities Units; and (iii) contributions to the Capital Reserve Funds pursuant to **Section 4.2** in connection with the Hotel Amenities Units.

<u>Initial Term</u> – as defined in **Section 5.1.1**.

<u>Index</u> – the Consumer Price Index for All Urban Consumers (Base 1982-1984=100) published by U.S. Bureau of Labor Statistics for the entire United States or, if that index is no longer published, the index published by the former publisher of that consumer price index in substitution for that consumer price index or, in the absence of any such substituted index, the available replacement index which is most reliably reflective of changes in the prices of consumer goods in the market of the Hotel, as reasonably designated by Operator.

<u>Labor Contracts</u> – as defined in **Section 2.6.9**.

<u>Legal Requirements</u> – all laws, statutes, ordinances, rules, regulations, permits, licenses, authorizations, directions, and requirements of all governments and governmental authorities, that now or hereafter may be applicable to the Hotel including, if same affects other portions of

11

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

the Project and the operation thereof, including those relating to employees, zoning, building, life/safety, health and environmental matters, and accessibility of public facilities.

License Fee – as defined in the Promoter/Developer License Agreement.

Licensor – as defined in **Recital G**.

Maintenance Work – as defined in **Section 2.4.2**.

Management Fee/Hotel – the Base Fee/Hotel and Incentive Fee/Hotel.

Management Fee/Hotel Amenities Units – the Base Fee/Hotel Amenities Units and Incentive Fee/Hotel Amenities Units.

Management Fees – as defined in **Section 3.1.1**.

Mandatory Cost Cap – as defined in **Section 8.1**.

Marketing Plan – as defined in **Section 2.3.1(c)**.

Minimum Base Fee – as defined in **Section 3.1.5**.

Minimum Base Fee Calculation – as defined in **Section 3.1.5**.

Mortgage – any mortgage, deed of trust, ground lease, security agreement, or similar document or instrument encumbering all or any part of Owner's, Promoter/Developer's, Hotel Amenities Units Owner or Owners Meeting's interests in the Building or any portion of the Hotel Component, together with all promissory notes, loan agreements or other documents relating thereto; but specifically excluding any mortgage or deed of trust or similar encumbrance on any individual Unit owned by any Unit owner other than Promoter/Developer or Hotel Amenities Units Owner or any of their Affiliates (other than the Hotel Unit purchased by an Affiliate for personal use, such as the Hotel Unit purchased by Roger Khafif for his personal use).

Mortgagee – any holder of a Mortgage.

Non-Branded Operator – as defined in **Section 5.3.6**.

Non-Hotel Services – as defined in **Section 2.6.2**.

Office Units – as defined in Recital A.

OS&E – operating supplies and equipment.

Opening Date – shall mean that date reasonably determined by Operator and Owner after substantial completion of the Building and the Hotel, which in no event shall be earlier than the date after (a) the following areas of the Hotel are complete, fully functional, not subject to material interference from construction and opened for public guest occupancy so as to enable Operator to operate the Hotel consistent with the Operating Standard: (i) at least seventy five

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

percent (75%) of the Hotel Units, (ii) all of elements comprising the Hotel Common Areas, (iii) all elements comprising the Hotel Amenities Units, and (b) all pre-opening installations, including all mechanical systems, and tasks as may be identified by the parties as required to furnish and operate the Hotel consistent with the Operating Standard are complete, unless such requirements are waived in writing by Operator.

> Operating Account – as defined in **Section 4.1.2**.

> Operating Budget – as defined in **Section 2.3.1(a)**.

Operating Expenses – shall mean Operating Expenses/Hotel together with Operating Expenses/Hotel Amenities Units. Hotel Unit Owners shall pay their proportionate share of the Operating Expenses that relate to the Hotel Units and the Building pursuant to the Hotel Unit Maintenance Agreement, which payment requirement shall be consistent with the approved budget for the Building Common Areas and the Hotel Common Areas and the applicable Annual Plan for the Hotel Units and Hotel Amenities Units. At such time as the Hotel Amenities Units Lease is terminated, Hotel Amenities Units Owner shall pay its proportionate share of the Operating Expenses that relate to the Hotel Amenities Units and the Building pursuant to the Hotel Amenities Units Maintenance Agreement, which payment requirement shall be consistent with the approved budget for the Building Common Areas and the Hotel Common Areas and the applicable Annual Plan for the Hotel Units and Hotel Amenities Units.

Operating Expenses/Hotel – shall mean: all ordinary and necessary expenses incurred in the (a) rental of each Hotel Unit, (b) the operations of the in room features (other than food and beverage operations) of each Hotel Unit such as high speed internet, telephone, television and movie services, and properly attributable to the period under consideration determined in accordance with GAAP, prior to payment of any amounts by the applicable Hotel Unit Owner, (c) the provision of Operator Hotel Services provided to Hotel Unit Owners and guests of Hotel Units (other than expenses of food and beverage services provided to Hotel Unit Owners and guests of Hotel Units) and (d) the provision of Other Operator Services provided to owners and permitted occupants of other Units (other than revenues from food and beverage services provided to owners and permitted occupants of other Units) prior to payment of any amounts by the applicable Hotel Unit Owner or guest or other owner or occupant of other Units, as allocated by Operator in its reasonable discretion among every Hotel Unit and other parties that receives Other Operator Services (provided that expenses of the Rental Program, including without limitation, the operation and administration of the Rental Program, shall be allocated only to Participating Units), including (without duplication) Personnel Costs, the portion of the cost of operation and maintenance of the Hotel Common Areas and Building Common Areas allocated to the Hotel Units pursuant to the Co-Ownership Regulations, the cost of maintenance and Utilities (to the extent not metered to a particular Hotel Unit), administrative expenses, the costs of advertising, marketing and business promotion, the Centralized Charges (reasonably allocated by Operator as appropriate among the Hotel Unit Owners), and the Base Fee/Hotel, all as determined in accordance with GAAP and the Uniform System. Notwithstanding the foregoing, the following shall not constitute Operating Expenses/Hotel: (i) the Incentive Fee/Hotel; (ii) Taxes; (iii) insurance premiums for insurance obtained by or on behalf of Operator or Owner pursuant to Article 6; (iv) contributions to the Capital Reserve Funds pursuant to **Section 4.2**; (v) Capital Expenses; (vi) those portions of any such costs for which Participating Unit Owners are

13

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

responsible pursuant to the Rental Program; (vii) depreciation, amortization and other non-cash charges; (viii) principal, interest and other payments in respect of funds borrowed by Owner (whether from owners of Units or otherwise); (ix) costs and expenses of any personnel of Owner or Hotel Amenities Units Owner not engaged in providing Operator Hotel Services or Other Operator Services, including entertainment expenses, salaries, wages and employee benefits of such personnel; (x) professional fees and costs, including the fees and disbursements of attorneys, accountants and appraisers, incurred directly or indirectly in connection with any category of expense that is not itself an Operating Expense/Hotel; (xi) losses that fall within the deductible amount on any insurance policies; (xii) expenses (such as Taxes and expenses for Utilities) to the extent reimbursable by tenants, subtenants, licensees, concessionaires and operators of any Hotel Amenities Unit not operated by Operator; and (xiii) payments (such as cash advances or payments to an outside cleaner or florist) to the extent reimbursable by Hotel Guests and patrons of the Hotel except to the extent Gross Operating Revenue/Hotel include an amount at least equal to such payment.  To the extent any of the expenses described in this definition are incurred by Operator for the benefit of the Hotel and one or more other hotels and/or condo-hotels managed by Operator or its Affiliates, then Operator shall allocate such expenses among the Hotel and such other hotels and/or condo-hotels, using a fair and equitable methodology developed by Operator in accordance with GAAP, and only the portion properly allocable to the Hotel shall be included in the calculation of Operating Expenses/Hotel.

Operating Expenses/Hotel Amenities Units – shall mean: all ordinary and necessary expenses incurred in: (a) the operation of the Hotel Amenities Units, (b) providing Operator Hotel Services to the Hotel Amenities Units, (c) the provision of Operator Hotel Services to Hotel Unit Owners and guests of Hotel Units from the Hotel Amenities Units (such as in room food and beverage services provided to Hotel Unit Owners and guests of Hotel Units) and (d) the provision of Other Operator Services provided to owners and permitted occupants of other Units from the Hotel Amenities Units (such as in Unit food and beverage services provided to owners and permitted occupants of other Units), including (without duplication) Personnel Costs, the portion of the cost of operation and maintenance of the Hotel Common Areas and Building Common Areas allocated to the Hotel Amenities Units pursuant to the Co-Ownership Regulations, the cost of maintenance and Utilities, administrative expenses, the costs of advertising, marketing and business promotion, the Centralized Charges, and the Base Fee/Hotel Amenities Units, all as determined in accordance with GAAP and the Uniform System. Notwithstanding the foregoing, the following shall not constitute Operating Expenses/Hotel Amenities Units: (i) the Incentive Fee/Hotel Amenities Units; (ii) Taxes; (iii) insurance premiums for insurance obtained by or on behalf of Operator or Owner pursuant to Article 6; (iv) contributions to the Capital Reserve Funds pursuant to **Section 4.2**; (v) Capital Expenses; (vi) depreciation, amortization and other non-cash charges; (vii) principal, interest and other payments in respect of funds borrowed by Owner (whether from partners, directors, officers of Owner or otherwise); (viii) costs and expenses of Owner, Hotel Amenities Units Owner, or Owner's or Hotel Amenities Units Owner's personnel, including entertainment expenses, salaries, wages and employee benefits of Owner's or Hotel Amenities Units Owner's employees, except for those engaged in the operation of the Hotel Amenities Units; (ix) professional fees and costs, including the fees and disbursements of attorneys, accountants and appraisers, incurred directly or indirectly in connection with any category of expense that is not itself an Operating Expense/Hotel Amenities Units; (xi) losses that fall within the deductible amount on any insurance policies; (xii) expenses (such as Taxes and expenses for Utilities) to the extent

14

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

reimbursable by tenants, subtenants, licensees, concessionaires and operators of any Hotel Amenities Unit not operated by Operator; and (xiii) payments (such as cash advances or payments to an outside cleaner or florist) to the extent reimbursable by Hotel Guests and patrons of the Hotel Amenities Units except to the extent Gross Operating Revenue/Hotel Amenities Units include an amount at least equal to such payment.  To the extent any of the expenses described in this definition are incurred by Operator for the benefit of the Hotel Amenities Units and one or more other hotels and/or condo-hotels managed by Operator or its Affiliates, then Operator shall allocate such expenses among the Hotel Amenities Units and such other hotels and/or condo-hotels, using a fair and equitable methodology developed by Operator in accordance with GAAP, and only the portion properly allocable to the Hotel Amenities Units shall be included in the calculation of Operating Expenses/Hotel Amenities Units.

Operating Standard – means the level of service and quality generally considered to be luxury and no less than the level of service and quality prevailing from time to time at the Trump Brand Hotels, (b) consistent with the Trump Brand Standards, and (c) in accordance with this Agreement, and taking into consideration local custom, usage and standards in Panama, as agreed to by the parties; provided, however, in the event the Parties are unable to agree upon the local standard, if any, to be applied, such dispute shall be resolved pursuant to **Section 9.1** hereof.

Operator – as defined in the Introductory paragraph.

Operator Hotel Services –the management and operation of the Hotel and the provision of services to Hotel Units and Hotel  Amenities Units pursuant this Agreement, the Hotel Unit Maintenance Agreement and Hotel Amenities Units Maintenance Agreement.

Other Operator Services –provision of services, including A La Carte Hotel Services, housekeeping, repair and security services, to owners and users of Casino, Commercial, Office and Residential Units.

Other Trump Marks – trademarks using the "**Trump**" name other than the Trump Mark.

Other Units -- Casino, Commercial, Office and Residential Units.

Owner – means Hotel TOC Inc., with respect to the Hotel Units and the Hotel Amenities Units for so long as the Hotel Amenities Units Lease is in effect.  At such time, as the Hotel Amenities Units Lease is terminated, Owner shall mean (i) Hotel TOC Inc. with respect to the Hotel Units, and (ii) Hotel Amenities Units Owner with respect to the Hotel Amenities Units, in which event all references to the term "**Owner**" herein shall refer to Hotel TOC Inc. solely with respect to the Hotel Units and to Hotel Amenities Units Owner solely with respect to the Hotel Amenities Units.

Owner License Agreement – as defined in Recital G.

Owner Parties – as defined in **Section 5.2.5**.

Owner Proprietary Materials – as defined in **Section 10.3.2**.

15

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

7404892v25

<u>Owner's Restoration Notice</u> – as defined in **Section 8.2**.

<u>Ownership Interests</u> – all forms of ownership interests in Owner, whether legal or beneficial, direct or indirect, voting or non-voting, including stock, partnership interests and limited liability company memberships, and all options, warrants and instruments convertible into such other interests, and any other right, title or interest not included in this definition that constitutes a form of direct or indirect ownership in Owner under the laws of Owner's jurisdiction of formation.

<u>Partial Destruction</u> – any destruction of or damage to the Hotel and/or part of the Building that affects Hotel operations by fire, casualty or any other cause, which does not constitute a Total Destruction.

<u>Participating Unit</u> – any Hotel Unit participating in the Rental Program at the time in question.

<u>Participating Unit Owner</u> – any Hotel Unit Owner owning a Participating Unit.

<u>Performance Test Period</u> – each period of two (2) consecutive Fiscal Years commencing with the third full Fiscal Year.

<u>Personnel Costs</u> – all costs associated with the employment, management or termination of Hotel Personnel, including recruitment expenses, the costs of moving Hotel Executive Staff, their families and their belongings to the area in which the Hotel is located at the commencement of their employment at the Hotel, compensation and benefits, employment taxes and Social Security obligations, training costs and severance payments, all in accordance with Legal Requirements and Operator's personnel policies.

<u>Personnel Costs/Hotel</u> – all Personnel Costs allocated to Owner pursuant to Section 2.6.2.

<u>Personnel Costs/Non-Hotel</u> – all Personnel Costs allocated to Owners Meeting pursuant to Section 2.6.2 for Non-Hotel Services.

<u>Proceeding</u> – as defined in **Section 2.6.6**.

<u>Prohibited Person</u> – any Person that (a) is a Competitor; (b) in Operator's reasonable judgment, is generally recognized in the community as being a Person of ill repute or is in any other manner a Person with whom a prudent business person would not wish to associate in a commercial venture; (c) has been convicted (or any Affiliate controlling it has been convicted) of a felony; (d) in Operator's reasonable judgment, could jeopardize the Hotel's liquor license or any other approvals required to operate the Hotel; (e) in Operator's reasonable judgment, could jeopardize any approvals held by Donald J. Trump, Operator or any Affiliate under any applicable laws, including but not limited to the loss or failure to qualify for or renew any gaming license, real estate brokerage license, real estate mortgage brokerage license, real estate mortgage banking license or liquor license. or (f) in Operator's reasonable judgment, could cause Operator or any Affiliate to violate any applicable laws, or cause any of their assets or interests, to any fines, penalties, sanctions, confiscation or similar liability or action under any Sanction Laws.

16

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

Promoter/Developer Advances – as defined in **Section 4.4.**

Promoter/Developer Agreements – as defined in **Section 4.4.**

Promoter/Developer License Agreement – as defined in Recital F.

Promoter/Developer's Entire Interest – as defined in **Section 7.2.1.**

Reimbursable Expenses –  as defined in **Section 3.2.1.**

Release Date – as defined in **Section 1.5.1.**

Renewal Term – as defined in **Section 5.1.2.**

Rental Agreement – as defined in **Section 1.5.1.**

Rental Program – the program operated by Operator for rental of the Participating Hotel Units.

Residential Units – as defined in Recital A.

Restaurant Standards – as defined in **Section 2.12.**

RevPAR – a performance metric in the hotel industry which stands for **"revenue per available room."** For purposes of this Agreement, RevPAR for the Hotel and the Competitive Hotel Set shall be determined by Smith Travel Research (STR), or such other organization as Owner and Operator may determine if STR no longer provides RevPAR information. As for the Hotel the calculation of RevPAR shall be limited to those Hotel Units that are Available Participating Units, excluding all room nights whereby (i) a Unit Owner is occupying his, her or its Participating Unit, or (ii) a Participating Unit is utilized as a complimentary room, including part of Complimentary Services.

Sanction Laws – all present and future Applicable Laws of the United States of America that prohibit or restrict Operator or an Affiliate from entering into this Agreement or performing any of its obligations hereunder, respecting the Person in question, including (a) The United and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act (the **"Patriot Act"**), (b) The Trading with the Enemies Act, (c) all rules and regulations issued by the U.S. State Department or U.S. Treasury Department's Office of Foreign Assets Control, and (d) Executive Orders 13224 issued by the President of the United States, and similar executive orders.

Shortfall – as defined in **Section 5.3.3.**

System-Wide – all services, policies or procedures which Operator utilizes in all Trump Brand Hotels; provided, however, that the Trump Sonesta Florida shall not be considered a Trump Brand  Hotel unless and until Operator advises Owner that the Trump Sonesta Florida shall be included as a Trump Brand Hotel.

17

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

<u>Taking</u> – a taking as a result of condemnation or eminent domain, or a conveyance by Owner in lieu thereof, of all or part of the Hotel or any part of the Building necessary to operate the Hotel; and any taking by any governmental authority or governmental unit (or any authority or entity acting on behalf of or purporting to act on behalf of any governmental authority or unit) for any purpose whatsoever, including confiscation, or a conveyance by Owner in lieu thereof, of all or part of the Hotel; and any change in laws, regulations, orders, decrees, or the like which has the effect of a taking of all or part of the Hotel or any part of the Building necessary to operate the Hotel.

<u>Taxes</u> – means all taxes imposed by any governmental authority of the Republic of Panama, including (without limitation) income, profits, real property, personal property, goods and services, gross receipts or occupancy, sales, use, transfer, purchase, franchise, stamp, ad valorem, value added, capital stock or surplus, occupation, excise, payroll, unemployment, disability, employees' income withholding, social security or withholding taxes.

<u>Term</u> – the Initial Term together with any and the Renewal Term, as described in **Section 5.1**.

<u>Termination</u> – the expiration or any other termination of this Agreement.

<u>Termination Date</u> – the date of Termination.

<u>Third Party Managers</u> – as defined in **Section 1.7.1**.

<u>Third Party Operated Areas</u> -- Hotel Amenities Units that may at any time be operated by a Third Party Manager in accordance with **Section 1.7.1**.

<u>Third Party Operating Agreements</u> – as defined in **Section 1.7.1**.

<u>Total Destruction</u> – the destruction of or damage to the Hotel or any part of the Building necessary to operate the Hotel by fire, casualty, or any other cause whereby either (i) the destruction of or damage to the Hotel or the relevant part of the Building is such that more than 50% of the Hotel Units are rendered unavailable for rental in the ordinary course of business of the Hotel or (ii) in accordance with the Co-Ownership Regulations the Owners Meeting elects not to cause the restoration of the Hotel or the relevant part of the Building (provided that Owner shall use all reasonable efforts to cause the Owners Meeting to restore the Hotel or relevant part of the Building).

<u>Transfer</u> – (A) with respect to Hotel Amenities Units Owner, any sale, lease (other than the lease of the Hotel Amenities Units to Owner), foreclosure of a mortgage, deed in lieu of foreclosure, appointment of a receiver, surrender to a landlord (whether by expiration or termination of an underlying ground lease) or other transfer, in whole or in part, of any ownership right, title or interest in the Hotel Amenities Units or any portion thereof, in each case whether voluntary, involuntary, by operation or law or otherwise, (B)  with respect to Promoter/Developer, any sale, lease (other than the lease of the Hotel Amenities Units to Owner), foreclosure of a mortgage, deed in lieu of foreclosure, appointment of a receiver, surrender to a landlord (whether by expiration or termination of an underlying ground lease) or other transfer, in whole or in part, of any ownership right, title or interest in the Hotel Units

18

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

(other than sales of individual Hotel Units in accordance with the Promoter/Developer License Agreement) or the Hotel Amenities Units or the site or any portion thereof, in each case whether voluntary, involuntary, by operation or law or otherwise.

Transfer of Control – (A) with respect to Hotel Amenities Units Owner for so long as it or one of its Affiliates holds ownership title to the Hotel Amenities Units, any transfer of ownership interests that results in either (a) a transfer of 50% or more of the ownership interests in Hotel Amenities Units Owner, or (b) the loss of the right to direct or control the management of the day-to-day operations of Hotel Amenities Units Owner. A transfer of ownership interests shall be deemed to occur upon any (a) sale, assignment or other transfer, in whole or in part, of any ownership interests in Hotel Amenities Units Owner, (b) merger, consolidation, reorganization or other restructuring of Hotel Amenities Units Owner, or (c) issuance of additional ownership interests in Hotel Amenities Units Owner that would have the effect of diluting voting rights or beneficial ownership of the ownership interests in Hotel Amenities Units Owner, in each case whether voluntary, involuntary or by operation of law, (B) with respect to Promoter/Developer for so long as it or one of its Affiliates holds ownership title to more than 25% of all Hotel Units, any transfer of ownership interests in Promoter/Developer that results in either (a) a transfer of 50% or more of the ownership interests in Promoter/Developer, or (b) the loss of the right to direct or control the management of the day-to-day operations of Promoter/Developer. A transfer of ownership interests shall be deemed to occur upon any (a) sale, assignment or other transfer, in whole or in part, of any ownership interests in Promoter/Developer, (b) merger, consolidation, reorganization or other restructuring of Promoter/Developer, or (c) issuance of additional ownership interests in Promoter/Developer that would have the effect of diluting voting rights or beneficial ownership of the ownership interests in Promoter/Developer, in each case whether voluntary, involuntary or by operation of law.

Transfer Promoter/Developer's Entire Interest – any transfer of ownership and rights in the Promoter/Developer's Entire Interest.

Trump Brand – Those hotels that are part of the Trump Hotel Collection, consisting of all hotels that that are operated under the name "Trump International," "Trump" or "Trump Ocean" or other names as designated from time to time in the future by Trump, but excluding Trump Sonesta.

Trump Brand Hotels – all hotels and resorts that are operated by Operator or its Affiliates under the Trump Brand, including all such hotels and resorts that are owned and operated by Operator or its Affiliates.

Trump Brand Standards – the *Trump Hotel Collection Physical Standards – Panama*, dated March 11, 2011 and the *Trump Hotel Collection Operating Standards – Panama*, dated March 11, 2011 published by Operator, copies of which have been provided to Owner by Operator, as such standards may be amended from time to time, provided that Operator provides Owner with written notice and copies of such amendments prior to implementation at the Hotel, and provided, further, that such amendments are consistent with this Agreement and take into consideration local custom, usage and standards in Panama.

19

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

Trump Mark – as defined in the License Agreements.

Trump Operations Head – as defined in **Section 1.5.3**.

Trump Proprietary Materials – as defined in **Section 10.3.1**.

Uncontrollable Expenses – real estate taxes, Utilities, insurance premiums, license and permit fees, fuel costs and charges provided for in contracts and leases entered into pursuant to this Agreement and in compliance with Legal Requirements, and other expenses that are not within the ability of Operator to control.

Uniform System of Accounts or Uniform System – the Uniform System of Accounts for the Lodging Industry, most recent edition (currently 10th Edition, September 2006), as published by the Educational Institute of the American Hotel & Motel Association, ISBN #978-0-866-12-282-5.

Unit Purchaser Advances – as defined in **Section 4.4**.

Units – as defined in Recital A.

Updated Centralized Services – as defined in **Section 2.7.1**.

Utilities – the provision of electricity, water and sewer, fuel, and telecommunications services.

Working Capital – funds to be retained by Operator in the Hotel's Operating Account each month after payment of the Hotel's current financial obligations, in an amount to be established by the parties each year as part of the Annual Plan, to enable timely payment of all of Hotel Personnel Costs and other financial obligations (including all Operating Expenses) reasonably anticipated to be incurred in connection with the operation of the Hotel, including, but not limited to the Rental Program, and performance of Operator Hotel Services for a minimum period of two (2) calendar months, which may be increased in Operator's discretion to a period of up to four (4) calendar months.

Working Capital Reserve Account – as defined in **Section 4.4.**

Working Capital Threshold – as defined in **Section 4.4.**

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

7404892v25

1. **APPROVAL OF CO-OWNERSHIP REGULATIONS; APPROVAL OF ASSIGNMENTS; HOSPITALITY SERVICES; RENTAL PROGRAM**

   1.1 <u>Approval of Co-Ownership Regulations.</u>

   1.1.1 The Parties have agreed to accept the Co-Ownership Regulations, in the form registered with the Property Section, Panama Province, of the Public Registry, and the House Rules as mutually approved by Owner and Operator, as the approved form of Co-Ownership Regulations and House Rules for all purposes under this Agreement. During the Term, neither the Co-Ownership Regulations nor the House Rules shall be modified without the prior written approval of Operator. In determining whether to grant its approval, Operator may take into consideration all of Operator's business and legal issues affected by such documents, including whether such documents assure that Owner has sufficient control over the Hotel to maintain and enforce the Operating Standard. Owner shall provide Operator with copies of all modifications to the Co-Ownership Regulations or the House Rules promptly upon their execution or finalization, as may be applicable.

   1.1.2 Promoter/Developer (in its capacity as Unit Owner), Owner, Owners Meeting and Hotel Asset Manager shall take such action and exercise such rights under the Co-Ownership Regulations (through exercise of voting rights, enforcement of remedies or otherwise, subject to any constraints imposed under Legal Requirements) as may be necessary or desirable in order (a) to ensure that the Building and each Component over which Owner, Owners Meeting or Promoter/Developer has control is maintained and operated in accordance with the Operating Standard, and (b) otherwise to effectuate the terms of this Agreement, the License Agreements and the other agreements and documents referred to herein. Owner, Owners Meeting, Hotel Asset Manager and Promoter/Developer shall not take any action or exercise any rights that would materially affect Operator's rights or obligations under this Agreement or the Co-Ownership Regulations without Operator's prior written consent.

   1.2 <u>Approval of Assignment by Promoter/Developer to Owner.</u> Operator hereby approves the transfer and assignment of the rights and obligations of Promoter/Developer, as the party originally designated as "Owner" under the Hotel Management Agreement, that are set forth in this Agreement as the rights and Obligations of the Owner; provided, however, that until such time as Promoter/Developer has deposited all advances into the Working Capital Reserve Account as required pursuant to the Pre-Opening Agreement, Promoter/Developer shall be jointly and severally responsible for all obligations of Owner under the terms of this Agreement. If, at any time in the future, the Hotel Amenities Units Lease is terminated, then: (a) Hotel Amenities Units Owner shall be subject to all of the terms that apply to Owner under this Agreement, to the extent that such terms relate to any rights or obligations of Owner with respect to the Hotel Amenities Units, (b) Hotel Amenities Units Owner and Owner shall be jointly subject to all of the terms that apply to both Hotel Amenities Units Owner and Owner, such as decisions regarding Hotel Common Areas, and all decisions regarding such matters shall be made by Owner, and (c) Owner shall be subject to all of the terms that apply under this Agreement to the extent that such terms relate to any rights or obligations of Owner with respect to the Hotel Units.

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

7404892v25

1.3    Approval by Owners Meeting.  Owners Meeting hereby approves of the terms of this Agreement, and agrees that Owners Meeting will cooperate with, and take any actions required to be taken by Owners Meeting, pursuant to the Co-Ownership Regulations or applicable Legal Requirements, to allow Owner to fulfill its obligations under this Agreement on behalf of all Hotel Unit Owners collectively.  Owners Meeting further acknowledges and agrees that the Building, the Hotel and all other Components are required to be operated and maintained in accordance with the Operating Standard as set forth herein and in the Owner License Agreement, and that Owners Meeting will take all actions required in order to comply with such requirements.

1.4    Operator Hotel Services and Other Operator Services.

1.4.1    Operator shall provide Operator Hotel Services to all Hotel Unit Owners, Hotel Guests and other permitted occupants of Hotel Units, and shall provide Other Operator Services to owners and other permitted occupants of other Units, consistent with the Operating Standard.  The nature and extent of Operator Hotel Services to be provided to all Hotel Units, and the cost of and payment for such services, shall be as provided in this Agreement and in the Hotel Unit Maintenance Agreement ("**Hotel Unit Maintenance Agreement**"), in the form approved by Promoter/Developer, Owner, Owners Meeting and Operator and attached hereto as **Exhibit A** (as it may be amended in accordance with its terms), to be entered into between Operator, Owner and every purchaser of a Hotel Unit, and between Promoter/Developer, Owner and Operator with respect to all Hotel Units until such time as Promoter/Developer transfers ownership title to each Hotel Unit to a purchaser of such Hotel Unit.  The nature and extent of Operator Hotel Services to be provided to Hotel Amenities Units, and the cost of and payment for such services, shall be as provided herein and in the Hotel Amenities Units Maintenance Agreement ("**Hotel Amenities Units Maintenance Agreement**"), in the form approved by Promoter/Developer, Owner, Owners Meeting and Operator and attached hereto as **Exhibit B** (as it may be amended in accordance with its terms), to be entered into between Operator, Owner, as lessee of the Hotel Amenities Units, and Promoter/Developer, as Hotel Amenities Units Owner and lessor of the Hotel Amenities Units.  The nature and extent of Other Operator Services shall be determined from time to time by Operator and made available in accordance with the Co-Ownership Regulations.

1.4.2    Operator has prepared the initial Annual Plan, which has been approved by Owner and shall go into effect upon the Opening Date.  Operator shall provide an annual budget for Operator Hotel Services for each successive Fiscal Year after the Opening Date and include such annual budget within the Annual Plan.

1.5    Rental Program.

1.5.1    Operator shall manage and operate a voluntary Rental Program for all Hotel Unit Owners, in accordance with the terms of the Unit Rental Agreement ("**Rental Agreement**"), in the form approved by Promoter/Developer, Owner and Operator and attached hereto as **Exhibit C** (as it may be amended in accordance with its terms), to be entered into between Operator, Owner and every purchaser of a Hotel Unit who desires to participate in the Rental Program, and between Promoter/Developer, Owner and Operator with respect to all Hotel Units until such time as Promoter/Developer transfers ownership title to each Hotel Unit to a

22

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

purchaser of such Hotel Unit. Prior to the Opening Date, Promoter/Developer shall fit out all Hotel Units with all FF&E and OS&E required for Hotel Units to participate in the Rental Program, and provide all Hotel Units to Operator for inclusion in the Rental Program until the respective Release Date (hereinafter defined) for each Hotel Unit. Unless then-currently occupied by a Hotel Guest, Operator shall permit each Hotel Unit to be viewed by prospective purchasers, and shall release the Hotel Unit from the Rental Program on the date that the following two conditions are met: (a) title to such Hotel Unit has been legally transferred to a purchaser of such Hotel Unit, and (b) the purchaser of such Hotel Unit has executed a Unit Maintenance Agreement as required by the terms of the Co-Ownership Regulations (the "**Release Date**").

1.5.2    Operator shall, on Owner's behalf, interface with Participating Unit Owners. Operator shall maintain a log of material issues with respect to (a) the Rental Program and (b) compliance with the Rental Agreements, that are raised with it by Participating Unit Owners. Such list of issues shall be furnished to Owner on a periodic basis, but not more frequently than monthly, as requested by Owner, and shall be incorporated in Operator's monthly reporting called for pursuant to **Section 2.5.3**. Owner may provide input to Operator at its periodic meetings with Operator on the matters raised by Participating Unit Owners although Operator shall have reasonable discretion, consistent with the Co-Ownership Regulations, in determining how such matters are to be addressed. Owner and Operator acknowledge and agree that concerns on the part of Participating Unit Owners shall be directed to Operator for proper handling.

1.5.3    In the event of a material breach of Operator's duties to manage the Rental Program as a whole, which has been caused solely by Operator's failure to fulfill its obligations which is not cured within the applicable notice and cure periods (a "**Breach**"), Owner may send a notice to the General Manager with a copy to Operator, specifically identifying the Breach and requesting a meeting with the employee of Operator that has responsibility for hotel management operations for the Other Trump Marks (the "**Trump Operations Head**"), to whom the General Manager reports directly, or indirectly through interim personnel.

1.5.4    Subject to the availability of Owner's representative, the Trump Operations Head shall confer with Owner's representative via telephone or in person within ten (10) business days after Operator's receipt of the notice to discuss the Breach and shall consider Owner's proposals related to the Breach.

1.5.5    If the Trump Operations Head and Owner agree in writing, signed by both parties, that any specific follow-up action is necessary, including without limitation an action plan setting forth expected time frames, Operator shall cause on-site Hotel Personnel to carry out such follow-up action and shall take appropriate steps to ascertain that the same has occurred and that longer term steps to avoid similar Breaches in the future have been implemented, which shall include personnel changes to the extent the Trump Operations Head, using reasonable discretion, determines that the same is necessary. If Owner requests a personnel change in writing but Operator does not comply, Operator shall state the reasons for Operator's refusal to comply via telephone to Owner within ten (10) days. In the event the parties are unable to agree, the dispute shall be resolved pursuant to **Section 9.1**.

23

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

1.6     Management of P.H. TOC and Hotel Common Areas.

1.6.1     Condominium Manager shall serve as the manager and administrator of the P.H.TOC pursuant to the terms of the Condominium Management Agreement. The nature and extent of management and administrative services to be provided by Condominium Manager, and the cost of and payment for such services, shall be as provided in the Condominium Management Agreement, in the form approved by Promoter/Developer, Owners Meeting and Operator, and attached hereto as **Exhibit D** (as it may be amended in accordance with its terms).

1.6.2     The Parties acknowledge that the portion of the Annual Plan prepared by the Operator under this Agreement that relates to the Hotel Common Areas shall be submitted by Operator to the Condominium Manager, for approval by the Committee of the Hotel Component, in accordance with the Co-Ownership Regulations. The parties further acknowledge that the Assessments paid by Hotel Unit Owners and Hotel Amenities Units Owner for the Hotel Common Areas will be made available by the Condominium Manager to Operator and Owner to use in connection with the operation, management, maintenance and repair of the Hotel Common Areas.

1.6.3     The Parties acknowledge that Operator shall supervise Owner in the operation, management, maintenance and repair of the Hotel Common Areas pursuant to this Agreement, as part of the business of the Hotel.  Operator and Owner acknowledge that the operation and maintenance of the Hotel Common Areas are also subject to the requirements of the Co-Ownership Regulations, and Operator agrees to operate and maintain the Hotel Common Areas in accordance with the requirements of the Co-Ownership Regulations.

1.7     Third Party Operated Areas.

1.7.1     Owner (or for the purposes of this **Section 1.7**, Hotel Amenities Units Owner if the Hotel Amenities Units Lease is no longer in effect) and Operator may agree that any one or more of the Hotel Amenities Units or portions thereof may be operated by third parties (the **"Third Party Managers"**) selected by Operator, subject to Owner's approval, under a lease, operating or similar agreement (**"Third Party Operating Agreement"**).  The operation of any Hotel Amenities Unit by a Third Party Manager and the selection of a Third Party Manager for such Third Party Operated Areas must be approved by Owner and Operator.

1.7.2     Upon Owner's prior written approval, Operator may negotiate, enter into and administer, in the name and on behalf of Owner, any Third Party Operating Agreements that have a term equal to or less than one year or that can be terminated, without penalty and upon notice of no more than one hundred twenty (120) days.  If Operator elects to negotiate and enter into a Third Party Operating Agreement, Operator, at Owner's expense, may engage third party legal counsel approved by Owner for the preparation and the negotiation of the Third Party Operating Agreement.  The Third Party Operating Agreements shall require the Third Party Managers to operate their businesses and facilities in accordance with the Operating Standard, to the extent applicable, and with the requirements of the Co-Ownership Regulations. Operator shall have rights to enforce the terms of all Third Party Operating Agreements.

24

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

1.8     Trump Brand Standards.

As provided elsewhere in this Agreement, the Building and all of the Components (other than the interiors of Commercial, Office and Residential Units) are intended to be operated in accordance with the Operating Standard, which includes the Trump Brand Standards from time to time in effect. Owner acknowledges that in the interest of the owners of all Trump Brand Hotels and Operator, Operator and its Affiliates will regularly be reviewing and updating the Trump Brand Standards, including guest services and amenities to be offered, in an effort to maintain the Trump Brand as a competitive luxury hotel brand and to upgrade the brand. Among other things, Capital Improvements may from time to time be required as a result of changes in the Trump Brand Standards. However, Owner shall not be required to make any Capital Improvements to the Hotel (i) in the first five (5) years after the Opening Date, or (ii) based upon changes to the Trump Brand Standards, unless at least ninety five percent (95%) of the Comparable Trump Brand Hotels are also being required to make any necessary improvements to conform to the changes in the Trump Brand Standards and such changes are not imposed on the physical condition of the Building if the same would require material alterations of the Building or the Hotel (e.g., expansion of the Building, material reconfigurations or refurbishments). In the event Owner is required to make Capital Improvements to the Hotel in the first five years after the Opening Date, Owner shall have the right to phase in the improvements over five (5) years if the cost of such improvements exceeds One Hundred Thousand and 00/100 Dollars ($100,000.00).

2.     **GENERAL MANAGEMENT AND OPERATIONS**

2.1     General Management Services.

2.1.1     Owner hereby engages Operator as its agent to supervise, direct, and control the management, operation, and promotion of all aspects of the Hotel in accordance with and subject to the terms and conditions of this Agreement. Operator's services shall primarily be provided from Operator's offices outside of Panama, and all operations and maintenance of the Hotel shall be provided using Hotel Personnel employed by Owner. Hotel Amenities Units Owner hereby agrees to all of the obligations of Owner set forth herein with respect to the Hotel Amenities Units from and after the date that the Hotel Amenities Units Lease is no longer in Effect.

2.1.2     Operator shall operate the Hotel for the account of and at the expense of Owner, in accordance with the terms of this Agreement and the Annual Plan. Owner acknowledges Operator's expectation of operating a hotel which is physically at all times (a) in compliance with all Legal Requirements and the Operating Standard, including, without limitation, standards relating to life safety and quality of the Building and the Hotel and (b) competitive with the Competitive Hotel Set, is essential to inducing Operator and its Affiliates to undertake this Agreement. Accordingly, Promoter/Developer (as long as it owns any Units), Owner, Owners Meeting, Hotel Amenities Units Owner and Hotel Asset Manager agree to take all commercially reasonable actions within their power to cause all owners of Units and Hotel Unit Owners to approve all Operating Expenses and Capital Expenses necessary to operate the Building and the Hotel in accordance with the Operating Standard; provided, however, Operator

25

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

may not expend more than the amount allocated in the Capital Budget, as approved by Owner, for any Capital Improvement.

        2.1.3     Subject to the terms of this Agreement, Operator shall have uninterrupted control over the operation of the Hotel Component. Owner acknowledges that under this Agreement, except as may otherwise be expressly provided herein, Owner delegates all authorities and responsibilities for operation of the Hotel to Operator. Such responsibilities include, without limitation, (a) the establishment and maintenance of the Hotel Accounts (as defined in **Section 4.1**), and (b) directing all Gross Operating Revenue/Hotel and Gross Operating Revenue/Hotel Amenities Units, respectively, to the appropriate Bank Account. In addition, Operator, in the exercise of reasonable discretion and business judgment, shall be solely responsible for determining room rates, food and beverage menu prices and charges to Hotel Guests for other Operator Hotel Services and Other Operator Services. Operator shall also have sole responsibility, in the exercise of reasonable discretion and business judgment, to determine the terms of guest occupancy and admittance to the Hotel, use of rooms for commercial purposes, policies relating to entertainment, labor policies, publicity and promotion activities and technology services and equipment to be used in the Hotel, all in accordance with the terms of this Agreement, the Hotel Unit Maintenance Agreement, the Hotel Amenities Units Maintenance Agreement and the Rental Agreement.

    2.2    <u>Authority and Duty of Operator.</u>

        Operator hereby accepts the foregoing engagement and covenants and agrees to manage the Hotel and perform Operator Hotel Services and Other Operator Services during the Term of this Agreement in accordance with the Operating Standard and to use its commercially reasonable efforts to operate the Hotel in such a manner to endeavor to maximize the profitability and long term value of the Hotel. Without limiting the generality of the foregoing, but subject to the limitations set forth in **Sections 2.3** and **2.6-2.11** and the other provisions of this Agreement, Operator shall have the authority and duty, as necessary or advisable for the proper operation and maintenance of the Hotel and performance of the other Operator Services in accordance with the Operating Standard, to:

        2.2.1     establish and implement marketing, sales and reservations programs and systems to secure reservations for the Participating Units, including all arrangements with wholesale and bulk volume purchasers;

        2.2.2     if established by Operator or its Affiliates and appropriate for the Hotel as determined by Operator and reasonably approved by Owner, include the Hotel in Operator's local, regional and worldwide promotional and advertising programs directed at the leisure, business and meetings markets, as Operator may deem advisable; represent the Hotel through Operator's worldwide sales offices;

        2.2.3     if established by Operator or its Affiliates and appropriate for the Hotel, cause the Hotel to participate in applicable marketing and promotional programs associated with the Other Trump Marks, including without limitation the cross-brand loyalty programs, now or hereafter established by Operator or its Affiliates; provided the cost shall be included in the Annual Plan;

26

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

2.2.4     coordinate the Hotel's participation in travel programs marketed by airlines, travel agents and government tourist departments when Operator determines such participation to be advisable;

2.2.5     cause the Hotel to participate in sales and promotional campaigns and activities involving complimentary rooms, food and beverages to bona fide travel agents, tourist officials and airline representatives where Operator has determined that such participation is in furtherance of the Hotel's business and is customary in the travel industry or in the practices and policies of Operator;

2.2.6     accept reservations for the Hotel from individual customers and groups who contact Operator directly or through a regional reservation or sales office of Operator;

2.2.7     accept reservations for the Hotel through other hotels with Other Trump Marks;

2.2.8     accept reservations for the Hotel through the reservation systems of other providers in the travel industry, including, without limitation, global distribution systems and general ·sales agencies with which Operator may have agreements from time to time, whereby the reservation systems of such parties are available for communication of reservations to hotels with Other Trump Marks;

2.2.9     accept reservations for the Hotel received through alternative communications channels such as the Internet;

2.2.10     provide access to the Hotel of the communications network, if any, used by Operator for communication between it and hotels with Other Trump Marks; provided, such network shall exist and be appropriate in Operator's reasonable judgment;

2.2.11     supervise the recruitment, relocation, training, pay, and discharge of all Hotel Personnel, and establish and supervise all personnel policies relating to the Hotel;

2.2.12     subject to the terms hereof, establish (consistent with each year's Annual Plan) all prices, price schedules, rates and rate schedules for the Participating Units, including all arrangements with wholesale and bulk volume purchasers;

2.2.13     supervise and maintain complete books and records consistent with GAAP, including the books of accounts and the accounting procedures of the Hotel;

2.2.14     cause the Hotel to be maintained in good operating order, repair, and condition and in compliance with the Operating Standard, including making necessary replacements, improvements, additions and substitutions thereto;

2.2.15     cause to be made all repairs, replacements, corrections and maintenance items as are required in the normal and ordinary course of operation of the Hotel and as are required (i) to maintain the competitive position of the Hotel in its market; (ii) to comply with the Operating Standard; (iii) to secure, maintain and renew required permits and licenses; (iv) to protect guests or employees or to preserve and protect the Hotel from injury; (v) to correct or

27

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

avoid violation of any laws, ordinances, rules, regulations or other applicable legal requirements; (vi) to comply with any order of any governmental or municipal power, department, agency, authority or officer; and/or (vii) to maintain required insurance coverage. In conjunction therewith, Operator is authorized to make and enter into in the name of, for the account of and at the expense of Owner all contracts and agreements as are necessary or advisable in Operator's opinion for the repair, maintenance, refurbishment and improvement of the Hotel;

2.2.16   coordinate the design, construction and installation of any renovations, improvements, repairs, or replacements of FF&E, building systems, or other physical components of the Hotel that may be undertaken;

2.2.17   negotiate, enter into (at Operator's option), and administer, in the name and on behalf of Owner, service contracts and licenses for Hotel operations, including contracts and licenses for life/safety systems maintenance, electricity, gas, telephone, cleaning, elevator and boiler maintenance, air conditioning maintenance, laundry and dry cleaning, master television service, use of copyrighted materials (such as music and videos), entertainment, and other services;

2.2.18   negotiate, enter into, and administer, in the name and on behalf of Owner, contracts for the use of banquet and meeting facilities, if any;

2.2.19   supervise and purchase, or arrange for the purchase of, all inventories, provisions, consumable supplies, and OS&E as Operator, in the exercise of its reasonable discretion and business judgment, deems necessary for the proper operation of the Hotel in accordance with the Operating Standard and to maintain its competitive market position, and to use the same in the management and operation of the Hotel;

2.2.20   prepare and submit to Owner the Annual Plan in accordance with **Section 2.3.1**;

2.2.21   provided Operator is reimbursed for all reasonable out-of-pocket expenses and reasonably directly attributable overhead expenses, cooperate in all reasonable respects with any Owner, Hotel Unit Owner or Hotel Amenities Units Owner and any prospective purchaser, lessee, Mortgagee, or other lender in connection with any proposed sale, lease, or financing (or refinancing) of or relating to any Hotel Units or Hotel Amenities Units;

2.2.22   institute in its own name or in the name of Owner or the Hotel, but in any event at Owner's expense, any and all legal actions or proceedings reasonably necessary in the ordinary course of business to collect charges, rent, or other income derived from the Hotel operations or to oust or dispossess guests, tenants, or other persons in possession therefrom, or to cancel or terminate any lease, license, concession or operating agreement for the breach thereof or default thereunder by the tenant, licensee, concessionaire or operator.  In the event the counterparty under any lease, license, concession or operating agreement is in breach of its obligations and such breach is adversely affecting Operator's ability to operate and manage the Hotel and otherwise perform services hereunder in accordance with the Operating Standard, Owner shall use commercially reasonable efforts to take the reasonable and necessary actions to cause such breach to be remedied, including legal proceedings, (including termination of the

28

applicable agreement). All such actions shall be taken in coordination with Operator to ensure the continued operation and maintenance of the Hotel in accordance with the Operating Standard and the Owner License Agreement. At the direction of Owner (and at Owner's expense except as otherwise expressly provided in this Agreement), Operator shall take appropriate steps to challenge, protest, appeal, and/or litigate to final decision in any appropriate court or forum any laws affecting the Hotel or any alleged violation of any law;

2.2.23   be available by phone, or at the head office, to consult with and advise Owner or its designee at Owner's reasonable request, at reasonable times, concerning matters relating to the Hotel;

2.2.24   exercise commercially reasonable efforts to do or cause to be done all such acts and things in or about the Hotel as shall be reasonably necessary to comply with Legal Requirements and the terms of all insurance policies;

2.2.25   keep Owner informed and advised of all material financial and other matters concerning the Hotel and the operation thereof;

2.2.26   operate the Rental Program;

2.2.27   provide or supervise the Hotel Personnel who provide Operator Hotel Services and Other Operator Services;

2.2.28   exercise commercially reasonable efforts to collect all charges, rent (as applicable), and other amounts due from Hotel Guests, and any lessees, licensees, concessionaires and operators of the Hotel Amenities Units, and to use those funds, as well as funds from other sources as may be available to the Hotel first to pay all Operating Expenses and then any other financial obligations of the Hotel as Owner may direct, or as may be otherwise set forth in this Agreement;

2.2.29   oversee compliance by any Third Party Managers with, and (to the extent within Operator's control and funds are available) cause the performance of Owner's obligations under, any leases or concession agreements for the Hotel Amenities Units;

2.2.30   inform Owner promptly of any claims advanced or litigation commenced relating to the Hotel or any portion thereof;

2.2.31   negotiate, enter and administer all Rental Agreements with the Participating Unit Owners;

2.2.32   perform such other tasks as are customary in the performance of the hotel operator services at hotels of the standard of the Operating Standard;

2.2.33   Operator and Owner shall mutually determine in good faith, as between Operator and Owner, which party is most appropriate to hold particular licenses and permits, but in the event that a mutual determination cannot be made, the Owner shall make the final determination. Each party shall, in a prompt and timely manner, complete, execute, file and

29

secure the issuance of any registration (including registration for all local, state and federal income, sales, occupancy and other tax filings), license or permit, application or renewal that it is required by such party to hold and make them available to the Hotel and shall cooperate with the other to ensure all of same are obtained and in place as necessary. The costs associated with all of the foregoing shall be an Operating Expense. Owner agrees to indemnify and defend Operator, to hold Operator harmless from, and to reimburse Operator for, any loss, cost, liability or expense of any nature suffered by the Operator, its Affiliates or any of their respective officers, directors, employees or agents as a result of obtaining and maintaining in full force and effect all necessary operating licenses and permits pursuant to this **Section 2.2.33**;

> 2.2.34   coordinate the downloading of reservations from third party rentals into the Hotel's PMS system; and

> 2.2.35   coordinate third party audits once annually for all Third Party Operated Areas in order to monitor adherence with the Operating Standard, the cost of which shall be an Operating Expense.

### 2.3   Annual Plan.

> 2.3.1   The Annual Plan for the first Fiscal Year (including the partial year from the Opening Date until December 31, 2011) of the Hotel has been approved by Owner. On or before ninety (90) days prior to the commencement of each Fiscal Year thereafter, Operator shall prepare and deliver to Owner for Owner's approval a proposed annual plan ("**Annual Plan**") for such ensuing Fiscal Year, with projections of Gross Operating Revenue/Hotel, Gross Operating Revenue/Hotel Amenities Units, Operating Expenses/Hotel and Operating Expenses/Hotel Amenities Units for such Fiscal Year. The Annual Plan will be accompanied by statements, in narrative form, of the principal assumptions made in its preparation, to the extent those assumptions are not included in Operator's standard planning and budgeting procedures and requirements. The proposed Annual Plan for each Fiscal Year shall be prepared in accordance with Operator's standard internal processes and Operator shall act reasonably and in good faith and exercise prudent business judgment in proposing the Annual Plan. The Annual Plan shall also include the following:

> (a)   the Operating Budget (hereinafter defined) shall contain the following items, which shall be set forth for each month of such Fiscal Year: (i) estimated results of operations (including estimated Gross Operating Revenue/Hotel, Gross Operating Revenue/Hotel Amenities Units, Operating Expenses/Hotel, Operating Expenses/Hotel Amenities Units, Gross Operating Profit/Hotel and Gross Operating Profit/Hotel Amenities Units) including the components of each in reasonable detail; (ii) a description of proposed Capital Improvements to be made during such ensuing Fiscal Year and itemized estimated Capital Expenses therefor; (iii) projected occupancy, room rates for Hotel Units, including complimentary rooms pursuant to **Sections 2.2.5, 2.6.4** and **2.8**; and projections for Hotel Unit Owner occupancy of Hotel Units; and food and beverage prices and rates; (iv) a summary of credit policies; (v) a summary of employment and hiring plans and a compensation plan for Hotel Personnel; (vi) a description of the current status of collective bargaining or labor negotiations, if any, and pending suits; (vii) a statement of cash flow and proposed Working Capital levels, and (viii) an annual operating budget for the administration of each of the Hotel

30

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

7404892v25

and the Hotel Amenities Units, including a schedule of any anticipated requirements for funding by Hotel Unit Owners, and Hotel Amenities Units Owner; together with the following supporting data: (a) estimates of total Personnel Costs, including both fixed and variable labor; (b) estimates of the average daily house rate and occupancy of Participating Units; and (c) an estimate of Base Fee and Incentive Fees, Reimbursable Expenses and other payments to Operator and its Affiliates; (d) the amounts required to be paid into the Capital Reserve Funds (including that portion of Building reserves payable by Hotel Unit Owners and Hotel Amenities Units Owners) and anticipated expenditures from such reserves during the applicable Fiscal Year, and (e) cash distributions to Hotel Unit Owners (or, if applicable, a schedule of any anticipated deficits and requirements for funding by Hotel Unit Owners), with a breakdown by operating departments and by major categories of Operating Expenses, ((i) through (viii) the **"Operating Budget"**);

(b)      a budget for proposed Capital Expenses that Operator proposes to make and the proposed source of funds therefor (including the costs of completing any Capital Improvements commenced in a prior Fiscal Year), itemized by month(s) of occurrence and description of proposed Capital Improvements (the **"Capital Budget"**), along with a five (5) year projection of Capital Expenses that Operator proposes to make and the proposed source of funds therefor;

(c)      a marketing plan, describing in narrative form Operator's intentions for the next Fiscal Year for the promotion and positioning of the Hotel, including a plan for the activities to be undertaken by Operator pursuant to **Section 2.2**, which plan shall include a description of the Hotel's target markets, the Hotel's relative position in those markets, the proposed room rate structures for each market segment, the current and future sales plan for the Hotel, the advertising and public relations plan for the Hotel, and the proposed staffing for the sales and marketing activities of the Hotel (**"Marketing Plan"**);

(d)      a separately identifiable portion of the budget setting forth the amounts required to be paid for maintenance of the interior of Hotel Units as required under the Hotel Unit Maintenance Agreement (the **"Hotel Unit Maintenance Budget"**);

(e)      a separately identifiable portion of the budget setting forth the amounts required to be paid for maintenance of the interior of Hotel Amenities Units as required under the Hotel Amenities Units Maintenance Agreement (the **"Hotel Amenities Units Maintenance Budget"**);

(f)      a separately identifiable portion of the budget setting forth the amounts required to be paid for maintenance of the Hotel Common Areas, which will be provided to the Condominium Manager for inclusion in the budget for submission to Hotel Unit Owners as required by the Co-Ownership Regulations;

(g)      a narrative comparison to the Annual Plan and operating results of the prior Fiscal Year, highlighting material changes for the upcoming Fiscal Year;

(h)      any other information reasonably requested from time to time by Owner.

31

2.3.2    Operator will, from time to time, issue periodic forecasts of operating performance to Owner reflecting any significant unanticipated changes, variables or events or describing significant additional unanticipated items of income or expense. Operator will provide Owner with the material data and information utilized in preparing the Annual Plan and the Capital Budget or any revisions thereof. Operator will not be deemed to have made any guaranty, warranty or representation whatsoever in connection with the Annual Plan or any revisions thereof, and Owner acknowledges that the Annual Plan, including, but not limited to, the Capital Budget, the Operating Budget, the Hotel Unit Maintenance Budget, the Hotel Amenities Units Budget, are intended only as reasonable estimates of the matters they describe. In administering the Annual Plan, Operator may, without Owner's approval, reallocate budget line items within the same general divisional classification of budget items shown in the Annual Plan (e.g., rooms, food and other categories, as determined in accordance with GAAP) so long as such reallocation does not materially and adversely affect the purposes for which the original budget line items were intended. With respect to other items, in the event that Operator encounters circumstances which require unbudgeted and unanticipated expenditures not foreseen at the time of preparation of the Annual Plan and which Operator deems reasonably necessary, Operator may submit such matters for Owner's approval, which approval will not be unreasonably withheld or delayed.

2.3.3    The proposed Annual Plan will contain budgets for the Hotel Common Areas that require approval by the Committee of Hotel Unit Owners under the Co-Ownership Regulations and budgets for the Hotel Units and Hotel Amenities Units that will require approval by Owner. The following procedures will apply to each portion of the Annual Plan:

(a)    The portion of the proposed Annual Plan that is required to be approved by the Committee of Hotel Unit Owners under the Co-Ownership Regulations, consisting of the budget for the Hotel Common Areas, shall be submitted for approval to the Committee of Hotel Unit Owners as required by the Co-Ownership Regulations, and shall be deemed approved by Owner if deemed approved by Hotel Unit Owners as required by the Co-Ownership Regulations. The following additional provisions shall apply to the budget for the Hotel Common Areas:

(i)    Owner shall advise the Hotel Unit Owners that they may not withhold approval of any expenditures, revenues or other items in the proposed Annual Plan (including capital projects) based upon its objection to: (a) Operator's projections of the expenditures required to be made under this Agreement or otherwise reasonably required to operate the Hotel in accordance with the Operating Standard (including implementing and maintaining the Trump Brand Standards); (b) Uncontrollable Expenses; or (c) increases in projected costs and expenses of operating the Hotel, which are primarily caused by projected increases in occupancy or use of the Hotel.

(ii)    If the Annual Plan is rejected, the Operating Expenses and Capital Expenses in the Annual Plan for the previous year, increased by the greater of the percentage increase in the Index from January 1 of the prior Fiscal Year to December 31 of the prior Fiscal Year or twenty percent (20%) for the second Fiscal Year and four percent (4%) for each subsequent Fiscal Year, plus, for the second and each subsequent year, the actual increase in the cost of utilities, taxes and insurance from the past year of operation to the current year of operation, will remain in effect until such time as a new Annual Plan is approved or deemed

32

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

approved by the Committee of Hotel Unit Owners in accordance with the Co-Ownership Regulations.

        (iii)     The Annual Plan for the first Fiscal Year is based on a partial year from the Opening Date until December 31, 2011, and the second Fiscal Year Annual Plan shall be annualized to reflect a full twelve (12) months of operation. Therefore, any increases in Operating Expenses and Capital Expenses in the Annual Plan in the second year of operation that result solely from including a full twelve months of expenses shall not be taken into account in determining the allowable increase of up to 20% in the second year of operation.

        (iv)     Notwithstanding anything to the contrary contained herein or in the Co-Ownership Regulations, Hotel Unit Owners may not object to any item of the proposed Annual Plan, and the proposed Annual Plan shall not be modified to reflect any objection of Hotel Unit Owners if, as a result thereof, Operator would be unable to operate the Hotel in a safe and efficient manner, complying with all Legal Requirements, the Operating Standard and the Owner License Agreement, and maintaining in full operation all facilities and services operated or provided in accordance with the terms of this Agreement.

        (b)     The portion of the proposed Annual Plan that is not submitted to the Committee of Hotel Unit Owners under the Co-Ownership Regulations, consisting of the Operating Expenses and Capital Expenses of the Hotel Units and Hotel Amenities Units (during the term of the Hotel Amenities Units Lease), shall be submitted to Owner, and Owner shall provide Operator with any objections to the proposed Annual Plan in writing, in reasonable detail, within thirty (30) days after receipt of the proposed Annual Plan from Operator; provided however, if Owner shall fail to approve or reject any such submission within such thirty (30) day period, Operator may send an additional notice to Owner, which notice and the envelope containing same shall be marked "**URGENT**" and shall include a warning thereon in bold faced 16 point type that: **OWNER'S FAILURE TO RESPOND WITHIN 15 DAYS OF OWNER'S RECEIPT OF THIS SECOND NOTICE WILL RESULT IN THE REQUESTED CONSENT OR APPROVAL BEING DEEMED TO HAVE BEEN GRANTED.** If Owner shall fail to reply within fifteen (15) days following Owner's receipt of this second notice, Owner shall be deemed to have approved any portion of the proposed Annual Plan to which Owner has not objected in writing within such time period. Owner shall not withhold approval of any expenditures, revenues or other items in the proposed Annual Plan (including capital projects) based upon its objection to: (a) Operator's projections of the expenditures required to be made under this Agreement or otherwise reasonably required to operate the Hotel in accordance with the Operating Standard (including implementing and maintaining the Trump Brand Standards); (b) Uncontrollable Expenses; or (c) increases in projected costs and expenses of operating the Hotel, which are primarily caused by projected increases in occupancy or use of the Hotel. If Owner objects to any portion of the Annual Plan, then the provisions of **Section 2.3.3(d)** shall apply.

        (c)     If the Hotel Amenities Units Lease is no longer in effect, then the portion of the proposed Annual Plan for the Hotel Amenities Units only shall be submitted for approval to Hotel Amenities Units Owner, and Hotel Amenities Units Owner shall provide Operator with any objections to the proposed Annual Plan in writing, in reasonable detail, within thirty (30) days after receipt of the proposed Annual Plan from Operator. Hotel Amenities Units;

33

THIS DOCUMENT IS A CONFIDENTIAL FILING.<br/>ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

provided however, if Hotel Amenities Units Owner shall fail to approve or reject any such submission within such thirty (30) day period, Operator may send an additional notice to Hotel Amenities Units Owner, which notice and the envelope containing same shall be marked "URGENT" and shall include a warning thereon in bold faced 16 point type that: **HOTEL AMENITIES UNITS OWNER'S FAILURE TO RESPOND WITHIN 15 DAYS OF HOTEL AMENITIES UNITS OWNER'S RECEIPT OF THIS SECOND NOTICE WILL RESULT IN THE REQUESTED CONSENT OR APPROVAL BEING DEEMED TO HAVE BEEN GRANTED.** If Hotel Amenities Units Owner shall fail to reply within fifteen (15) days following its receipt of this second notice, Hotel Amenities Units Owner shall be deemed to have approved any portion of the proposed Annual Plan to which Hotel Amenities Units Owner has not objected in writing within such time period. Hotel Amenities Units Owner shall not withhold approval of any expenditures, revenues or other items in the proposed Annual Plan (including capital projects) based upon its objection to: (a) Operator's projections of the expenditures required to be made under this Agreement or otherwise reasonably required to operate the Hotel Amenities Units in accordance with the Operating Standard (including implementing and maintaining the Trump Brand Standards); (b) Uncontrollable Expenses; or (c) increases in projected costs and expenses of operating the Hotel Amenities Units which are primarily caused by projected increases in use of the Hotel Amenities Units. If Hotel Amenities Units Owner objects to any portion of the Annual, then the provisions of **Section 2.3.3(d)** shall apply.

(d)     If Owner or Hotel Amenities Units Owner objects to any portion of the proposed Annual Plan in accordance with **Section 2.3.3(b)** or **(c)**, as applicable, the following procedures shall apply:

(i)     Operator and the objecting party shall meet within fourteen (14) days after Operator's receipt of Owner's or Hotel Amenities Units Owner's objections to discuss the objections, and then Operator shall submit written revisions to the proposed Annual Plan. The parties shall use good faith efforts to reach an agreement on the Annual Plan prior to January 1 of the applicable Fiscal Year. The proposed Annual Plan, as modified to reflect the revisions either agreed to by the parties or determined by resolution pursuant to **Section 9.2**, shall become the Annual Plan for the next Fiscal Year. Owner and/or Hotel Amenities Units Owner, as applicable, shall act reasonably and exercise prudent business judgment in approving, or objecting to, all or any portion of the Annual Plan (including Capital Expenses).

(ii)     If despite their good faith efforts, the parties do not agree on the Annual Plan for the Hotel Units or the Hotel Amenities Units (as applicable) for a Fiscal Year by January 1 of such Fiscal Year, the parts of the Annual Plan not in dispute shall become effective on January 1 of that Fiscal Year, and either party may submit the matter(s) in dispute for resolution in accordance with **Section 9.2**. The prior Fiscal Year's Annual Plan shall govern the items in dispute pending the resolution of such dispute, except that the budgeted expenses provided for such item(s) in the prior Fiscal Year's Annual Plan (or, if earlier, the last Annual Plan in which the budgeted expenses for such disputed item(s) were approved) shall be increased (a) by the greater of five percent (5%) or the percentage increase in the Index from January 1 of the prior Fiscal Year (or, if applicable, each additional Fiscal Year between the prior Fiscal Year and the Fiscal Year in which there became effective the last Annual Plan in which the budgeted

34

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

expenses for such disputed item(s) were approved), (b) for increases in costs not within the control of Owner and/or Hotel Amenities Units Owner and/or Operator and (c) due to increases in the occupancy and/or use of the Hotel Units or Hotel Amenities Units.  The Annual Plan for the first Fiscal Year is based on a partial year from the Opening Date until December 31, 2011, and the second Fiscal Year Annual Plan shall be annualized to reflect a full twelve (12) months of operation.  If the disputed item did not previously appear in any previous Annual Plan, the expenditures for such items pending resolution of the dispute shall be at Operator's reasonable discretion.  Upon the resolution of any such dispute (whether by agreement of the Parties or under **Section 9.2**), such resolution shall control as to such item(s).

(iii)    Notwithstanding any other provision of this Agreement, Operator shall be authorized to pay expenditures pending resolution of any dispute in accordance with the provisions of Section 2.3.3.(d)(ii); provided, however, that during the period of any unresolved dispute under the provisions of this **Section 2.3.3**, relating to Capital Expenses, the applicable Capital Improvements shall not be commenced unless the failure to undertake such Capital Improvement would result in Operator's being unable to operate the Hotel in a safe and efficient manner, complying with all Legal Requirements, in accordance with the Operating Standard, and this Agreement and the Owner License Agreement, and maintaining in full operation all facilities and services operated or provided in accordance with the terms of this Agreement in the immediately preceding Fiscal Year.  Notwithstanding the provisions of the foregoing sentence, any Capital Improvements that are the continuation of a Capital Improvement project previously approved may continue.

(iv)    Notwithstanding anything to the contrary contained herein, Owner and Hotel Amenities Units Owner may not object to any item of the proposed Annual Plan, and the proposed Annual Plan shall not be modified to reflect any objection of Owner if, as a result thereof, Operator would be unable to operate the Hotel Units or the Hotel Amenities Units in a safe and efficient manner, complying with all Legal Requirements, the Operating Standard and the Owner License Agreement, and maintaining in full operation all facilities and services operated or provided in accordance with the terms of this Agreement.

2.3.4    Once the Annual Plan is established for a Fiscal Year (whether by agreement or by operation of the dispute resolution provisions described in **Section 2.3.3**), Operator shall deliver the final Annual Plan to Owner and Operator shall use commercially reasonable efforts at all times to operate the Hotel within the approved Annual Plan for such Fiscal Year (subject, in the case of any disputed items, to the provisions of **Section 2.3.3.**).  The parties recognize, however, that the preparation of the Annual Plan is inherently inexact and that actual results may vary significantly from projections.  Operator shall not, without prior approval or deemed approval of Owner with respect to the operating expenses of the Hotel Units and Hotel Amenities Units (or Hotel Amenities Units Owner with respect to the Hotel Amenities Units in the event the Hotel Amenities Units Lease is terminated) (which approval shall be deemed approved if not denied within ten (10) days after the request), or without prior approval or deemed approval of the Committee of Hotel Unit Owners with respect to the Hotel Common Areas as required under the Co-Ownership Regulations, incur costs or expenses or make expenditures that would (i) cause the expenditures in any of the major budget categories within an Annual Plan (i.e., rooms, food and beverage, administration and general, advertising and business promotion, maintenance, Utilities, insurance, personal property and equipment leases

35

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

and other operating departments) to exceed the budgeted expenditures in such budget category by more than fifteen percent (15%) with respect to the first two Fiscal Years and ten percent (10%) with respect to each subsequent Fiscal Year or (ii) cause the aggregate expenditures to exceed the aggregate amount of expenditures provided for in the Annual Plan by more than five percent (5%). The Annual Plan for the first Fiscal Year is based on a partial year from the Opening Date until December 31, 2011, and the second Fiscal Year Annual Plan shall be annualized to reflect a full twelve (12) months of operation. Therefore, any increases in expenditures in the second year of operation that result solely from including a full twelve months of expenses shall not be taken into account in determining the allowable increase in the second year of operation. Notwithstanding the foregoing, Owner understands and agrees as follows:

(a)     Certain expenses provided for in the Annual Plan for any Fiscal Year will vary based on the occupancy of the Hotel and participation in the Rental Program; and, accordingly, to the extent that occupancy of the Hotel for any Fiscal Year do or do not exceed the occupancy projections in the approved Annual Plan for such Fiscal Year (including by reason of increased or decreased participation or actual availability of the Participating Units for occupancy being higher or lower than anticipated), such approved Annual Plan shall be deemed to include corresponding increases or decreases in such variable expenses.

(b)     The amount of Uncontrollable Expenses are not within the ability of Operator to control; provided, however, Operator shall use commercially reasonable efforts to conserve the consumption of Utilities at the Hotel. Operator shall have the right to pay all Uncontrollable Expenses without reference or limitation to the amounts provided for such items in the approved Annual Plan for any Fiscal Year; provided that if such payment of Uncontrollable Expenses relates to the Hotel Common Areas or Building Common Areas, such payments are made in compliance with the Co-Ownership Regulations, and provided further that in the event that any Extraordinary Assessments are required to be paid in connection with the Hotel Common Areas or Building Common Areas, such Extraordinary Assessments are approved in accordance with the Co-Ownership Regulations.

(c)     If any expenditures are required on an emergency basis to avoid damage to the Hotel or injury to Persons or property, Operator may make such expenditures, whether or not provided for or within the amounts provided for in the approved Annual Plan for the Fiscal Year in question, but subject to the approval of the Board of Directors of the Owners Meeting or the Board of Coordinators of the affected Component, if required under the Co-Ownership Regulations with respect to an emergency repair of Building or Hotel Component Common Areas, as may reasonably be required to avoid or mitigate such damage or injury. In no event shall such emergency expenditures exceed $250,000 in any Fiscal Year without Owner's prior approval provided that the foregoing $250,000 limit shall not apply in the event of an emergency arising out of an imminent risk of life, health, safety, or civil or criminal liability. Operator shall use its reasonable efforts to give Owner advance notice of any expenditures to be made by Operator pursuant to this clause and, in any event, Operator shall give Owner notice as soon as practicable after such expenditures, but in no event later than fifteen (15) days after such expenditures are made of the nature of the emergency, unforeseen or special circumstances giving rise to such expenditures, the action taken by Operator and the amount of such expenditures. The $250,000 limit described above shall be deemed increased as of the

36

commencement of each Fiscal Year by the percentage increase in the Index during the preceding Fiscal Year.

2.3.5     Operator shall have the right from time to time during each Fiscal Year to propose modifications to the approved Annual Plan then in effect based on actual operations during the elapsed portion of the Fiscal Year in question and Operator's judgment as to what will transpire during the remainder of such Fiscal Year.  Any such modifications shall be subject to Owner's, Hotel Unit Owners and/or Hotel Amenities Units Owner's approval in the same manner as approval of the Annual Plan itself.  Any dispute relating to a proposed modification of an approved Annual Plan shall be resolved in the manner required in **Section 2.3.3**.

2.4     Maintenance and Repair of Hotel.  Subject to the Annual Plan and the provisions of **Sections 2.3** and **4.2** of this Agreement, and Owner providing the required Working Capital pursuant to **Section 4.4,** Operator shall from time to time make or cause to be made such repairs and maintenance (other than Capital Improvements) as are required to maintain the Hotel Units and Hotel Amenities Units in accordance with the Operating Standard.  Notwithstanding the foregoing, it shall be the responsibility of each Hotel Unit Owner to provide the funds necessary to maintain the FF&E within his, her or its Unit in good repair and in a condition consistent with the Operating Standard.  In addition, subject to the Annual Plan and the Hotel Unit Owners' payment of their Hotel Component Assessments in the manner required under the Co-Ownership Regulations, Operator shall cause to be made, in coordination with the Condominium Manager, such repairs and maintenance (other than Capital Improvements) as are required to maintain the Hotel Common Areas in accordance with the Operating Standard.

2.4.2     Owner, Hotel Amenities Units Owner and Owners Meeting shall take all actions necessary to assure that the Hotel and all other portions of the Building and the Components are maintained in accordance with the Operating Standard and Owner License Agreement.  Subject to the express limitations of **Section 4.1** of this Agreement, Owner shall approve, in the proposed Annual Plan or an amendment to an Annual Plan, any Capital Improvements proposed by Operator which are required to maintain the Hotel in accordance with the Operating Standard.  Operator shall, on behalf of Owner and at Owner's expense, make or cause to be made all repairs, replacements, corrections and maintenance items as are required in the normal and ordinary course of operation of the Hotel and as are required (i) to comply with the Operating Standard; (ii) to secure, maintain and renew required permits and licenses; (iii) to protect guests or employees or to preserve and protect the Hotel from injury; (iv) to correct or avoid violation of any Legal Requirements; (v) to comply with any order of any governmental or municipal power, department, agency, authority or officer; and/or (vi) to maintain required insurance coverage, collectively "**Maintenance Work**".  In conjunction therewith, Operator is authorized to make and enter into in the name of, for the account of and at the expense of Owner all contracts and agreements as are necessary or advisable in Operator's opinion for the repair, maintenance, refurbishment and improvement of the Hotel.  Operator shall competitively bid all Maintenance Work in excess of Fifty Thousand and 00/100 Dollars ($50,000.00) to at least three (3) of the contractors reasonably approved by Owner ("**Bidders**"), and shall award the contract to the highest qualified Bidder for the project contemplated with the lowest price unless Operator determines that there is a legitimate reason to award the contract to a Bidder who is not the highest qualified Bidder with the lowest price (which determination shall be subject to Owner's reasonable concurrence).  The bids submitted by the Bidders shall be broken down on a trade-by-

37

trade basis, and Operator shall permit Owner to review all of the bids received.  Operator shall disclose to Owner in writing if Operator or an Affiliate of Operator is one of the Bidders.

2.4.3    Subject to Owner providing the necessary Working Capital, together with funds from Assessments charged to Hotel Unit Owners for Hotel Common Areas, and other funds pursuant to **Section 4.2** and **Section 4.5**, Operator, as agent of Owner and at Owner's sole expense, shall incur all Capital Expenses necessary for the continued operation of the Hotel and to maintain the Hotel in accordance with the Operating Standard and Owner License Agreement. All Capital Expenditures shall require Owner's reasonable approval except to the extent same are provided for and approved in the Annual Plan or otherwise permitted under this Agreement. Unless otherwise required to maintain the Hotel in accordance with the Operating Standard, in compliance with Legal Requirements and in a safe and/or efficient condition, Operator shall exercise good faith efforts to schedule Capital Expenses so that such Capital Expenses are funded from the Capital Reserve Funds or the reserve fund maintained for the Hotel Common Areas under the Co-Ownership Regulations, as applicable, to the extent such funds are available.

2.4.4    Following the Opening Date, if Owner chooses to retain the services of Operator or an Affiliate of Operator designated by Operator to perform project management services in connection with an approved Capital Improvement project at the Hotel (excepting ordinary course day-to-day refurbishing, maintenance or repairs at the Hotel customarily supervised by Hotel Staff) and if such services require Operator to engage Head Office Personnel, as opposed to Hotel Staff (for reasons of expertise or capacity), then for such project management services Owner shall pay to Operator a mutually agreed upon fee.  If, however Owner elects to have a third party provide such project management services and Operator is nevertheless required to engage Head Office Personnel, as opposed to Hotel Staff to perform services reasonably required in connection with the project to (a) ensure consistency with the Operating Standard or (b) minimize interference with the operations of the Hotel, Owner shall pay Operator an administrative fee and reimburse Operator for any reasonable actual out-of-pocket expenses (which shall not be treated as an Operating Expense/Hotel or Operating Expense/Hotel Amenities Units, respectively, for the purposes of the calculation of Gross Operating Profit/Hotel or Gross Operating Profit/Hotel Amenities Units, as applicable) incurred while overseeing a Capital Improvement project, all to the extent specifically set forth in the Annual Plan.  In any event, Operator, in its capacity as manager of the Hotel, shall oversee the execution and implementation of all ordinary course day-to-day refurbishing, maintenance or repairs at the Hotel customarily supervised by Hotel Staff without a fee or reimbursement at the Hotel unless otherwise directed by Owner.

2.4.5    The repair and maintenance of the interior of each Hotel Unit, whether or not the Unit is a Participating Unit, shall be governed by the Co-Ownership Regulations and the Hotel Unit Maintenance Agreement.  Notwithstanding anything to the contrary set forth herein, the responsibility to provide funds for repairs, replacements, corrections and maintenance within a Hotel Unit shall be with the owner of the subject Hotel Unit. Operator shall have the right to suspend a Participating Unit from participation in the Rental Program in the event that sufficient funds to enable Operator to maintain such Participating Unit in accordance with the standards required pursuant to this Agreement, including the Operating Standard, are not made available to Operator by such Participating Unit Owner, as provided in the Hotel Unit Maintenance Agreement.

38

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

2.5    Books and Records; Financial Statements. Operator shall cause books of account and other records relating to or reflecting the results of the operation of the Hotel and Operator's provision of services to the Hotel to be kept in accordance with the Uniform System of Accounts and, to the extent applicable and not in conflict with the Uniform System of Accounts, or with GAAP. All books of account and other financial records shall be available at the Hotel to Owner, Hotel Amenities Units Owner, any Mortgagee and their designated agents at all reasonable times and on reasonable notice for examination, audit, inspection, and copying, provided, that, such inspection is during business hours and does not materially interfere with Operator's activities. Such books and records shall reflect the results of operation and maintenance of the Hotel, including the operation of the Rental Program, with the records and books of account for each Hotel Unit and the Hotel Amenities Units to be maintained in accordance with the Hotel Unit Maintenance Agreement and the Hotel Amenities Units Maintenance Agreement.

2.5.2    At Owner's election and expense, a certified audit of the Hotel and Rental Program operations shall be performed annually and after the Expiration Date, by a nationally recognized, independent Certified Public Accounting firm appointed by Owner and approved by Operator. The cost of any such audit shall be an Operating Expense. Notwithstanding the foregoing, in the event that Owner's audit of the books and records shows a discrepancy of two percent (2%) or more from the Gross Operating Profit/Hotel or Gross Operating Profit/Hotel Amenities Units appearing on the statement, then Operator shall pay to Owner the reasonable costs of conducting the audit.

2.5.3    On or before the fifteenth (15th) day after the close of each month during the Term, Operator shall cause to be prepared and delivered to Owner a monthly operating report reflecting operational results for each month of each Fiscal Year. Monthly operating reports shall include, at a minimum:  (i) an income and expense statement for the month in question and for the elapsed portion of the current Fiscal Year through the end of such month; (ii) a statement of net cash flow from operations in reasonable detail for such month as well as the cumulative Fiscal Year-to-date; (iii) a statement of the amount of the Management Fees and Reimbursable Expenses payable or reimbursable to Operator or its Affiliates; (iv) a variance report showing any variances that have occurred or that are anticipated between the applicable Annual Plan and actual results along with any variance to the actual results for the same period for the immediately preceding Fiscal Year, (v) a balance sheet including current month and prior beginning of year balance comparisons and differences in reasonable detail, (vi) a schedule of Capital Expenses showing, in reasonable detail, items budgeted, actual expenditures to date and the amount of expenditures projected for completion; (vii) the monthly bank statements and reconciliation; (viii) the most recent monthly Smith Travel Research ("STR") reports, available at the time Operator submits the operating statement; (ix) a monthly statistical report, including the average daily room rate, the revenue per available room, occupancy, room availability, rooms occupied, and room sales; and (x) a reforecast of income and expense for the remainder of the current Fiscal Year as compared to the approved Annual Plan, (xi) a detailed labor analysis in such form as Owner shall reasonably request, and (xii) other information reasonably requested by Owner consistent with information made available to owners of other Trump Brand Hotels. In addition, Operator will make available to Owner, in digital form, on a monthly basis, the general ledger for the prior month and, if available to other

7404892v25                    THIS DOCUMENT IS A CONFIDENTIAL FILING.
                    ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

owners of hotels utilizing Other Trump Marks, real time access via pass code, and on a weekly basis, the **"flash"** reports for the prior week for the Hotel.

2.5.4    On or before the twenty-fifth (25th) day after the close of each quarterly period of a Fiscal Year, Operator shall provide to each Hotel Unit Owner a financial report setting forth the financial performance of such Hotel Unit Owner's Hotel Unit(s) during such quarterly period.

2.5.5    Not later than sixty (60) days following the conclusion of each Fiscal Year, Operator shall cause to be prepared and delivered to Owner financial statements for the preceding Fiscal Year, including both a balance sheet and each of items **2.5.3 (i) through (xii)** above, and a computation in reasonable detail of the Base Fee/Hotel, Base Fee/Hotel Amenities Units, Incentive Fee/Hotel and Incentive Fee/Hotel Amenities Units for such Fiscal Year (**"Annual Report"**).

2.5.6    Operator may provide Owner the Monthly Reports and Annual Financial Statements and any other documents or information that Operator is required or may choose to provide to Owner regarding the Hotel by e-mail or other means of electronic transmission. The parties shall cooperate reasonably with each other in order to adapt to new technologies that may be available respecting the transmission of such documents and information.

2.6    Personnel.

Operator and Owner shall have the responsibilities and exercise the rights regarding Hotel Personnel set forth below:

2.6.1    All Hotel Personnel shall be employed by Owner. Operator, as agent for Owner, shall identify, appoint, assign, instruct, and supervise all Hotel Personnel. In the event that Owner requests that the Hotel's General Manager be replaced, which may only be upon reasonable cause, such as material failure to perform duties, fraud, or willful misconduct, Operator shall promptly take the necessary actions to replace the General Manager. Subject to **Section 2.6.5**, all decisions regarding hiring, firing, changes or replacements of the Hotel Personnel, other than the Hotel's General Manager, shall be at the sole discretion of Operator. Operator, in the exercise of reasonable discretion and business judgment, will be the sole judge of the fitness and qualifications of such personnel, and except to the extent provided in this Agreement, is vested with absolute discretion in the hiring, supervising, directing, discharging and determining the compensation, other benefits and terms of employment of such personnel. The terms of employment, including training, compensation, bonuses, health and welfare benefits, discharge, and replacement of all Hotel Personnel shall be established and administered by Operator, subject to the limitations in **Section 2.3.4** and in this **Section 2.6**. Operator shall keep the Hotel staffed at all times by a sufficient number of capable Hotel Personnel to enable it to properly, adequately, safely and economically manage, operate, maintain, and account for the Hotel.

2.6.2    Certain Hotel Personnel shall provide operating, maintenance, repair and other services necessary to operate the Building and all Common Areas of the Building, other than Hotel Common Areas (**"Non-Hotel Services"**). Under the terms of the Condominium

40

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

Management Agreement, Owners Meeting will be responsible for all Personnel Costs/Non-Hotel with respect to Non-Hotel Services, and Owner will be responsible for all Personnel Costs/Hotel with respect to services provided to the Hotel Component, including the Hotel Units, Hotel Amenities Units and Hotel Common Area. Operator will determine the Personnel Costs/Non-Hotel which will be allocated to Owners Meeting and Personnel Costs/Hotel which will be allocated to Owner based on Operator's reasonable determination of the amount of time spent by Hotel Personnel on services for the Hotel relative to time spent on Non-Hotel Services. Personnel Costs to be allocated between Owners Meeting and Owner shall include all expenses, costs, charges or claims which are or would be related or incidental to any personnel employed by Owner, including, to the extent applicable under any Legal Requirements, and without limitation: salaries, wages, other compensation, benefit contributions and premiums; stop-loss insurance premiums; premiums for self-insured group welfare and similar plans; plan benefit payments under self-insured group welfare and similar plans for current and former employees (and their dependents) to the extent those benefit payments under each such plan in the aggregate exceed the total premium amounts paid under each such plan; pay for vacation, holidays, sick leave and other leaves of absence, workers' compensation premiums; workers' compensation benefit payments in excess of premium amounts; administrative fees, expenses and costs (including, for example, fees for employee benefit plan record keepers, claims processors, attorneys and other service providers); employment and other employee or employee benefit related taxes; and severance benefits applicable under Operator's then current human resources policies).

2.6.3    Operator's reasonable expenses incurred in connection with the relocation of employees to the Hotel shall be allocated to the Hotel as an Operating Expense/Hotel or Operating Expense/ Hotel Amenities Units, as applicable, in accordance with Operator's written relocation policies reasonably approved by Owner.

2.6.4    Operator, in its discretion, but always in accordance with the policies and procedures of Operator for Trump Brand Hotels (which shall limit accommodations to space projected to be available and not reserved or occupied by members of the public), and the Annual Plan, may provide food and beverages at reasonable times and in reasonable quantities, temporary accommodations not to exceed one hundred (100) complimentary room-nights per Fiscal Year (and a prorated amount for partial Fiscal Years) based on availability and other use of the Hotel for the following members of the Hotel Personnel and their immediate families: the Hotel Executive Staff, the director of human resources, the director of operations, the food and beverage manager, the front office manager, the human resources manager, the chief engineer and such other department heads and personnel reasonably determined by Operator to be necessary for the efficient operation of the Hotel or as required by Labor Contracts or Legal Requirements. In making any determination to provide complimentary accommodations (or accommodations at rates below those offered by Operator or its Affiliates) or services to employees of Operator or Owner's personnel, Operator shall not displace any paying customers of the Hotel with confirmed reservations. Operator shall include a reasonably detailed report of any and all complimentary rooms (or rooms provided to traveling employees at rates below those offered by Operator) in the monthly reports provided to Owner. All costs incurred for such food, beverages, temporary accommodation and use shall be an Operating Expense. In addition to the foregoing, if Operator determines that, in order to provide a competitive salary and benefits package to Hotel Executive Staff, it is necessary to offer permanent accommodations at the

41

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.