12.5    Waivers, Modifications, Remedies.  No failure or delay by a party to insist on the strict performance of any term of this Agreement, or to exercise any right or remedy consequent on a breach thereof, shall constitute a waiver of any breach or any subsequent breach of such term.  Neither this Agreement nor any of its terms may be changed, waived, discharged, or terminated except by an instrument in writing signed by the party against whom the enforcement of the change, waiver, discharge, or termination is sought.  No waiver of any breach shall affect or alter this Agreement, but each and every term of this Agreement shall continue in full force and effect with respect to any other then existing or subsequent breach thereof.  The remedies provided in this Agreement are cumulative and not exclusive of the remedies provided by law or in equity.

12.6    Interpretation/Severability.  The use of the terms "**including**," "**include**," and "**includes**" followed by one or more examples is intended to be illustrative and shall not be deemed or construed to limit the scope of the classification or category to the examples listed. The Table of Contents and captions to the Articles and Sections of this Agreement are for convenience of reference only and in no way define, limit, describe, or affect the scope or intent of any part of this Agreement.  In the event that any one or more of the provisions contained herein shall, for any reason, be determined or held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provisions of this Agreement, and this Agreement shall be construed as if such invalid, illegal or unenforceable provisions had never been contained herein, unless the deletion of such provision or provisions would substantially destroy the benefit of the bargain of such agreement to Owner or Operator, in which event the party intended to benefit from the unenforceable provision shall have the right to amend this Agreement to modify such provision in such a manner it will be enforceable, so long as it does not negatively impact the rights or obligations of the other party or, if the other party does not or cannot amend this Agreement to modify such provision in a manner it will be enforceable without negatively impacting the rights or obligations of the other party, then the unenforceable provision shall be judicially modified, if at all possible, to come as close as possible to the expressed intentions of Owner and Operator in this Agreement.

12.7    Notices.  All notices, consents, determinations, approvals (or requests for any of the foregoing), demands, reports, objections, directions, and other communications required or permitted to be given under this Agreement shall be in writing and shall be personally delivered to any duly authorized representative of the party receiving such notice or sent by facsimile transmission, registered or certified mail (return receipt requested), or by internationally recognized courier service (e.g. Federal Express) courier service, return receipt requested, addressed:

    (a)       If to Owner:
                 Board of Directors
                 Hotel TOC Inc.
                 Calle Punta Colón
                 Punta Pacifica
                 Panama City, Panama 0833-00321
                 Facsimile No.: (507) 209-9000

    (b)       If to Owners Meeting:

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

7404892v25

Board of Directors
Owners Meeting of the P.H. TOC
Calle Punta Colón
Punta Pacifica
Panama City, Panama 0833-00321
Facsimile No.: (507) 209-9000

(c)        If to Promoter/Developer:
Roger Khafif
TOC Sales Center
Trump Plaza
53 Street, Obarrio
Panama City
Rep. of Panama
Facsimile No.:  (507) 209-9000
E-Mail:  rkhafif@dkfashion.com.pa

<u>With a copy to</u>:
Nelson F. Migdal, Esq.
Greenberg Traurig LLP
2101 L Street, NW, Suite 1000
Washington, DC 20037
Facsimile No.:  (202) 261-4757
E-Mail:  migdaln@gtlaw.com

(e)        If to Hotel Asset Manager
Ocean Point Development Corp.
c/o Roger Khafif
Trump Plaza
53 Street, Obarrio
Panama City
Rep. of Panama
Facsimile No.:  (507) 209-9000
E-Mail:  rkhafif@dkfashion.com.pa

(e)        <u>If to Operator, to all of the following</u>:
Allen Weisselberg
c/o Trump Panama Hotel Management LLC
725 Fifth Avenue, 26th floor
New York, NY 10022
ph: (212) 715-7224
fx:  (212) 832-5396
weisselberg@trumporg.com

Jason Greenblatt, Esq.
c/o Trump Panama Hotel Management LLC

89

7404892v25

725 Fifth Avenue
26th floor
New York, NY 10022
ph: (212) 715-7212
fx:  (212) 980-3821
jgreenblatt@trumporg.com

Donald J. Trump, Jr.
c/o Trump Panama Hotel Management LLC
725 Fifth Avenue
25th floor
New York, NY 10022
ph: (212) 715-7247
fx:  (212) 688-8135
djtjr@trumporg.com

Ivanka Trump
c/o Trump Panama Hotel Management LLC
725 Fifth Avenue
25th floor
New York, NY 10022
ph: (212) 715-7256
fx:  (212) 688-8135
itrump@trumporg.com

Eric Trump
c/o Trump Panama Hotel Management LLC
725 Fifth Avenue
25th floor
New York, NY 10022
ph: (212) 715-7256
fx:  (212) 688-8135
etrump@trumporg.com

Jim Petrus
c/o Trump Panama Hotel Management LLC
725 Fifth Avenue, 25th Floor
New York, NY 10022
ph: (212) 715-7227·
fx:  (212) 688-8135
jpetrus@trumporg.com

or at such other address as the party to whom the notice is sent has designated in accordance with this **Section 12.7.**  All such notices shall be effective upon personal delivery or, if sent by facsimile transmission, shall be effective on the date of transmission duly shown on the

90

7404892v25

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

confirmation slip, or, if sent by courier or delivery service, shall be effective on the date of delivery duly shown on the return receipt.

12.8    Successors and Assigns.   Subject to the provisions of Article 7, this Agreement shall inure to the benefit of and shall be binding on the successors and assigns of the parties, and the terms "**Owner**" and "**Operator**" as used in this Agreement shall include all permitted successors and assigns of the original parties.

12.9    Purchasing.   In making purchasing decisions with respect to products and services used in the operation of the Hotel, Operator will exercise reasonable business judgment in accordance with the standards in this Agreement generally applicable to management of the Hotel, Operator will act in a manner that enables Owner and the Hotel to gain the same benefits with respect to purchasing as are made available to other luxury hotels owned or operated by Operator or its Affiliates of the same category as the Hotel. In all purchasing decisions taken as a whole, Operator will give consideration to relevant competitive standards and practices among potential suppliers, taking into account the price, quality, service and other considerations which would be applied to a supplier unrelated to Operator, and will confirm that the Hotel shall be supplied goods or services at prices and on other terms, when taken as a whole, at least as favorable to the Hotel as generally available to similarly situated hotels in the relevant market and consistent with terms made available to other similar hotels operated by Operator.

12.9.2    Owner acknowledges that Operator, an Affiliate of Operator, or an entity in which Operator may have an interest, purchases or provides various goods and services used in the operation of the Hotel, and that in such instances, the related entity sets charges for such goods and services (which may include recovery of costs as well as profit). In addition, Owner acknowledges that Operator or entities related to it may receive rebates, allowances or similar kinds of payments in connection with purchasing activities, so long as, in all events, such amounts received by Operator are used to reduce the Operating Expenses of the Hotel. Owner agrees that, so long as Operator is acting in accordance with the standards described in the preceding paragraph, it may make such purchases unless otherwise instructed by Owner in writing. To the extent possible at the time of submission of the Annual Plan, Operator shall (i) include in the Annual Plan, a list of the services to be provided by Affiliates to the Hotel and shall identify the Affiliates who have or will provide such services to the Hotel, and (ii) shall disclose any rebates and allowances that Operator expects to receive in the next Fiscal Year or has received in the previous Fiscal Year in connection with the services to be provided by Affiliates. Operator shall not enter into any arrangement with Affiliates to provide services to the Hotel unless such arrangements are disclosed to Owner.

12.9.3    Owner may cancel the foregoing authorization and remove the Hotel from participation in Operator's purchasing programs provided (i) Owner has given Operator at least sixty (60) days' advance written notice of its intent to do so, and (ii) Owner has, at least thirty (30) days' in advance of the effective date of such cancellation, arranged for an alternative, comprehensive purchasing program which is sufficient, in Operator's reasonable business judgment, to meet all of the Hotel's requirements for the purchase of goods and services at prices equal to or lower than those made available to the Hotel under Operator's purchasing program, and complies with the Operating Standard, provided, however, that Owner recognizes that Operator remains responsible to control, direct and supervise the Hotel's purchasing programs.

91

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

With respect to FF&E and OS&E, Owner and Operator shall mutually and reasonably agree as to whether any such item shall be purchased or leased and Operator shall have the right to reasonably approve the terms and conditions of each lease and all modifications thereto.

12.9.4    With respect to purchasing products bearing the Trump Mark or any Other Trump Marks, Owner may seek Operator's approval, not to be unreasonably withheld, conditioned or delayed, to use suppliers other than Operator's suppliers, so long as such suppliers meet Operator's quality and design standards.

12.10   Freedom of Action.    Either party and their respective Affiliates shall be free to engage in and/or possess an interest in other business ventures of every nature and description, independently or with other persons, including but not limited to ownership, financing, leasing, operation, management, brokerage and development of real property, which may be competitive with the Hotel.  The other party shall not have any right by virtue of this Agreement in and to such other business venture or to the income or profits derived from such activities.

12.11   Entire Agreement.   This Agreement and any Exhibits, together with any other document or agreements executed between the parties concurrently herewith, supersede all prior contracts and understandings, written or oral, with respect to the subject matter hereof.

12.12   Counterparts.   This Agreement may be executed in several counterparts, each of which shall be an original, but all of which shall constitute one and the same instrument. Facsimile copies of signature pages shall be deemed originals for purposes of the creation of a fully executed, delivered and enforceable counterpart agreement.

12.13   Relationship of the Parties; Nature of Agreement.   Operator and Owner are not joint venturers, partners, or joint owners with respect to the Hotel, and nothing contained in this Agreement shall be construed as creating a partnership, joint venture, or similar relationship between the parties.  In operating the Hotel, signing contracts, accepting reservations, conducting financial transactions and making any other commitment, Operator acts on behalf of and as agent for Owner and assumes no independent contractual liability nor shall Operator be obligated to extend its own credit with respect to any obligation incurred in operating the Hotel or performing its obligations under this Agreement.

12.14   Confidentiality.  The parties agree that the matters set forth in this Agreement are strictly confidential.   This shall not preclude a party from disclosing the existence of this Agreement.   In addition, the parties agree to keep strictly confidential all information of a proprietary or confidential nature about or belonging to a party to which the other party gains or has access by virtue of the relationship between the parties.  Except as disclosure may be required to obtain the advice of professionals or consultants, or financing for the Hotel from an institutional lender, or in furtherance of a permitted assignment of this Agreement, or as may be required by law or by the order of any government, governmental unit, or tribunal, each party shall make every effort to ensure that such information is not disclosed to the press or to any other third person or entity without the prior consent of the other party.  The obligations set forth in this **Section 12.14** shall survive any Termination of this Agreement.   The parties shall coordinate with one another on all public statements, whether written or oral and no matter how

92

disseminated, regarding their contractual relationship as set forth in this Agreement, or the performance by either of them of their respective obligations under this Agreement.

12.15   No Third Party Beneficiaries.  The provisions of this Agreement are solely for the benefit of the parties hereto and the persons to whom their respective rights may be assigned in accordance with this Agreement, and no other person shall be entitled to enforce the provisions of this Agreement.

12.16   Time of the Essence.  Time is of the essence of this Agreement, and all time periods provided herein shall be strictly construed.

12.17   Representations and Warranties of Parties.  Each of the Parties hereto represents and warrants to the other Parties hereto that:

12.17.1   Such Party is duly organized, validly existing and in good standing under the laws of the jurisdiction of its formation and of each jurisdiction in which the nature of the business conducted or property owned or controlled by it makes such qualification necessary.

12.17.2   Such Party has the power and authority and all licenses, authorizations, consents and approvals necessary to perform its obligations under this Agreement and all of the other agreements referred to herein to which such Party is a party.

12.17.3   The execution, delivery and performance by such Party of this Agreement and all of the other agreements referred to herein to which such Party is party have been duly authorized by all necessary action required under such Party's charter documents, and do not and will not contravene the terms of such Party's charter documents, conflict with, or result in any breach or contravention of, any contractual obligation to which such Party is a party or any order, injunction, writ or decree of any governmental authority to which such Party or its property is subject, including any liens or encumbrances upon the property or assets of such Party, or violate any Legal Requirements.

12.17.4   This Agreement and all other agreements referred to herein to which such Party is a party constitute legal, valid and binding obligations of such Party, enforceable against such Party in accordance with their terms, except as enforceability may be limited by applicable bankruptcy, insolvency, or similar Legal Requirements affecting the enforcement of creditors' rights generally or by equitable principles relating to enforceability.

12.18   Survival of Miscellaneous Provisions.  The provisions of **Sections 5.5, 5.6, 9.1, 9.2, 11.1, 11.2, 12.1, 12.3-12.8** and **12.11-12.19** shall survive Termination of this Agreement.

12.19   Taxes.  Any and all taxes incurred or imposed in connection with the execution and delivery of this Agreement, including any applicable stamp taxes, shall be borne solely by Owner. Owner shall reimburse Operator promptly upon demand any taxes paid by Operator in connection the execution and delivery of this Agreement, provided however, that nothing in this Agreement shall be construed as imposing on Operator  the obligation to pay of any of such taxes.

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

7404892v25

## 13.    EXCLUSIVITY.

13.1    So long as Owner is not in default hereunder, neither Operator, Licensor nor Donald J. Trump, Sr. nor any of their respective Affiliates shall manage, license the Trump Mark to, or brand or franchise any other hotel or hotel condominium, (i) within the area known as **"Punta Pacifica"**, as shown on the map attached hereto as Exhibit F, for a period of ten (10) years after the date of the first closing of any Residential Unit or Hotel Unit to a third-party purchaser, and (ii) within the area designated as the **"Outer Region"** shown on the map attached hereto as Exhibit E to this Agreement, for a period of five (5) years after the date of the first closing of any Residential Unit or Hotel Unit to a third-party purchaser.  The exclusivity provisions set forth in this **Section 13.1** shall terminate and be of no force and effect if, at any time, Operator, an Affiliate of Operator or an Affiliate of Licensor is not the manager of the Hotel.  Further, for purposes of clarification, this clause shall in no way restrict Licensor or any of its Affiliates from entering into a license agreement with respect to any residential project that does not include a hotel or hotel condominium component.

13.2    Notwithstanding anything herein to the contrary, the provisions of this **Section 13.2** shall be applicable to Donald J. Trump, Jr., Ivanka Trump and Eric Trump, any and all affiliates of Donald J. Trump, Sr., Donald J. Trump, Jr., Ivanka Trump and Eric Trump, and all such persons and entities shall be bound by the restrictions set forth hereunder.  In the event that any of Donald J. Trump, Jr., Ivanka Trump or Eric Trump are no longer employed by Operator, Licensor or the Trump Organization, LLC, this **Section 13.2** shall no longer apply to solely to that individual no longer employed by Operator, Licensor or the Trump Organization, LLC.

*Signatures on next pages*

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

7404892v25

## TRUMP OCEAN CLUB INTERNATIONAL HOTEL & TOWER

### AMENDED AND RESTATED HOTEL MANAGEMENT AGREEMENT

Signature Page

**IN WITNESS WHEREOF,** the Parties hereto have executed this Agreement on the 13 day of April, 2011.

**OPERATOR:**

**TRUMP PANAMA HOTEL
MANAGEMENT LLC,** a Delaware limited
liability company

By: _____
   Donald J. Trump
   President

State of New York

       ) ss.:

County of New York

On the 13th day of April in the year 2011 before me, the undersigned, a Notary Public in and for said State, personally appeared Donald J. Trump, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity as indicated in such instrument, and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

_____
Notary Public

MICHAEL COHEN
Notary Public, State of New York
No. 02CO6137349
Qualified in New York County
Commission Expires November 21, 2013

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.



TRUMP OCEAN CLUB INTERNATIONAL HOTEL & TOWER

AMENDED AND RESTATED HOTEL MANAGEMENT AGREEMENT

Signature Page

OWNER:

HOTEL TOC INC., a Panamanian
corporation

By: _____
Charles Mark Stevenson
Secretary

HOTEL AMENITIES UNITS OWNER
AND
PROMOTER/DEVELOPER:

NEWLAND INTERNATIONAL
PROPERTIES, CORP., a Panamanian
corporation

By: _____
Roger Khafif
President

OWNERS MEETING:

OWNERS MEETING OF THE P.H.
TOC

By: _____
Roger Khafif
President

Yo, Lidia LUIS FRAIZ DOCABO, Notario Público Primero del Circuito de
Panamá con cédula de identidad personal No.8-311-734.
CERTIFICO:
que dada la certeza de la identidad del (los) sujeto(s) que firma(firman) m
... en el presente documento tu (s) firma (s) su (sus) ... 
Panamá _____ 10 ABR 2009

Testigo                                    Testigo

Lidia LUIS FRAIZ DOCABO
Notario Público Primero

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

TRUMP OCEAN CLUB INTERNATIONAL HOTEL & TOWER

AMENDED AND RESTATED HOTEL MANAGEMENT AGREEMENT

Signature Page

HOTEL ASSET MANAGER

OCEAN POINT DEVELOPMENT CORP.,
a Panamanian corporation

By:

Roger Khafif
President

Yo, Licdo. LUIS FRAIZ DOCABO, Notario Público Primero del Circuito de
Panamá, con cédula de identidad personal No. 8-311-734,
CERTIFICO:
Que dada la certeza de la identidad del (ton) sujeto(s) que firmo(firmaron) el
presente documento la(s) firma (s) es (son) auténtica (s).
PANAMA, _____ 13 ABR 2011

_____          _____
Testigo                          Testigo

Licdo. LUIS FRAIZ DOCABO
Notario Público Primero

## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| MORGAN & MORGAN, P.A., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) C.A. No. _____ |
| | ) |
| TRUMP PANAMA HOTEL | ) **CONFIDENTIAL FILING** |
| MANAGEMENT LLC, and TRUMP | ) |
| INTERNATIONAL HOTELS | ) |
| MANAGEMENT, LLC, | ) |
| | ) |
| Defendants. | ) |

**EXHIBIT B** TO VERIFIED COMPLAINT TO ENJOIN ARBITRATION
**(REQUEST FOR ARBITRATION – without exhibits)**

**YOU ARE IN POSSESSION OF A CONFIDENTIAL FILING FROM THE
CHANCERY COURT OF THE STATE OF DELAWARE IN AND FOR
NEW CASTLE COUNTY.**

**If you are not authorized by Court order to view or retrieve this document read
no further than this page. You should contact the following persons:**

**VENABLE LLP**

*/s/ Daniel A. O'Brien*
Jamie L. Edmonson (No. 4247)
Daniel A. O'Brien (No. 4897)
1201 N. Market Street, Suite 1400
Wilmington, DE 19801
Tel.: 302.298.3535
Fax: 302.298.3550
jledmoson@venable.com
daobrien@Venable.com

**Pursuant to Rule 5.1(d)(2) a public version in not required to be filed.**

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

# Exhibit B

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY THE COURT.

ARBITRATION ADMINISTERED BY
INTERNATIONAL CHAMBER OF COMMERCE

CASE NO. _____

**HOTEL TOC, INC.,**

*Claimant,*

-against-

**TRUMP PANAMA HOTEL MANAGEMENT LLC, TRUMP INTERNATIONAL
HOTELS MANAGEMENT, LLC, and JOHN DOES 1-5,**

*Respondents.*

---

## REQUEST FOR ARBITRATION

---

| | |
|---|---|
| Joshua D. Bernstein<br>Darryl R. Graham<br>Kathleen M. Prystowsky<br>Vanessa I. Garcia<br>**AKERMAN LLP** | Jose Carrizo<br>Orlando Tejeira<br>**MORGAN & MORGAN** |
| 666 Fifth Avenue, 20th Floor<br>New York, New York 10103<br>Telephone 212.880.3800<br>Facsimile: 212.880.8965 | MMG Tower, 23rd Floor<br>Avenue Paseo del Mar, Costa del Este<br>Panama, Republic of Panama<br>Telephone: 507.265.7777<br>Facsimile: 507.265.7700 |

*Attorneys for Claimant Hotel TOC, Inc.*

**October 14, 2017**

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY THE COURT.

Claimant Hotel TOC, Inc. ("Owner" or "Hotel TOC") hereby files this Request for Arbitration against Trump Panama Hotel Management LLC, Trump International Hotels Management, LLC (collectively "Operator"), and John Does 1-5 ("Does," and collectively with Operator, "Respondents"), and states as follows.

## NATURE OF ACTION

1.      This arbitration arises out of Operator's utter mismanagement of the Trump International Hotel & Tower Panama f/k/a the Trump Ocean Club International Hotel & Tower (the "Hotel"), a premier hotel property in Panama and Latin America, which Operator was charged to manage and operate pursuant to the parties' hotel management agreement (the "Management Agreement," as further defined herein)[1] as a luxury hotel, with a level of service and quality generally considered to be luxury, and in a manner designed to maximize the profitability and long term value of the Hotel.

2.      As a direct result of Operator's abysmal management of the Hotel, material breaches of the Management Agreement and its fiduciary duties to Owner, the economic performance, physical condition, and guest service levels of the Hotel have dramatically declined. The Hotel is one of the finest hotels in Panama and Latin America; yet, as a result of Operator's conduct, including that detailed herein, the Hotel has been virtually empty resulting in abysmal occupancy rates and RevPAR, all the while guest complaints go unanswered, rooms go uncleaned, and Hotel amenities remain substantially underutilized.

3.      By virtue of Operator's conduct, the Hotel (despite being a physically stunning structure with the best amenities and finishes in the market) has fallen to the very bottom of any

---

[1] A true and correct copy of the Amended and Restated Hotel Management Agreement for Trump Ocean Club International Hotel & Tower among Trump Panama Hotel Management LLC, Newland International Properties Corp., Hotel TOC Inc. and Owners Meeting of the P.H. TOC, dated as of April 13, 2011, is attached hereto as Exhibit 1 (without schedules). A true and correct copy of the First Amendment to the Amended and Restated Hotel Management Agreement, dated as of July 3, 2013, is attached hereto as Exhibit 2.

2

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY THE COURT.

meaningful competitive set and guest satisfaction scores have plummeted, as evidenced by, among other things, ratings on TripAdvisor.com, Hotels.com, and Oyster.com.

4.      While occupancy levels for the Hotel have collapsed over the last few years, significantly depressing revenues, Owner has been shouldering the burden of the Hotel operation out of its own pocket.  Yet, Operator has provided Owner only sparse and deficient financial disclosure, all the while failing to make required distributions and develop an effective marketing plan to address the problems plaguing the Hotel caused by Operator's incompetence.

5.      By contrast, Operator (and upon information and belief Operator's affiliates John Does 1-5) have enjoyed nothing but upside while the Hotel continues to lose market share at an alarming rate and while expenses are significantly higher than its regional luxury competitors.

6.      Beneficiaries of the Owner have repeatedly raised these concerns and implored Operator to develop a sales and marketing strategy that will target the right market, encourage group and contract business to engage with the Hotel, reduce bloated expenses, and drive occupancy.  Operator's gross incompetence and deficient sales organization stands in the way of Owner making any profit on its investment, all the while lining Operator's pockets.

7.      Despite its obligation under the Management Agreement to operate the Hotel as a luxury hotel, perform its services "in accordance with the Operating Standard,"[2] and "use its commercially reasonable efforts to operate the Hotel in such a manner to endeavor to maximize the profitability and long term value of the Hotel," Operator has materially breach the Management Agreement and done anything but act reasonably or maximize the Hotel's profitability.

---

[2] The Operating Standard is defined in the Management Agreement to mean "the level of service and quality generally considered to be luxury and no less than the level of service and quality prevailing from time to time at the Trump Brand Hotels, (b) [sic] consistent with the Trump Brand Standards, and (c) in accordance with this Agreement, and taking into consideration local custom, usage and standards in Panama, as agreed to by the parties...."

3

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY THE COURT.

8.     By its wrongful acts, incompetence, and violations of its own standards, Operator has not only cost Owner in excess of $15 million in damages, but has irreparably devastated the reputation, value and future success of the Hotel and Owner's investment therein.

9.     Accordingly, on October 14, 2017, Hotel TOC served Operator with a Notice of Default (the "Default Notice")[3] detailing specific breaches of the Management Agreement and demanding that those breaches be cured (to the extent curable). However, as many, if not all, of the breaches articulated in the Default Notice are incurable pursuant to the express terms of the Management Agreement, Owner is entitled to immediately terminate the agreement as a matter of law.

10.     Based on Operator's failure and/or inability to cure the defaults articulated in the Default Notice, Owner brings this arbitration seeking, among other things: (i) a declaration that uncured Events of Default have occurred entitling Owner to terminate the Management Agreement, including, but not limited to, breaches of Sections 2.1, 2.2, 2.3, 2.4, 2.5, 2.6, 4.2, 4.4, 4.6, 5.2(a), 5.2(e), 5.2(f), and 5.2(h); (ii) a declaration that, even if an Event of Default has not occurred, Owner is entitled to terminate the Management Agreement under the laws of personal services contracts and agency; and (iii) damages in an amount to be proven but no less than $15 million to compensate Owner for Operator's flagrant, calculated and material breaches of the Management Agreement and its fiduciary duties to Owner, including interest, costs, and attorneys' fees.

## JURISDICTION AND VENUE

11.     **ICC Arbitration.** This dispute is governed by the arbitration provision in the Amended and Restated Hotel Management Agreement for Trump Ocean Club International Hotel & Tower made among Trump Panama Hotel Management LLC, Newland International

---

[3] A true and correct copy of the Default Notice is attached hereto as Exhibit 3.

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY THE COURT.

Properties Corp. ("Hotel Amenities Unit Owner," now owned by Ithaca Capital Investments II, S.A.), Hotel TOC, Inc., and Owners Meeting of the P.H. TOC (the "P.H. TOC"), dated as of April 11, 2011, and as amended (the "Management Agreement"). Pursuant to Article 9, disputes arising out of the Management Agreement, including, but not limited to, Events of Default, are to be resolved by binding arbitration before the International Chamber of Commerce (the "ICC").

12.    Section 9.1 of the Management Agreement provides:

> Unless otherwise specifically provided for in this Agreement, all disputes, controversies, claims or disagreements arising out of or relating to the Agreement (singularly, a "Dispute", and collectively, "Disputes") shall be resolved in the following manner.
>
> 9.1.1   Either Party may submit the Dispute to the International Chamber of Commerce for binding arbitration under then existing ICC Commercial Arbitration Rules. ...

13.    Since the disputes raised herein in this Request for Arbitration concern Operator's material breaches of the Management Agreement and Owner's right to terminate Operator, these claims are properly brought before the ICC.

14.    **Language and Place of Arbitration**. Pursuant to Sections 9.1.2 and 9.1.5 of the Management Agreement, the language of the arbitral proceedings shall be English and the place of the arbitration shall be Panama City, Panama.

15.    **Governing law**. Section 12.3 of the Management Agreement further provides that "all disputes relating to the performance or interpretation of any term of this Agreement... shall be construed under and governed by the internal laws of the State of New York...."

5

## APPOINTMENT OF ARBITRATOR

16.     The Management Agreement provides that any arbitration conducted in accordance with Article 9 of the agreement will be conducted by a panel of three arbitrators.

17.     Specifically, arbitrators must meet the following qualifications:

> Each arbitrator shall have not fewer than 10 years of experience (at the time the request for arbitration is filed) in the luxury hotel business as construed under U.S. market standards (and no fewer than five years of experience in the luxury condominium business), shall be independent of the parties as provided by the ICC Commercial Arbitration Rules, and shall not be an Affiliate of or a Person who has any past (within the prior three years from the date the arbitration is filed), present, or currently contemplated future business or personal relationship with Owner, Promoter/Developer, any owner of 10% of the Hotel Units or any other category of Units, or Operator.

Management Agreement at § 9.1.1.

18.     The Management Agreement also provides the method for appointing an arbitration panel and specifies that each party to the arbitration is entitled to select one arbitrator. Specifically, the Section 9.1.1 provides:

> Each of Operator, on the one hand, and any one or more of the other Parties, on the other hand, shall propose one arbitrator by written notice incorporated into the request for arbitration and the answering statement, to the other Party, and the two arbitrators selected shall, within twenty (20) days after their appointment, select a third arbitrator. If either Party does not select an arbitrator within twenty days after the Dispute is submitted, then an arbitrator shall be selected for that Party under the ICC Commercial Arbitration Rules. In the event that the parties are unable to obtain the services of arbitrators which meet the qualifications set forth in this **Section 9.1.1**, the parties shall use diligent efforts to obtain the services of arbitrators whose qualifications are substantially similar to those set forth above.

*Id.* (emphasis in original).

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY THE COURT.

19.     Hotel TOC hereby designates Cecilia Fanelli as its party appointed arbitrator.  Ms.

Fanelli's contact information is as follows:

Cecelia L. Fanelli, Esq.
Steptoe & Johnson LLP
1114 Avenue of the Americas
New York, New York 10036
Tel.: 212.506.3925
Fax: 212.506.3950
cfanelli@steptoe.com

## THE PARTIES

20.     Claimant, Hotel TOC, Inc., is a corporation formed under Panamanian law, with

its principal place of business located at la Propiedad Horizontal P.H. TOC, Ciudad de Panamá,

República de Panamá.

21.     All communications to Hotel TOC in connection with this proceeding should be

sent to its counsel, as follows:

Joshua D. Bernstein
Darryl R. Graham
Kathleen M. Prystowsky
Vanessa I. Garcia
AKERMAN LLP
666 Fifth Avenue, 20th Floor
New York, New York 10103
Tel: 212.880.3800
Fax: 212.259.7181
Joshua.Bernstein@akerman.com
Darryl.Graham@akerman.com
Kathleen.Prystowsky@akerman.com
Vanessa.Garcia@akerman.com

Jose Carrizo
MORGAN & MORGAN
MMG Tower, 23rd Floor
Avenue Paseo del Mar, Costa del Este
Panama, Republic of Panama
Tel.: 507.265.7777
Fax: 507.265.7700
Jose.Carrizo@morimor.com

7

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY THE COURT.

22.   Respondent Trump Panama Hotel Management LLC is a limited liability company formed under Delaware law, with its principal place of business at 725 Fifth Avenue, 26th Floor, New York, New York 10022.

23.   Pursuant to the Management Agreement, all communications to Respondent Trump Panama Hotel Management LLC should be sent to all of the following:

> Allen Weisselberg
> c/o Trump Panama Hotel Management LLC
> 725 Fifth Avenue, 26th Floor
> New York, New York 10022
> Tel:   212.715.7224
> Fax:   212.832.5396
> weisselberg@trumporg.com

> Jason Greenblatt, Esq.
> c/o Trump Panama Hotel Management LLC
> 725 Fifth Avenue, 26th Floor
> New York, New York 10022
> Tel:   212.715.7212
> Fax:   212.980.3821
> jgreenblatt@trumporg.com

> Donald J. Trump, Jr.
> c/o Trump Panama Hotel Management LLC
> 725 Fifth Avenue, 25th Floor
> New York, New York 10022
> Tel:   212.715.7247
> Fax:   212.688.8135
> djtjr@trumporg.com

> Ivanka Trump
> c/o Trump Panama Hotel Management LLC
> 725 Fifth Avenue, 25th Floor
> New York, New York 10022
> Tel:   212.715.7256
> Fax:   212.688.8135
> itrump@trumporg.com

> Eric Trump
> c/o Trump Panama Hotel Management LLC
> 725 Fifth Avenue, 25th Floor
> New York, New York 10022

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY THE COURT.

Tel:    212.715.7256
Fax:    212.688.8135
etrump@trumporg.com

Jim Petrus
c/o Trump Panama Hotel Management LLC
725 Fifth Avenue, 25th Floor
New York, New York 10022
Tel:    212.715.7227
Fax:    212.688.8135
jpetrus@trumporg.com

24.     Upon information and belief, Respondent Trump International Hotels
Management, LLC is a limited liability company formed under Delaware law, with its principal
place of business at 725 Fifth Avenue, 26th Floor, New York, New York 10022.

25.     Upon information and belief, Respondent Trump International Hotels
Management, LLC assigned certain of its interests in the Management Agreement to Respondent
Trump Panama Hotel Management LLC.

26.     All communications to Respondent Trump Panama Hotel Management LLC
should be sent to all of the following:

Allen Weisselberg
c/o Trump International Hotels Management LLC
725 Fifth Avenue, 26th Floor
New York, New York 10022
Tel:    212.715.7224
Fax:    212.832.5396
weisselberg@trumporg.com

Jason Greenblatt, Esq.
c/o Trump International Hotels Management LLC
725 Fifth Avenue, 26th Floor
New York, New York 10022
Tel:    212.715.7212
Fax:    212.980.3821
jgreenblatt@trumporg.com

9

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY THE COURT.

Donald J. Trump, Jr.
c/o Trump International Hotels Management LLC
725 Fifth Avenue, 25th Floor
New York, New York 10022
Tel:    212.715.7247
Fax:    212.688.8135
djtjr@trumporg.com

Ivanka Trump
c/o Trump International Hotels Management LLC
725 Fifth Avenue, 25th Floor
New York, New York 10022
Tel:    212.715.7256
Fax:    212.688.8135
itrump@trumporg.com

Eric Trump
c/o Trump International Hotels Management LLC
725 Fifth Avenue, 25th Floor
New York, New York 10022
Tel:    212.715.7256
Fax:    212.688.8135
etrump@trumporg.com

Jim Petrus
c/o Trump International Hotels Management LLC
725 Fifth Avenue, 25th Floor
New York, New York 10022
Tel:    212.715.7227
Fax:    212.688.8135
jpetrus@trumporg.com

27.    Upon information and belief, Respondents John Does 1-5 are individuals and/or legal entities, affiliated with Operator, the names and addresses of which are presently unknown.

28.    Upon information and belief, at all relevant times, John Does 1-5 are individuals and/or entities that dominated and controlled Operator, and primarily transacted Operator's business instead of its own.

29.    Upon information and belief, John Does 1-5 used their control and domination of Operator to breach Operator's legal duties, causing damages to Owner.

10

30.     Indeed, upon information and belief, Operator is nothing but a pass-through entity created by John Does 1-5 to manage the Hotel and purportedly and fraudulently shield John Does 1-5 from liability to Operator's creditors (including Hotel TOC), thereby attempting to make Operator judgment proof so as to prevent an actual recovery for Operator's breaches of the Management Agreement and its fiduciary duties, among other things.

31.     Accordingly, pursuant to New York law (which governs the Management Agreement and this proceeding), Hotel TOC is entitled to pierce the corporate veil and to a judgment in this arbitration declaring that John Does 1-5 are liable for all damages awarded.

## FACTUAL BACKGROUND

### I.     The Development of the Trump Ocean Club International Hotel & Tower

32.     The Trump International Hotel & Tower Panama is part of a 70-story, luxury mixed-use, multi-component tower located on the waterfront overlooking Panama Bay in the Punta Pacifica area of Panama City, Panama, which includes a hotel, residences, event space, restaurants, and casino.

33.     The tower complex is comprised of five components: the Hotel, residential condominiums, offices, commercial space, and a casino.   Collectively, these components are governed by a horizontal property regime known as the P.H. TOC, a condominium association.

34.     The Hotel, one of the finest luxury hotel properties in Latin America, consists of 369 Hotel Units and a Hotel Amenities Unit, each of which are owned by individual unit owners. To ensure effective management of the Hotel, these individual unit owners are beneficiaries in an entity known as the Hotel TOC Foundation, which in turn controls Hotel TOC, Inc. – the Claimant here.

35.     The tower's developers envisioned that the P.H. TOC and Hotel TOC would be managed and operated by an international luxury hotel brand to ensure the efficient and

11

comprehensive operation of the tower as a luxury property that would maximize the investment for all component owners.

36.     In connection with this project, the developer entered into a series of agreements with Donald J. Trump and his affiliates to brand, manage and operate the Building, including a condominium management agreement, hotel management agreement, and license agreement. These agreements streamlined the management of the Building to ensure that all the components, particularly the Hotel and condominium, would be maintained and operated in a cohesive manner as a luxury property.

37.     To that end, on or about March 16, 2006, K Group Developers Inc. entered into a License Agreement with Donald J. Trump to license the "Trump" trademark as the brand for the tower.[4]  Pursuant to that agreement, the developer received a license to use the Trump Mark to brand the tower.

38.     In connection with the development of the tower, P.H. TOC entered into a twenty-year management agreement with a Trump affiliate, known as the Trump Panama Condominium Management LLC ("Trump Condo"), to operate common areas of the tower.   Under that agreement, Trump Condo agreed to provide luxury services to P.H. TOC, including the maintenance and operation of the tower.

39.     Upon information and belief, the P.H. TOC Management Agreement was terminated after allegations arose concerning Trump Condo's gross negligence and potentially fraudulent conduct, including the commingling of accounts for the various components and the distribution of funds from P.H. TOC bank accounts without authorization.  Upon information

---

[4] Thereafter, K Group Developers Inc. assigned its interests in the agreement to Newland and Mr. Trump assigned his interest in the agreement to Trump Marks Panama LLC.

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY THE COURT.

and belief, Trump Condo agreed to the termination of the P.H. TOC Management Agreement pursuant to a Mutual Release and Settlement Agreement.

40.    Additionally, on or about August 11, 2008, Hotel TOC (as Owner of the Hotel component and representative of the individual hotel unit owners) entered into the Management Agreement, which is the subject of this arbitration, with Respondent Operator (another Trump affiliate) to manage and operate the Hotel Units and Hotel Amenities Units[5] as a first class, luxury hotel. Operator's obligations under the Management Agreement are described more fully below.

## II.    The Hotel Management Agreement

### A.    Operator's Contractual and Fiduciary Obligations to Owner

41.    In connection with the Management Agreement, Operator held itself out to be a sophisticated international luxury hotel manager that could position the Hotel as a luxury property and maximize the revenue stream to Owner.

42.    Indeed, the express purpose of retaining Operator was to "operate the Hotel Units and Hotel Amenities Units as a first class, luxury hotel." Management Agreement at p.2.

43.    Based on these representations, Owner engaged Operator "as its agent to supervise, direct, and control the management, operation, and promotion of all aspects of the Hotel." *Id.* at § 2.1.1.

44.    The initial term of the Management Agreement is for a period of twenty (20) years after the Opening Date, which runs until July 6, 2031. *Id.* at § 5.1. While the Management Agreement includes an automatic five (5) year Renewal Term, both the Owner and the Operator

---

[5] In connection with the Management Agreement, the Hotel Amenities Unit Owner leased the Hotel Amenities Unit to Owner. Pursuant to the Management Agreement, Operator is contractually obligated to oversee compliance of the lease and cause Owner to perform its obligations under the lease. *See* Management Agreement at § 2.2.29.

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY THE COURT.

have the right to forgo the Renewal Term by terminating the agreement by notice given twelve

(12) months prior to the expiration date. *Id.* at § 5.1.2.

45.    Under the Management Agreement, Operator is contractually obligated to "use its

commercially reasonable efforts to operate the Hotel in a manner to endeavor to maximize the

profitability and long term value of the Hotel." *Id.* at § 2.2.

46.    Specifically, Section 2.2 provides:

> Operator hereby accepts the foregoing engagement and covenants
> and agrees to manage the Hotel and perform Operator Hotel
> Services and Other Operator Services during the Term of this
> Agreement in accordance with the Operating Standard and to *use
> its commercially reasonable efforts to operate the Hotel in such a
> manner to endeavor to maximize the profitability and long term
> value of the Hotel.* Without limiting the generality of, the
> foregoing, but subject to the limitations set forth in Sections 2.3
> and 2.6-2.11 and the other provisions of this Agreement, Operator
> shall have the authority and duty, as necessary or advisable for the
> proper operation and maintenance of the Hotel and performance of
> the other Operator Services in accordance with the Operating
> Standard....

*Id.* at § 2.2 (emphasis added).

47.    Moreover, Operator also has the "authority and duty" to operate and maintain the

Hotel in accordance with the Operating Standard, *i.e.* as a luxury hotel. *Id.*

48.    The definition of "Operating Standard" in the Management Agreement provides:

> <u>Operating Standard</u> - means the *level of service and quality
> generally considered to be luxury* and no less than the level of
> service and quality prevailing from time to time at the Trump
> Brand Hotels, (b) consistent with the Trump Brand Standards, and
> (c) in accordance with this Agreement, and taking into
> consideration local custom, usage and standards in Panama, as
> agreed to by the parties; provided however, in the event the Parties
> are unable to agree upon the local standard, if any, to be applied,
> such dispute shall be resolved pursuant to Section 9.1 hereof.

*Id.* at 15 (emphasis added).

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY THE COURT.

49.   To that end, and evidencing Operator's overall power and control over the Hotel, the Management Agreement states that "except as may otherwise be expressly provided for [therein], Owner delegates all authorities and responsibilities for operation of the Hotel to Operator." *Id.* at § 2.1.3.

50.   This delegation to Operator includes providing customary hotel operator services, supervising Hotel personnel, causing the Hotel to be maintained in good order, and making "all necessary repairs, replacements, corrections and maintenance … to maintain the competitive position of the Hotel in its market." *See e.g.*, *id.* at §§ 2.2.14-2.2.15, 2.2.19, 2.2.27, 2.2.32.

51.   Operator is also charged with the authority to operate the Hotel as Owner's agent in all of the following aspects, among others:

- "[T]he establishment and maintenance of the Hotel Accounts…" *Id.* at § 2.1.3.

- "[D]irecting all Gross Operating Revenue/Hotel and Gross Operating Revenue/Hotel Amenities Units, respectively to the appropriate bank account." *Id.*

- "[D]etermining room rates, food and beverage menu prices and charges to Hotel Guests for Other Operator Services." *Id.*

- Determining "the terms of guest occupancy and admittance to the Hotel, use of rooms for commercial purposes, policies relating to entertainment, labor policies, publicity and promotion activities and technology services and equipment to be used in the Hotel…" *Id.*

- Establishing and implementing "marketing, sales and reservations programs and systems to secure reservations for the Participating Units, including all arrangements with wholesale and bulk volume purchasers." *Id.* at § 2.2.1.

- Supervision and procurement of "all inventories, provisions, consumable supplies and OS&E as Operator…" *Id.* at § 2.2.19.

15

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY THE COURT.

- Performance of "such other tasks as are customary in the performance of the hotel operator services at hotels the standard of the Operating Standard." *Id.* at § 2.2.32.

52.     Operator also has the obligation under the Management Agreement to maintain the Hotel's accounts in accordance with the Uniform System of Accounting and to provide regular, detailed statements of accounts to Owner. *Id.* at § 2.5.

53.     For example, Operator is required to provide Owner with monthly operational statements that provide a "statement of net cash flow from operations in reasonable detail for such month as well as the cumulative Fiscal Year-to-date," "balance sheet including current month and prior beginning of year balance comparisons and differences in reasonable detail," and "schedule of Capital Expenses showing, in reasonable detail, items budgeted, actual expenditures to date and the amount of expenditures projected for completion." *Id.* at § 2.5.3.

54.     Operator is also obligated to make distributions to the Hotel Unit Owners and the Hotel Amenities Unit Owner based on quarterly financial statements detailing the performance of each such Hotel Unit Owner's Hotel Unit(s) during that period. *Id.* at § 2.5.4.

55.     Operator, like any hotel operator, is also responsible for developing a cogent and effective sales and marketing plan for the Hotel.     Specifically, Section 2.3.1(c) of the Management Agreement provides that the plan must include the following:

> Operator's intentions for the next Fiscal Year for the promotion and positioning of the Hotel, including a plan for the activities to be undertaken by Operator pursuant to Section 2.2, which plan shall include a description of the Hotel's target markets, the Hotel's relative position in those markets, the proposed room rate structures for each market segment, the current and future sales plan for the Hotel, the advertising and public relations plan for the Hotel, and the proposed staffing for the sales and marketing activities of the Hotel ("Marketing Plan").

16

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY THE COURT.

56.     In exchange for these services, Operator charges Owner a Base Fee of 3.5% of Gross Operating Revenue for the Hotel for fiscal year 2017, which increases to 3.75% for fiscal years 2018 – 2031.

57.     An incentive fee of 10% over and above the Base Fee is also included in the Management Agreement if certain contractually prescribed benchmarks are met, as motivation for Operator to fully perform its obligations under the agreement.

58.     Operator has not come close to reaching the required benchmarks to receive the incentive fee in the last few years.

59.     Rather, Operator has consistently and materially breached its contractual and fiduciary obligations by failing to develop an effective sales and marketing strategy to target the proper market, encourage group and contract business to engage in the Hotel, and to drive occupancy.   Instead, Operator has been losing market share steadily and stands in last place among its peer luxury hotels in all the relevant metrics for success in the hotel industry, including ADR, RevPAR, and occupancy.  This decline in occupancy has a direct impact on the Hotel's bottom line.  The resulting decline in revenues has been particularly precipitous in the past two years, leaving Owner to shoulder the financial burden of the Hotel on its own, all the while Operator lines its pockets with ill-gotten management fees.

**B.      Owner's Contractual Rights to Terminate the Management Agreement**

60.     The Management Agreement provides Owner with a contractual mechanism to terminate Operator in the event Operator defaults on its obligations under the Management Agreement.

61.     Pursuant to Section 5.2 of the Management Agreement, Owner is entitled to serve a Notice of Default upon a specified "Event of Default."  These defaults include:

17

a.    the failure of Operator to disburse any amount to Hotel Unit Owners or Hotel Amenities Unit Owner as provided for in this Agreement ... for a period of thirty (30) days after the date on which notice of the failure has been given to the defaulting party by the other party;

*       *       *

e.    the commission of fraud, crime of moral turpitude or willful misconduct or gross negligence which does not otherwise constitute a breach of any express covenant or obligation under this Agreement; ·

f.    a termination of the ... Condominium Management Agreement[6] in accordance with [its] terms, for any reason, for which there shall be no opportunity to cure under this Agreement;

h.    the failure of any Party to fulfill any of the other material covenants, undertakings, obligations, or conditions set forth in this Agreement, and the continuance of any such default for a period of thirty (30) days after written notice of the failure; provided that if upon the receipt of any notice the defaulting party promptly and with all due diligence attempts to cure the default and, if the non-monetary default is not susceptible of being cured within the thirty (30) days period and the defaulting party advises the other party in writing of the reasonable period which will be required to cure the default and with all due diligence takes and continues action to cure and cures the failure within the reasonable period so advised, then no Event of Default shall be deemed to have occurred unless and until the ·defaulting party has failed to take or to continue to take action or to complete the cure within such reasonable period.

*Id.* at § 5.2

62.    The Management Agreement further provides that the non-defaulting party may, "without prejudice to any other recourse at law or in equity" issue a notice of termination upon the defaulting party, and that such termination "shall be effective no earlier than thirty (30) days and no later than ninety (90) days following the date the notice of termination is given." *Id.* at § 5.2.2.

---

[6] Condominium Management Agreement is defined in the Management Agreement to mean the P.H. TOC Management Agreement, referred to herein, and which has been terminated surrounding allegations of the mismanagement.

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY THE COURT.

63.     Notwithstanding these provisions, pursuant to Section 5.2.4 of the Management Agreement, "[a]ny termination notice given pursuant to Section 5.2.2 ... shall not result in the termination of this Agreement if a bona fide dispute with respect to any alleged Event of Default ... has arisen and such dispute has been submitted to [the ICC for] resolution."

64.     Based on Operator's numerous defaults under the Management Agreement, as described in further detail below, and the reasonable expectation that Operator will contest Owner's Default Notice, and any forthcoming Notice of Termination, Owner submits these disputes to this arbitration panel in accordance with Sections 5.2.4 and 9.1 of the Management Agreement.

**III.    Operator's Material Breaches and Incurable Defaults
         of the Management Agreement**

65.     Each day that the Management Agreement remains in place, Owner's investment in the Hotel is in jeopardy due to Operator's gross incompetence, deficient sales organization and failure to implement an effective sales and marketing strategy designed to drive occupancy and compete with its peer luxury hotels.

66.     Over the past few years, Operator has consistently failed to meet its obligations under the Hotel Management Agreement.  With the P.H. TOC Management Agreement now terminated, the Hotel's bottom line has been even worse.

67.     Operator has materially breached its contractual and fiduciary obligations under the Management Agreement to "supervise, direct, and control the management, operation, and promotion of all aspects of the Hotel," operate the Hotel in accordance with the Operating Standard, and to "use its commercially reasonable efforts to operate the Hotel in such a manner as to endeavor to maximize the profitability and long term value of the Hotel."

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY THE COURT.

68.     Operator has also breached its obligations to maintain the Hotel as a luxury hotel, use its commercially reasonable efforts to manage the costs and expenses of the Hotel, make disbursements to Hotel Unit Owners based on actual costs and expenses, maintain the Hotel's financial records in accordance with the Uniform System of Accounts, include the minimum disclosures required in the monthly operating reports, maintain the appropriate funds in segregated reserve accounts, and permit Owner to make monthly payment for Common Area Maintenance of the Hotel amenities and reimburse the Hotel Amenities Unit Owner for all such payments made to date.

69.     This conduct is a material breach and default of, among other things, Sections 2.1, 2.2, 2.3, 2.4, 2.5, 2.6, 4.1, 4.2, 4.4, 4.6, 5.2(a), 5.2(e), 5.2(f), and 5.2(h) of the Management Agreement.

**A.     The Termination of the P.H. TOC Management Agreement Is an Incurable Event of Default Entitling Owner to Terminate As a Matter of Law**

70.     As explained above, the developer intended for all the components of the tower to be managed and operated as a luxury property by one international luxury brand management company – Trump and his affiliated companies – in order to realize economies of scale and maximize the profitability of the each component.

71.     Recognizing that Operator may not be able to fulfill its obligations to operate the Hotel if the P.H. TOC Management Agreement were terminated, the parties to the Management Agreement included in Section 5.2(f) a cross-termination provision, which allows Owner the option to terminate the Management Agreement as a matter of right if the P.H. TOC Management Agreement is terminated. By contract, this default is incurable as a matter of law.

72.     Indeed, since the termination of the P.H. TOC Management Agreement in Summer 2015, the Hotel's bottom line has rapidly deteriorated.

20

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY THE COURT.

73.     In addition to the loss of efficiencies and Operator's apparent lack of interest in continuing to operate the Hotel as a luxury brand, Owner has also been directly, financially impacted by the termination of P.H. TOC Management Agreement in the form of lost economies of scale and detrimental expense allocations, as evidenced by, among other things, the July 16, 2016 readjustment charged to Hotel TOC of approximately $1.5 million.

74.     Accordingly, Owner is exercising its right under Section 5.2(f) to terminate the Management Agreement, which default is incurable and results in immediate termination of Operator.

75.     On this basis alone, and as a matter of law, Owner is entitled to a declaration that the Management Agreement is terminated.

**B.      Operator's Fatally Flawed Sales and Marketing Strategy**

76.     Owner is also entitled to terminate the Management Agreement based on Operator's inability to develop an effective sales and marketing strategy, which is causing the Hotel to lose market share dramatically and which has resulted in the Hotel underperforming compared to its luxury competitors.

77.     Beneficiaries of the Owner have repeatedly raised its concerns with Operator and implored Operator to develop a sales and marketing strategy that will target the right market, encourage group and contract business to engage with the Hotel, and drive occupancy. Operator's gross incompetence and deficient sales organization stands in the way of Owner making any profit on its investment.

78.     Significantly, over the last few years, Operator has failed to generate room nights and is continuously losing market share to lower quality hotels at an exponential rate.  Operator represents itself as the manager of a luxury brand and has been given the opportunity to manage

21

one of the best hotels in Panama (if not the best) in terms of amenities, finishes, and waterfront location. Yet, despite Operator's boasts, the Hotel is practically empty.

79.     As compared to its peers, the property was 2 out of 7 in terms of occupancy for all of 2015, but fell to 7 out of 7 in 2016 and remains in last place for most of 2017.

80.     This decline in occupancy has a direct impact on the Hotel's bottom line.  In May 2017, the Hotel was outperformed in RevPAR by lesser hotels with substandard amenities, smaller rooms, and lower quality finishes, including select service hotels like the Courtyard by Marriott.  This decline in revenue relative to not only its luxury peers, but also to bargain hotels in Panama City, is the direct result of Operator's gross incompetence and failure to implement a commercially reasonable strategy to market the Hotel.

81.     Operator has also failed to dedicate the standard brand resources to marketing the Hotel.  For example, even though Latin America is the Hotel's primary source market, the Global Sales Office has only one person dedicated to that market. Of the seven individuals working in the Global Sales Office, not a single person is located in Florida, Brazil, Colombia or Mexico, despite those being some of the main markets for guests to the Hotel.

82.     Moreover, upon information and belief, only a fraction of room nights (approximately 5%, or even less) comes through Operator's reliance on its brand resources; whereas a typical international luxury hotel management company produces approximately 18-22% of room nights, with some at 30%.

83.     However, despite recognizing that lead generation is a significant issue plaguing the Hotel, Operator has not developed any, much less an effective, sales and marketing strategy. Rather than address the growing concern of market saturation as any other reasonable operator would, including by ensuring a steady stream of corporate accounts and group stays, Operator

has in fact lost this business. In an attempt to reverse course, beneficiaries of the Owner solicited dozens of corporate accounts in order to have some regular room nights at the Hotel, but Operator failed to use commercially reasonable efforts to solicit these accounts.

84. Additionally, despite knowing that the W Hotel will be opening a new hotel in Panama City this year, Operator has refused to develop a detailed strategic plan to mitigate further market saturation, does not know what to do, and has refused to develop any contingency plans to ensure sufficient occupancy and revenues after the W Hotel opens. This same failure has occurred twice before, with the openings of the Hilton Panama and the Westin Panama Hotel.

85. As a result of Operator's continued failure to implement an effective sales strategy, occupancy has declined significantly over the last two years and revenue generation is down approximately 35% from 2015, an unprecedented decline for any hotel, in any market, especially since over half of that decline occurred in 2017, without a new luxury hotel entering the market year to date.

86. Furthermore, Operator has failed to take reasonable cost saving measures based on the steep decline in occupancy and revenue. Rather, Operator's costs are far higher when compared to regional luxury competitors. Based on a review of the scant financial information that Operator provides, it appears that costs relating to rooms, payroll, food and beverage, and administrative and general expenses, among others, are materially and needlessly higher (especially given the abysmal occupancy rates at the Hotel).

87. Alarmingly, the one area where Operator appears to have reduced costs is marketing – the very place where dollars are needed and should be wisely invested in order to ensure appropriate occupancy and revenue levels for this luxury Hotel.

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY THE COURT.

88.     Beneficiaries of the Owner have repeatedly notified Operator of its objections to Operator's sales and marketing strategy (for example, the July 13, 2017 meeting in New York and the August 27, 2017 meeting at the Hotel, as well as many other meetings and communications).

89.     Beneficiaries of the Owner has also repeatedly offered solutions that Operator could implement to generate room nights, including engaging wholesalers to increase group business, implementing a performance review for the Director of Sales and Marketing, developing well-articulated value propositions against each of its competitors based on a SWOT analysis, and prioritizing lost accounts based on the volume they generate in the Panama market, among other things.

90.     In response to these critiques, Operator admitted that it needs to improve its sales and marketing strategy.  But despite this acknowledgement, Operator has not taken any of the obvious and imminently reasonable steps recommended and has not developed any other reasonable or effective steps that any reasonable operator would – and as the Hotel's competitors clearly have.  Moreover, Operator has failed to develop its own plans to improve occupancy, decrease costs, and improve the long term value of the Hotel.

91.     Based on Operator's inability to develop an effective sales and marketing strategy over the last two years, and the Hotel's continued decline relative to both its luxury peers and lesser quality hotels, Operator has materially breached its obligations under the Management Agreement, including, but not limited to, Sections 2.1, 2.2, 2.3, 2.4, and 2.6.  Operator is, therefore, in default pursuant to Sections 5.2(e) and 5.2(h) of the Management Agreement, which defaults cannot be cured, as evidenced by Operator's prior attempts to implement an effective sales and marketing strategy.

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY THE COURT.

92.     Accordingly, Owner is entitled to both a declaration that an Event of Default has occurred and damages in an amount not less than $15 million resulting from Operator's material breaches of the Management Agreement, including interest, costs, and attorneys' fees.

### C.     Operator's Failure to Operate the Hotel as a Luxury Property

93.     As reflected by the Hotel's abysmal and unsustainable financial performance for the 2015 and 2016 fiscal years, Operator has also failed to operate the Hotel as a luxury hotel in accordance with the Operating Standard.

94.     Recent guest reviews made on third-party websites, such as TripAdvisor, Hotels.com, and Oyster.com evidence Operator's failure to maintain and operate the Hotel as a luxury property.  For example, reviews from TripAdvisor for the period March 2017 through the present include guest complaints about service problems, and rooms that have not been cleaned.

95.     The reviewers repeatedly noted that management did not seem invested in the property with at least two guests described the Hotel as feeling "abandoned."  Repeat guests have also noted the changes in the Hotel, with one guest, who had stayed at the property 6 times, explaining "it is unlikely we will return as the changes we experienced are too drastic from the last time we stayed."

96.     In response to many of these guest complaints, Operator provides a boilerplate response that admits it did not provide the luxury stay expected, further damaging the Hotel's reputation.  For example, in June 2017, the Guest Relations Manager of the Hotel responded to a guest's complaint that the hotel room door was broken and that an employee entered without even knocking with its standard response, as follows:

> TOCGM, Guest Relations Manager at Trump International Hotel
> & Tower Panama, responded to this review
>
> Responded June 30, 2017

25

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY THE COURT.

Dear Guest,

Thank you for taking the time to share your feedback. It is feedback like this that we learn from and use to improve. We work hard to deliver an exceptional guest experience, and it's apparent in this case that we fell short. If you give us a chance to earn back your trust, I can assure you that we will do our best to give you the great hotel experience that so many of our guests have grown so fond of.

Sincerely,
TrumpPanama
Executive Office Manager

97.     By failing to maintain the service levels that its guests expect from a luxury hotel, provide clean rooms, and adequately and appropriately address guest's complaints, Operator has violated its duty to operate the Hotel as a luxury hotel and caused severe reputational damage to the Hotel. Accordingly, it has materially breached its obligations under the Management Agreement, including, but not limited to, Sections 2.1, 2.2, 2.3, 2.4, and 2.6, and is thus in default of Sections 5.2(e) and 5.2(h), which defaults cannot be cured.

98.     For these reasons, Owner is entitled to a declaration that an Event of Default has occurred and damages for these material breaches of the Management Agreement, including interest, costs, and attorneys' fees.

**D.     Operator's Failure to Make Regular Disbursements to Unit Owners**

99.     In addition to the breaches described above, Operator has also breached the Management Agreement by failing to make distributions to the unit owners in accordance with Sections 2.5 and 4.6.

100.     Significantly, rather than calculate distributions to Unit Owners based on actual revenues and actual costs, Operator has impermissibly chosen to calculate distributions based on budgeted costs, which far exceed the Hotel's actual expenditures due to such abysmal occupancy levels. This results in Unit Owners receiving little in distributions, while Operator hoards

26

Owner's cash, possibly in order to fund prior deficiencies and unfunded reserves, in violation of Sections 2.5, 4.4, and 4.6 of the Management Agreement.

101.   Pursuant to Section 5.2(a) of the Management Agreement, an Event of Default has occurred based on Operator's failure to disburse owed amounts to Hotel Unit Owners and the Hotel Amenities Unit Owner.

102.   Accordingly, Owner is entitled to a declaration that an Event of Default has occurred, an order that Operator must make distributions in accordance with the Management Agreement, as explained herein, and damages resulting from Operator's failure to make such distributions, with interest.

E.   **Operator's Failure to Make Regular Disclosures**

103.   Operator has also failed to meet its obligation to make disclosures of financial information that is necessary for Owner to properly evaluate how the Hotel and Operator are actually performing.

104.   Operator's meager disclosures do not meet the standards required in Section 2.5 of the Management Agreement. For example, the Operator is not providing all aspects of the Consolidated Income Statement in accordance with the Uniform System of Accounts, including portions of the base management fee, brand marketing fee, and FFE Reserve related to the revenues of the Food and Beverage department. Other deficiencies include the failure to provide an adequate monthly statistical report, and a detailed labor analysis. These deficiencies result in misstatements, including understated Food and Beverage profit and Gross Operating Profit, as well as understated marketing expenses, management fees, and Non-Operating Income and Expenses.

105.   Operator has also failed to provide Owner all contractually required information in the monthly reports, including, but not limited to:

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY THE COURT.

- A statement of net cash flow from operations in reasonable detail for such month as well as the cumulative Fiscal Year-to-date;

- A statement of the amount of the Management Fees and Reimbursable Expenses payable or reimbursable to Operator or its Affiliates;

- A balance sheet including current month and prior beginning of year balance comparisons and differences in reasonable detail;

- A schedule of Capital Expenses showing, in reasonable detail, items budgeted, actual expenditures to date and the amount of expenditures projected for completion;

- The monthly bank statements and reconciliation;

- A monthly statistical report, including room availability and room sales;

- A detailed labor analysis in such form as Owner shall reasonably request; and

- The general ledger for the prior month.

106.    Moreover, Operator failed to timely provide Owner with audited financial statements, which arrived more than 8 months after the close of the fiscal year, prompting Owner to question the integrity of Operator's accounting operations.

107.    Similarly, the 2016 budget was not issued until January 2017 – three months late. Operator's purported excuse was that P.H. TOC would not cooperate with Operator and provide actual figures, so Operator could not develop a budget. Given the termination of the P.H. TOC Management Agreement, Operator eventually produced a budget relying on budgeted figures for P.H. TOC. Operator could have produced this "budget" in October 2016, as required by the Management Agreement.

108.    Most recently, in a meeting on October 3, 2017, Operator failed to present the Owner or the beneficiaries of the Owner with an annual budget for 2018 for their comment and

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY THE COURT.

approval in compliance with the Management Agreement.   Rather, Operator claims that it (Operator) has approved the budget because it acts for Hotel TOC, the Owner.

109.   Upon information and belief, Operator never presented the 2018 budget to the board of Hotel TOC, the Assembly of Shareholders, or any of the Beneficiaries of the Foundation for their approval, but instead has purported to usurp control of Hotel TOC and dispensed with corporate formalities, in flagrant violation of its contractual and fiduciary obligations to Owner.

110.   These failures constitute material breaches of Sections 2.1, 2.2, 2.3, and 2.5 of the Management Agreement, among others, as well as breaches of fiduciary duties.   Owner is, therefore, entitled to a damages resulting from these breaches and a declaration that an Event of Default has occurred pursuant to Sections 5.2(e) and 5.2(h).

**F.   Operator's Additional Breaches of the Management Agreement and Breaches of Fiduciary Duty**

111.   Additionally, Operator has violated other provisions of the Management Agreement meant to maintain the integrity of Operator's accounting records.

112.   Notably, Section 4.2 of the Management Agreement requires Operator to maintain certain separate Capital Reserve Funds for the Hotel Units and the Hotel Amenities Units, which Operator is only entitled to use "for the purpose of the funding of Capital Improvements and replacement and renewal of FF&E for the Hotel Units, Hotel Amenities Unit, and Hotel Common Areas."

113.   In a meeting on October 3, 2017, Operator produced a written presentation to beneficiaries of the Owner, admitting a reserves funding shortfall of approximately $1.9 million. Upon information and belief, not only do the reserve accounts have a deficit of $1.9 million, but Operator has also commingled these accounts in violation of the Management Agreement.

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY THE COURT.

114.   Upon information and belief, Operator has drained these reserve accounts to cover operational expenses, all the while lining its pockets with management fees.

115.   For example, Hotel TOC's 2016 Audited Financials state in Note 14:

Provision for food, beverage, furniture and equipment

Transactions in the provision for purchases of food, beverages, furniture, and equipment are summarized below:

|  | 2016 | 2015 |
|---|---|---|
| Provision for food and beverage | | |
| Beginning balance | 1,073,019 | 826,983 |
| Provision charged to expenses | 268,519 | 236,046 |
| Project, acquisition of food and beverage | (153,212) | - |
| Ending balance | 1,188,326 | 1,073,019 |

The bank account as of December 31, 2016 maintains a balance available for the provision for purchase of food and beverages of USD785,500, showing an insufficiency with respect to the provision for USD402,825.

|  | 2016 | 2015 |
|---|---|---|
| Provision for furniture and equipment | | |
| Beginning balance | 1,996,161 | 1,530,857 |
| Provision charged to expenses | 383,774 | 465,304 |
| Project, acquisition of furniture and equipment | (929,886) | - |
| Ending balance | 1,450,049 | 1,996,061 |

The bank account as of December 31, 2016 maintains a balance available for the provision for purchase of furniture and equipment of USD518,339, showing an insufficiency with respect to the provision on for USD931,710.

*Hotel Toc, INC. has account receivable from unit owners for an amount of B/.392,859 (See Note 6) which explains in part the insufficiency of funds to make the contributions to the reserve fund.*

Hotel TOC's 2016 Audited Financials, n. 4 (emphasis added).

30

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY THE COURT.

116.    The auditor's note confirms that Operator is not funding the reserves as required, but is in fact using what reserves remain to fund operational expenses. Moreover, the auditor's note confirms that Operator is routinely withdrawing funds from the reserve accounts and, at times, replacing those withdrawals with funds from other sources (such as the receivables referred to above), expressly breaching the requirement that reserves can only be funded from Hotel revenues and must be segregated, not commingled.

117.    Moreover, based on Operator's admission that the unfunded reserves have increased from the approximately $1.3 million indicated in the 2016 Audited Financials to $1.9 million today, Operator has also breached Section 4.2 of the Management Agreement by not funding the reserve accounts, while also making distributions to unit owners. In particular, Operator was aware in January 2017 that there was a binding agreement in place to sell the majority of Hotel Units and the Hotel Amenities Unit. Despite this knowledge, Operator made distributions to unit owners who were in the process of selling their units without first funding the reserve accounts, as required under the Management Agreement, to the detriment of Owner and the current beneficiaries of Owner.

118.    As a result, Operator is liable to Owner for conversion and breach of fiduciary duties and must immediately fund the entire reserve shortfall, resulting from Operator's systemic, continued, and intentional breaches of Section 4.2. of the Management Agreement.

119.    Similarly, in accordance with the P.H. TOC Management Agreement, Operator was required to maintain segregated accounts for the various components, including Hotel TOC Inc. and the P.H. TOC. However, upon information and belief, the funds for the two entities were commingled and the accounts looted.

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY THE COURT.

120.    In addition to Owner's concerns that Operator is improperly commingling and distributing reserve funds, upon information and belief, that there have been significant improprieties in the procurement department and the way Operator's corporate expenses have been allocated to Owner.

121.    Operator is liable to Owner for damages resulting from Operator's breach of fiduciary duties and conversion, including interest, costs, and attorneys' fees.

**IV.    <u>Owner's Default Notice</u>**

122.    On or about October 14, 2017, by reason of the breaches of the Management Agreement described above, Owner served Operator with a Default Notice.

123.    This Default Notice informed Operator that, by virtue of its wrongful acts and conduct, Operator was in default of, among other things:

> Sections 2.1, 2.2, 2.3, 2.4, 2.5, 2.6, 4.1, 4.2, 4.4, and 4.6, 5.2(a), 5.2(e), 5.2(f), and 5.2(h) of the Management Agreement in that, by virtue of the foregoing conduct Operator has failed to, among other things: (i) supervise, direct, and control the management, operation, and promotion of all aspects of the Hotel, including establishing a market-driven sales and marketing strategy that drives occupancy and is responsive to the Hotel's target market; (ii) operate the Hotel in accordance with the Operating Standard; and (iii) "use its commercially reasonable efforts to operate the Hotel in such a manner to endeavor to maximize the profitability and long term value of the Hotel."

124.    Pursuant to the procedures set forth in the Management Agreement, Owner put Operator on further notice that it was required to cure the enumerated defaults (to the extent curable – and many are not curable) by November 20, 2017 (the "Cure Date"), that being at least thirty (30) days from service of the Notice of Default, or Owner could terminate the Management Agreement.

125.    The Notice of Default required Operator to cure the defaults by taking the following actions:

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY THE COURT.

[C]ompensating Owner for all damages caused by the foregoing conduct in an amount of up to at least $15 million;[7] (ii) increasing the average yearly occupancy level of the Hotel to 65%; (iii) achieving RevPAR penetration against the Competitive Set of at least 100%; (iv) developing immediate contingency plans that will generate more group lead generation; (v) developing a contingency plan to address the opening of the W Hotel in Panama; (vi) utilizing Operator's brand resources to contribute at least 18% in both group and transient sales; (vii) reviewing the job performance of the Director of Sales and Marketing; (viii) developing a detailed tactical sales action plan that clearly articulates strategic goals that are precise and objectively measureable to compare the Hotel's performance against that of its competitors; (ix) conducting a SWOT analysis against each of the Hotel's competitors; (x) revamping its cleaning and maintenance program; (xi) having a Management level employee respond to guest comments on publicly available review platforms, which includes a sales pitch of other Hotel amenities the guest may not have been aware of; (xii) permitting Hotel TOC to pay Common Area Maintenance for the Hotel amenities and reimburse all such payments to date; and (xiii) including Owner in Operator's regular sales meetings.

126.    The Notice of Default also notified Operator that some, if not all, of the foregoing defaults are incurable, including, but not limited to, the termination of the P.H. TOC Management Agreement pursuant to Section 5.2(f) of the Management Agreement.

## AS AND FOR A FIRST CAUSE OF ACTION
### (Breach of Contract)

127.    Claimant repeats and realleges each and every allegation contained in paragraphs 1 through 126 hereof as though fully set forth herein.

128.    The Management Agreement constitutes a legally binding and enforceable contract.

129.    The Management Agreement requires Operator to, among other things, (i) supervise, direct, and control the management, operation, and promotion of all aspects of the

[7] Owner reserves the right to seek additional and other damages for Operator's breaches of the Management Agreement and its fiduciary duties, including, but not limited to, the diminution in value of the Hotel, as well as damages that accrue in the future.

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY THE COURT.

Hotel, including establishing a market-driven sales and marketing strategy that drives occupancy and is responsive to the Hotel's target market, Management Agreement at § 2.1; (ii) operate the Hotel in accordance with the Operating Standard, *id.*, at 2.2; and (iii) "use its commercially reasonable efforts to operate the Hotel in such a manner to endeavor to maximize the profitability and long term value of the Hotel," *id.*

130.    Operator breached the Management Agreement by, among other things, failing to perform according to Operating Standard, and failing to make commercially reasonable efforts to operate the Hotel in such a manner to endeavor to maximize the profitability and long term value of the Hotel by, among other things, (i) employing fatally flawed sales and marketing strategies, (ii) failing to properly manage the Hotel staff and physical condition of the Hotel, (iii) failing to address the plummeting occupancy levels, declining revenues, and increased costs despite repeated demands by Owner, and (iv) wasting funds and assets, all to Owner's detriment.

131.    By virtue of Operator's breaches of these contractual obligations of the Management Agreement, Owner has been damaged in an amount to be determined through arbitration but not less than $15 million, plus interest, costs, and attorneys' fees.

## AS AND FOR A SECOND CAUSE OF ACTION
### (Breach of Contract)

132.    Claimant repeats and realleges each and every allegation contained in paragraphs 1 through 131 hereof as though fully set forth herein.

133.    The Management Agreement required Operator to, among other things, (i) make disbursements to Hotel Units Owners based on actual costs and expenses; (ii) maintain the Hotel's financial records in accordance with the Uniform System of Accounts; (iii) include in the minimum disclosures required in the monthly operating report; and (iv) maintain the appropriate funds in segregated reserve accounts.

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY THE COURT.

134.   Operator has failed to perform all of these obligations.

135.   Owner has fully complied with its obligations under the Management Agreement.

136.   By virtue of Operator's breaches of these obligations under the contract, Owner has been damaged in an amount to be determined through arbitration but not less than $5 million, plus interest, costs, and attorneys' fees.

<u>**AS AND FOR A THIRD CAUSE OF ACTION**</u>
<u>**(Conversion)**</u>

137.   Claimant repeats and realleges each and every allegation contained in paragraphs 1 through 126 hereof as though fully set forth herein.

138.   Claimant has a possessory right or interest in the Hotel property and assets.

139.   Operator has dominion over Hotel property and assets, namely Hotel funds and revenue.

140.   In derogation of Owner's right or interest in the Hotel assets, Operator interfered with and converted Hotel assets by, among other things, failing to maintain segregated bank accounts for Hotel TOC and P.H. TOC.  Instead, upon information and belief, the funds for the two entities were commingled up until 2015 and the accounts looted.

141.   By reason of Operator's conduct, Claimant has been damages in the amount of the stolen funds, which is an amount to be determined at arbitration but not less than $3 million, plus interest, costs, and attorneys' fees.

<u>**AS AND FOR A FOURTH CAUSE OF ACTION**</u>
<u>**(Breach of Fiduciary Duty)**</u>

142.   Claimant repeats and realleges each and every allegation contained in paragraphs 1 through 141 hereof as though fully set forth herein.

143.   Pursuant to Section 2.1.1 of the Management Agreement, Operator serves as Owner's "agent" to "supervise, direct, and control the management, operation, and promotion of

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY THE COURT.

all aspects of the Hotel in accordance with and subject to the terms and conditions of [the Management Agreement]."

144.  Further, pursuant to Section 2.1.2, Operator agreed to operate the Hotel "for the account" of Owner.

145.  Because Operator undertook to operate and manage the Hotel solely on Owner's behalf and pursuant to the inherent agency powers granted by the Management Agreement, Operator is Owner's agent and owes it fiduciary duties.

146.  Further, even if Operator were an independent contractor and not an agent, Operator nonetheless owes Owner a fiduciary duty.

147.  Indeed, Operator undertook the duty to act on behalf of Owner.

148.  Owner was induced by Operator to, and did, repose trust and confidence in Operator and in its knowledge and expertise to (i) manage the Hotel; (ii) engage in honest dealings with Owner's best interests in mind; and (iii) perform its responsibilities under the Management Agreement.

149.  Additionally, upon information and belief, Operator appointed directors to Owner's Board of Directors in an effort to further control the Hotel, Owner's sole asset during the time of the relevant breaches.

150.  Accordingly, Operator held a position of authority and trust and retained control over the day-to day operations of the Hotel.

151.  Because, among other things, Operator induced reliance independent of the Management Agreement, Operator owes fiduciary duties to Owner.

152.  By reason of Operator's wrongful acts and conduct, including but not limited to (i) looting its accounts, (ii) failing to maintain segregated accounts, (iii) operating the Hotel

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY THE COURT.

without regard to the maximization of the Hotel's long term value and profitability, and (iv) causing the Hotel's reputation to be severely injured by its conduct, Operator has breached its fiduciary duties to Claimant.

153.   As a direct and proximate result of Operator's breaches of its fiduciary duties to Owner, Owner has been damaged in an amount be determined at arbitration but not less than $15 million, plus interest, costs, and attorneys' fees.

## AS AND FOR A FIFTH CAUSE OF ACTION
### (Breach of the Covenant of Good Faith and Fair Dealing)

154.   Claimant repeats and realleges each and every allegation contained in paragraphs 1 through 152 hereof as though fully set forth herein.

155.   Under New York Law, which governs the Management Agreement, the covenant of good faith and fair dealing is implied in every contract.

156.   The Management Agreement imposed on Operator the duty to use its commercially reasonable efforts to operate the Hotel in such a manner to endeavor to maximize the profitability and long term value of the Hotel.

157.   By reason of Operator's wrongful acts and conduct described above, Operator breached the covenant of good faith and fair dealing and unfairly frustrated the agreed upon common purpose of the Management Agreement, disappointed Owner's reasonable expectations of Operator, and thereby deprived Owner of the benefits of the Management Agreement.

158.   By virtue of Operator's breaches of the covenant of good faith and fair dealing, Owner has been damaged in an amount to be determined through arbitration but not less than $15 million, plus interest, costs, and attorneys' fees.

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY THE COURT.

## AS AND FOR A SIXTH CAUSE OF ACTION
### (Declaratory Judgment)

159.   Claimant repeats and realleges each and every allegation contained in paragraphs 1 through 158 hereof as though fully set forth herein.

160.   Pursuant to Section 5.2(f) of the Management Agreement, an Event of Default has occurred based on the termination of the P.H. TOC Management Agreement.

161.   Pursuant to the Management Agreement, Owner has the option to elect to terminate the Management Agreement based on this default, which default is incurable pursuant to the express provisions of the Management Agreement.

162.   On October 14, 207, Owner notified Operator of this Event of Default in its Default Notice in accordance with the terms of the Management Agreement.

163.   As a matter of contract and a matter of law, Operator cannot cure this default.

164.   Upon information and belief, Operator disputes these contentions and will refuse to recognize the validity of a termination notice based on a default of Section 5.2(f) of the Management Agreement.

165.   Therefore, an actual and justiciable controversy now exists as to Owner's right to terminate the Management Agreement.

166.   Accordingly, Owner is entitled to a declaration that the termination of the P.H. TOC Management Agreement constitutes an incurable Event of Default, and as such, Owner may terminate Operator.

## AS AND FOR A SEVENTH CAUSE OF ACTION
### (Declaratory Judgment)

167.   Claimant repeats and realleges each and every allegation contained in paragraphs 1 through 166 hereof as though fully set forth herein.

**38**

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY THE COURT.

168.    Pursuant to Sections 5.2(e), and 5.2(h), of the Management Agreement, an Event of Default has occurred based on Operator's failure to "supervise, direct, and control the management, operation, and promotion of all aspects of the Hotel," operate the Hotel in accordance with the Operating Standard, and "use its commercially reasonable efforts to operate the Hotel in such a manner to endeavor to maximize the profitability and long term value of the Hotel."

169.    These material breaches and gross negligence and/or willful misconduct includes, but is not limited to, Operator's failure to develop an effective sales and marketing strategy, to maintain the Hotel as a luxury hotel, to use its commercially reasonable efforts to manage the costs and expenses of the Hotel, to maintain the Hotel's financial records in accordance with the Uniform System of Accounts, to include the minimum disclosures required in the monthly operating report, to maintain the appropriate funds in segregated reserve accounts; and to permit Owner to make monthly payments for Common Area Maintenance of the Hotel amenities.

170.    On October 14, 207, Owner notified Operator of these defaults in its Default Notice in accordance with the terms of the Management Agreement.

171.    Despite repeated requests by Owner, Operator has failed to cure or commence curing the defaults set forth in the Default Notice. Upon information and belief, Operator is unable to cure the defaults set forth in the Notice of Default.

172.    Furthermore, some, if not all, of the defaults set forth in the Default Notice are incurable.

173.    Upon information and belief, Operator disputes these contentions and will refuse to recognize the validity of a termination notice based on a default of Sections 5.2(e) and/or 5.2(h) of the Management Agreement.

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY THE COURT.

174.    Therefore, an actual and justiciable controversy now exists as to Owner's right to terminate the Management Agreement.

175.    Accordingly, Owner is entitled to a declaration that an Event of Default has occurred, and that Owner may terminate the Management Agreement.

**AS AND FOR AN EIGHTH CAUSE OF ACTION**
**(Declaratory Judgment)**

176.    Claimant repeats and realleges each and every allegation contained in paragraphs 1 through 175 hereof as though fully set forth herein.

177.    Pursuant to Section 5.2(a) of the Management Agreement, an Event of Default has occurred based on Operator's failure to make distributions to the Hotel Unit Owners and Hotel Amenities Unit Owner based on actual costs and actual expenses in accordance with Section 4.6 of the Management Agreement.

178.    On October 14, 2017, Owner notified Operator of these defaults in its Default Notice in accordance with the terms of the Management Agreement.

179.    Despite repeated requests by Owner, Operator has failed to cure or commence curing the defaults set forth in the Default Notice.  Upon information and belief, Operator is unable to cure the defaults set forth in the Notice of Default.

180.    Furthermore, some, if not all, of the defaults set forth in the Default Notice are incurable.

181.    Upon information and belief, Operator disputes these contentions and will refuse to recognize the validity of a termination notice based on a default of Section 5.2(a) of the Management Agreement.

182.    Therefore, an actual and justiciable controversy now exists as to Owner's right to terminate the Management Agreement.

40

183. Accordingly, Owner is entitled to a declaration that an Event of Default has occurred, and that Owner may terminate the Management Agreement.

## AS AND FOR A NINTH CAUSE OF ACTION
### (Declaratory Judgment)

184. Claimant repeats and realleges each and every allegation contained in paragraphs 1 through 183 hereof as though fully set forth herein.

185. Under New York common law, it is a well-settled matter of public policy that personal services contracts can be terminated at any time and cannot be specifically enforced or compelled.

186. Under New York law, it is also recognized that hotel management agreements are classic examples of personal services contracts that may not be enforced by injunction.

187. Pursuant to the Management Agreement, Owner agreed to provide "Operator Hotel *Services*" that are "consistent with the Operating Standard." Management Agreement at § 1.4.1.

188. The Operating Standard relates to the "level of *service* and quality" Operator must provide, *e.g.*, luxury. *Id.* at 15. Operator also has great discretion to operate the Hotel in accordance with the Operating Standard through its provision of "General Manager *Services*." *Id.* at § 2.1.

189. Owner has the absolute right under New York law to terminate the Management Agreement as a personal services contract.

190. Upon information and belief, Operator disputes these contentions and will refuse to recognize the validity of a termination notice based on Owner's rights under personal services contract law.

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY THE COURT.

191.   Therefore, an actual and justiciable controversy now exists as to Owner's right to terminate the Management Agreement on personal services contract grounds.

192.   Accordingly, Owner is entitled to a declaration that an Event of Default has occurred, and that Owner may terminate the Management Agreement as a matter of right on the basis that the agreement is a personal services contract.

## AS AND FOR A TENTH CAUSE OF ACTION
### (Declaratory Judgment)

193.   Claimant repeats and realleges each and every allegation contained in paragraphs 1 through 192 hereof as though fully set forth herein.

194.   Under New York law, it is well-settled that a principal has the power to revoke his agent's authority to represent him at any time.

195.   Operator serves as Owner's "agent" under the Management Agreement, and is repeatedly referred to as an "agent" in the agreement.   Management Agreement at §§ 2.4.3; 2.6.1; 4.1.1; 12.3.

196.   The Management Agreement also specifies that *"Operator and Owner are not joint venturers, partners, or joint owners with respect to the Hotel ...."* *Id.* at § 12.3 (emphasis added).

197.   Owner has the absolute right under New York law to terminate the Management Agreement under agency law.

198.   Upon information and belief, Operator disputes these contentions and will refuse to recognize the validity of a termination notice based on Owner's rights under agency law.

199.   Therefore, an actual and justiciable controversy now exists as to Owner's right to terminate the Management Agreement on agency law grounds.

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY THE COURT.

200.    Accordingly, Owner is entitled to a declaration that an Event of Default has occurred, and that Owner may terminate the Management Agreement as a matter of right on the basis of agency law.

### AS AND FOR AN ELEVENTH CAUSE OF ACTION
### (Declaratory Judgment)

201.    Claimant repeats and realleges each and every allegation contained in paragraphs 1 through 200 hereof as though fully set forth herein.

202.    Upon information and belief, at all relevant times, John Does 1-5 dominated and controlled Operator.

203.    Upon information and belief, John Does 1-5 used their control and domination of Operator to breach Operator's legal duty and cause Owner's losses.

204.    Indeed, upon information and belief, Operator is nothing but a pass-through entity created by John Does 1-5 to manage the Hotel and purportedly and fraudulently shield John Does 1-5 from liability to Operator's creditors (including Owner) thereby attempting to make Operator judgment proof so as to prevent an actual recovery for Operator's breaches of the Management Agreement and its fiduciary duties.

205.    In fact, upon information and belief, Operator and all of the John Does 1-5 routinely commingle assets, disregard corporate formalities and are all part of the same family office known as the "Trump Organization" controlled by John Does 1-5.

206.    Thus, Operator is, by design, nothing more than a shell that John Does 1-5 created and used to fraudulently shield them from liability under, among other things, the Management Agreement.  Operator is intentionally undercapitalized, is funded solely by contributions from John Does 1-5, and those contributions were, upon information and belief, intentionally

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY THE COURT.

insufficient to pay Operator's obligations, including those obligations under the Management Agreement.

207. Accordingly, pursuant to New York law (which governs the Management Agreement and this proceeding), Owner is entitled to judgment in this arbitration declaring that it can pierce the corporate veil and that John Does 1-5 are liable for all damages awarded to Owner.

208. Claimant is, therefore, entitled to a declaration that under the theory of corporate piercing, John Does 1-5 are personally liable for any damages awarded to Owner.

### AS AND FOR A TWELFTH CAUSE OF ACTION
### (Accounting)

209. Claimant repeats and realleges each and every allegation contained in paragraphs 1 through 208 hereof as though fully set forth herein.

210. Operator undertook to operate and manage the Hotel solely for the account of Owner, as its agent and fiduciary, exercising exclusive control over the Hotel's revenue, assets, and books and records.

211. Operator breached its fiduciary duties owed to Owner concerning the management and operation of the Hotel.

212. Claimant has an interest in the Hotel as the Hotel's Owner.

213. Owner is entitled to an accounting pursuant to Section 2.5.1 of the Management Agreement, which provides that "[a]ll books of account and other financial records shall be available at the Hotel to Owner ... at all reasonable times and on reasonable notice for examination, audit, inspection and copying..."

214. Accordingly, Owner is entitled to an accounting of all Hotel assets.

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY THE COURT.

## STATEMENT OF RELIEF SOUGHT

215.   Hotel TOC respectfully requests that upon final hearing the Arbitral Tribunal without prejudice to any other or further claims that Hotel TOC may make in this arbitration enter an award as follows:

a.   On its First Cause of Action, an award of Claimant's damages in an amount to be determined through arbitration but not less than $15 million, plus interest;

b.   On its Second Cause of Action, an award of Claimant's damages in an amount to be determined through arbitration but not less than $5 million, plus interest;

c.   On its Third Cause of Action, an award of Claimant's damages in an amount to be determined through arbitration but not less than $3 million, plus interest;

d.   On its Fourth Cause of Action, an award of Claimant's damages in an amount to be determined through arbitration but not less than $15 million, plus interest;

e.   On its Fifth Cause of Action, an award of Claimant's damages in an amount to be determined through arbitration but not less than $15 million, plus interest;

f.   On its Sixth Cause of Action, a declaration that the termination of the P.H. TOC Management Agreement constitutes an incurable Event of Default, and as such, Owner may terminate Operator;

g.   On its Seventh Cause of Action, a declaration that an Event of Default has occurred, and that Owner may terminate the Management Agreement;

h.   On its Eighth Cause of Action, a declaration that an Event of Default has occurred, and that Owner may terminate the Management Agreement;

i.   On its Ninth Cause of Action, a declaration that an Event of Default has occurred, and that Owner may terminate the Management Agreement as a matter of right on the basis that the agreement is a personal services contract;

j.   On its Tenth Cause of Action, a declaration that an Event of Default has occurred, and that Owner may terminate the Management Agreement as a matter of right on the basis of agency law;

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY THE COURT.

k.     On its Eleventh Cause of Action, a declaration that under the theory of corporate piercing, John Doe Entities 1-5 are personally liable for any damages awarded to Hotel TOC;

l.     On its Twelfth Cause of Action, an accounting;

m.     Interest, cost, and attorneys' fees in an amount to be determined through arbitration but not less than $50,000.00; and

n.     Such other and further relief as the Arbitrator deems just and proper.

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY THE COURT.

216. Hotel TOC estimates that the amount in controversy in this dispute is approximately $15 million.

Dated: October 14, 2017

Respectfully submitted,

By: _____

Joshua D. Bernstein, Esq.
E-mail: joshua.bernstein@akerman.com
Darryl R. Graham, Esq.
Email: darryl.graham@akerman.com
Kathleen M. Prystowsky, Esq.
E-mail: kathleen.prystowsky@akerman.com
Vanessa I. Garcia, Esq.
E-mail: vanessa.garcia@akerman.com
**AKERMAN LLP**
666 Fifth Avenue, 20th Floor
New York, New York 10103
Telephone: 212.880.3800
Facsimile: 212.880.8965

Jose Carrizo
E-mail: Jose.Carrizo@morimor.com
Orlando Tejeira
E-mail: Orlando.Tejeira@morimor.com
MORGAN & MORGAN
MMG Tower, 23rd Floor
Avenue Paseo del Mar, Costa del Este
Panama, Republic of Panama
Telephone: 507.265.7777
Facsimile: 507.265.7700

*Attorneys for Claimant Hotel TOC, Inc.*

42839780    THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY THE COURT.

## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| MORGAN & MORGAN, P.A., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) C.A. No. _____ |
| | ) |
| TRUMP PANAMA HOTEL | ) **CONFIDENTIAL FILING** |
| MANAGEMENT LLC, and TRUMP | ) |
| INTERNATIONAL HOTELS | ) |
| MANAGEMENT, LLC, | ) |
| | ) |
| Defendants. | ) |

### EXHIBIT C TO VERIFIED COMPLAINT TO ENJOIN ARBITRATION (THIRD PARTY CLAIMS – without exhibits)

**YOU ARE IN POSSESSION OF A CONFIDENTIAL FILING FROM THE CHANCERY COURT OF THE STATE OF DELAWARE IN AND FOR NEW CASTLE COUNTY.**

**If you are not authorized by Court order to view or retrieve this document read no further than this page.  You should contact the following persons:**

**VENABLE LLP**

*/s/ Daniel A. O'Brien*
Jamie L. Edmonson (No. 4247)
Daniel A. O'Brien (No. 4897)
1201 N. Market Street, Suite 1400
Wilmington, DE 19801
Tel.: 302.298.3535
Fax: 302.298.3550
jledmoson@venable.com
daobrien@Venable.com

**Pursuant to Rule 5.1(d)(2) a public version in not required to be filed.**

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.
THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

# Exhibit C

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

INTERNATIONAL CHAMBER OF COMMERCE

| | |
|---|---|
| HOTEL TOC, INC., | Case No.: 23149/MK |
| *Claimant,* | **RESPONDENTS' ANSWER, COUNTERCLAIMS, REQUEST FOR JOINDER AND THIRD-PARTY CLAIMS** |
| -against- | |
| TRUMP PANAMA HOTEL MANAGEMENT LLC, TRUMP INTERNATIONAL HOTELS MANAGEMENT, LLC, and JOHN DOES 1-5, | |
| *Respondents.* | |
| TRUMP PANAMA HOTEL MANAGEMENT LLC, and TRUMP INTERNATIONAL HOTELS MANAGEMENT, LLC, | |
| *Counterclaimants,* | |
| -against- | |
| HOTEL TOC, INC., | |
| *Counterclaim-Respondent.* | |
| TRUMP PANAMA HOTEL MANAGEMENT LLC, and TRUMP INTERNATIONAL HOTELS MANAGEMENT, LLC, | |
| *Third-Party Claimants,* | |
| -against- | |
| ORESTES FINTIKLIS, GARY LUNDGREN, ITHACA CAPITAL INVESTMENTS I, S.A., ITHACA CAPITAL INVESTMENTS II, S.A., MORGAN & MORGAN, OWNERS MEETING OF THE P.H. TOC, HOTEL TOC FOUNDATION (SOLE SHAREHOLDER OF CLAIMANT) AND JOHN DOES 1-10, | |
| *Third-Party Respondents.* | |

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

# TABLE OF CONTENTS

Page

INDEX OF EXHIBITS ............................................................................. ii

NATURE OF PROCEEDINGS....................................................................1

   I.      Overview ....................................................................................1

   II.     Claimant's and Third Party Respondents' Wrongful Conduct ........................................4

ALL PARTIES TO THESE PROCEEDINGS ...........................................................8

JURISDICTION, VENUE AND GOVERNING LAWS ........................................12

APPOINTMENT OF ARBITRATORS ................................................................19

FACTS COMMON TO ALL CLAIMS ................................................................21

   I.      LUNDGREN'S AND OWNERS MEETING'S PRIOR ICC PROCEEDINGS ...........21

   II.     THE BULK SALE TO FINTIKLIS ................................................................23

   III.    FINTIKLIS MAKES HIS NEXT MOVE IN FURTHERANCE OF HIS FRAUD AND UNLAWFUL RICO SCHEME..........................................................................26

   IV.    THE HOTEL TOC "LUNCH MEETING" ........................................................27

   V.     THE "OCTOBER 14 MEETINGS," NOTICE OF DEFAULT, AND REQUEST FOR ARBITRATION ............................................................................................28

   VI.    THE SHAM DEFAULT NOTICE AND OPERATOR'S RESPONSE........................36

   VII.   THE NOVEMBER 2017 TERMINATION LETTER .................................39

   VIII.  DENIAL OF CLAIMANT'S CLAIMS..........................................................40

CLAIMS FOR RELIEF ....................................................................................40

RESERVATION OF RIGHTS .............................................................................71

i

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

# INDEX OF EXHIBITS

| Exhibit | Description |
|---------|-------------|
| A | Amended and Restated Hotel Management Agreement for Trump Ocean Club® International Hotel & Tower Among Trump Panama Hotel Management LLC, Newland International Properties Corp., Hotel TOC Inc. And Owners Meeting of the P.H. TOC, as further amended |
| B | Agreement in Connection with a Bulk Sale by and among Trump Panama Hotel Management LLC, Ithaca Capital Investments I, S.A. and Ithaca Capital Investments II, S.A., dated February 15, 2017 |
| C | Statement of Claim, *Trump Panama Condominium Management LLC v. Owners Meeting of the P.H. TOC, Ocean Club Casino Incorporated, Sun International Limited and Sun International Co.*, No. 21415/RD (before the International Chamber of Commerce) |
| D | Mutual Release and Settlement Agreement by and between Owners Meeting of the P.H. TOC, the board of directors of Owners Meeting of the P.H. TOC, and Trump Panama Condominium Management LLC |
| E | Notice of Default, dated October 14, 2017 |
| F | Trump Ocean Club® International Hotel & Tower Panama P.H. TOC Management Agreement by and between Trump Panama Condominium Management LLC, as Manager, And Owners Meeting of the P.H. TOC, dated April 13, 2011, as amended |
| G | Respondents' Request for Extension, Objection to Fanelli, and Nomination of Goodwin 11.8.2017 |
| H | Respondents' Reply Letter Challenging Fanelli, dated December 1, 2017 |
| I | Co-Ownership Regulations of the Building PH TOC |
| J | Operator's Written Approval of the Bulk Sale |
| K | October 3, 2017 Presentation |
| L | Fintiklis's October 3, 2017 Email |
| M | Partial Transcript of October 14, 2017 Meeting |
| N | Hotel TOC Foundation Charter/Articles of Incorporation |
| O | Foundation Minutes, filed October 16, 2017 |
| P | Claimant Minutes, filed October 16, 2017 |
| Q | Response to Notice of Default, dated November 6, 2017 |
| R | Termination Notice, dated November 21, 2017 |
| S | Response to Termination Notice, dated November 22, 2017 |

ii

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

Pursuant to the Arbitration Rules of the International Chamber of Commerce, Respondents Trump Panama Hotel Management LLC ("Trump Panama" or "Operator") and Trump International Hotels Management, LLC ("Trump International," and together with Trump Panama, "Respondents," "Counterclaimants" and/or "Third-Party Claimants"), by their undersigned attorneys, Pryor Cashman LLP, hereby submit their Answer and Counterclaims in response to the Request for Arbitration of Claimant Hotel TOC, Inc. ("Claimant" or "Hotel TOC"), dated October 14, 2017 (the "Request"), along with a Request for Joinder and third-party claims against Third-Party Respondents Orestes Fintiklis ("Fintiklis"), Gary Lundgren ("Lundgren"), Ithaca Capital Investments I, S.A. ("Ithaca I"), Ithaca Capital Investments II, S.A. ("Ithaca II"), Morgan & Morgan and Owners Meeting of The P.H. TOC ("Owners Meeting"), Hotel TOC Foundation ("Hotel Foundation") and John Does 1-10 ( the "Third-Party Respondents"), upon information and belief, as follows:

## NATURE OF PROCEEDINGS

### I.   Overview

1.      Fintiklis is an attorney and a Cypriot citizen who apparently resides in Florida. He purports to be the "authorized representative" of Claimant Hotel TOC, Inc. In said purported capacity, Fintiklis, together with Third-Party Respondents, has caused Claimant to commence this arbitration against Respondents alleging sham, fabricated breaches of the Hotel Management Agreement (the "HMA") relating to the Trump International Hotel Panama (the "Hotel").[1] These same sham defaults, which lack credibility and which were resoundingly refuted by Operator in a detailed letter to Fintiklis dated November 6, 2017 (to which Fintiklis never responded), form the

---

[1] A true and correct copy of the Amended and Restated HMA, as further amended, is attached hereto as **Exhibit A** (without schedules).

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

basis of the bogus termination notice that was subsequently served by Fintiklis in his (un)authorized capacity.

2.     In fact, Fintiklis has unlawfully conspired with the Third-Party Respondents in an effort to unlawfully seize control of the Hotel, in breach of numerous covenants and in violation of laws, including, but not limited to, civil RICO statutes.

3.     Furthermore, Fintiklis by and through his alter ego vehicles, Ithaca I and Ithaca II, obtained control of over 200 hotel units in 2017 by sheer fraud and deceit.

4.     Fintiklis and his alter ego vehicles knew they needed the written consent of Trump Panama as Operator to achieve any bulk purchase over ten hotel units.  To obtain such consent to the acquisition of more than 200 units, Fintiklis and Ithaca I and II fraudulently promised by written agreement dated as of February 15, 2017 (the "Consent to Bulk Sale Agreement" annexed hereto as **Exhibit B**) to refrain from taking any action, directly or indirectly, to interfere with or undermine the rights of Operator, including the exercise of any votes with respect to the Hotel or any components or units thereof which would be adverse to Operator.

5.     Shortly after closing on the acquisition of these units, in direct breach of the Consent to Bulk Sale Agreement, Fintiklis, together with Lundgren and Third-Party Respondents, organized what they falsely said was an informal lunch to be held on October 14, 2017 on the Hotel premises.  As surreptitiously planned and conspired, the "informal lunch" and "meet and greet" quickly morphed into two purported "board meetings" of Hotel TOC and Hotel Foundation, called without proper notice.

6.     At the purported "board" meetings, Fintiklis, Lundgren and the Third-Party Respondents staged an unlawful corporate take-over; unlawfully removing board members and appointing themselves in their stead.  In preparation for their corporate maneuver, Fintiklis already

2

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

had a contrived, pre-arranged Notice of Default prepared by counsel and ready for service on Respondents.

7.      As if this weren't enough, further evidencing the pre-textual and contrived nature of these notices, on the same date the purported "board" meetings were held, Fintiklis and his co-conspirators commenced this sham arbitration.

8.      Thus, on October 14, 2017, Fintiklis, purporting to act as the "Authorized Representative" of both Claimant and Hotel Foundation, personally signed and delivered to Respondents a purported Notice of Default under the HMA alleging sham breaches of the HMA and demanding cure of the same (if applicable under the HMA). Every aspect of the Notice of Default is fraudulent including the purported claim for $15 million in damages, which was inserted by Fintiklis's lawyer for the sole purpose of attempting to insure that there could be no cure. To be clear, there is and was at the time of the delivery of the default notice, zero basis for the phony damages claim.

9.      Of course, the Notice of Default demanding a cure was a complete sham because that very same day, Fintiklis and the Third-Party Respondents caused Claimant to file the instant sham arbitration demand, "based on [Respondents'] failure and/or inability to cure the defaults" and sought various declarations alleging Claimant's purported right to terminate the HMA, and damages relating thereto.

10.     Conspicuously absent from Claimant's Request for Arbitration are the facts and circumstances leading up to the fraudulent events of October 14, 2017. These facts and circumstances reveal these proceedings to constitute sham litigation under New York law: A fraud upon this tribunal by which Fintiklis and his co-conspirators are abusing legal process in a tortious and unlawful attempt to injure Respondents' rights through their 37 entities owning Units in the

Hotel, and by and through their corporate alter egos, and the Third-Party Respondents – all with the design to wrongfully seize control over the hotel property.

## II.   **Claimant's and Third Party Respondents' Wrongful Conduct**

11.   Lundgren, effectively *persona non grata* in the United States, has previously litigated with Affiliates of Respondents concerning his unlawful activities with respect to the management of the condominium portion of the property.   That litigation took place in a 2015 proceeding before the ICC (the "Lundgren Proceeding").   A copy of that complaint is annexed hereto as **Exhibit C**.   The Lundgren Proceeding settled by agreement in February 2016 (the "Lundgren Settlement Agreement").   The Lundgren Settlement Agreement, to which Lundgren is personally bound, affirmed (i) that as of February 2016, there were no material breaches of the HMA; and (ii) that Lundgren will take no actions to interfere with Respondents or Operator in the management of the Hotel.   A copy of the Lundgren Settlement Agreement is annexed hereto as **Exhibit D**.

12.   A mere four months after the Lundgren Settlement Agreement, Fintiklis, with knowledge of the Lundgren Proceeding, met with Respondents concerning his proposed bulk purchase of over 200 Units in the Hotel.

13.   On or about February 15, 2017, by execution of the Consent to Bulk Sale Agreement, Fintiklis fraudulently obtained, by and through his alter egos Ithaca I and Ithaca II, Respondents' consent, required under the governing documents and the HMA, to purchase 202 Units in the Hotel (through Ithaca I) and the 13 Hotel Amenities Units (through Ithaca II) from the Hotel developer/promoter ("Newland" and together, the "Bulk Sale"), which was then involved in bankruptcy proceedings.   Fintiklis accomplished this purchase with financing from Canal Bank.

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

Fintiklis and Canal Bank performed significant due diligence on the Hotel, in advance of the purchase, including the financial condition of the Hotel.

14.     By agreement dated February 15, 2017, Respondents gave their consent to the Bulk Sale, but conditioned their consent upon the material promise and consideration that Ithaca I and Ithaca II:

> shall not, directly or indirectly through any Affiliates or otherwise: (w) **take (or refrain from taking) any action (including any legal action) that would interfere with or undermine the rights or obligations of Operator under and in respect of any of the Hotel Agreements,** (x) exercise its vote with respect to any of the Hotel Units in any Owners Meeting or other constituent body of P.H. TOC (or any of its components), including without limitation, Hotel TOC Inc., **in a manner which is adverse to the interests of the Operator and/or its Affiliates under and in respect of any of the Hotel Agreements,** (y) take (or refrain from taking) any action (including any legal action) that could materially damage the relationship between Operator, its affiliates and any other Person, or (z) make, issue, solicit or endorse any statement that would damage or undermine the reputation of Operator or any of its Affiliates.

*See* Consent to Bulk Sale Agreement at **Ex. B** (emphasis added).

15.     Deeds evidencing the Bulk Sale were recorded in Panama on August 10, 2017. Following that closing and together with Lundgren, who purportedly through at least 35 separate entities claims to own 50 Units in the Hotel, the two at best may have wielded 68.2% of the votes of Third-Party Respondent Hotel TOC Foundation, the sole shareholder of Claimant.[2]  A vote of the Hotel TOC Foundation with 75% of its voting interests, together with cause (*i.e.*, the occurrence of an Event of Default), is required in order to terminate the HMA.  Lundgren and Fintiklis were knowingly lacking both a 75% super-majority and a genuine Event of Default -- but neither chose to see those glaring defects as an impediment to their tortious acts and conspiracy.

---

[2] As set forth below, in fact, Lundgren's alleged ownership in those 50 units, via his affiliates, is in material violation and breach of Operator's rights under the HMA and of the Co-Ownership Regulations and therefore is subject to resolution by the ICC pursuant to Respondents' claims against the Third-Party Respondents. In fact, Fintiklis and his Third-Party Respondents co-conspirators have far less than even 68% of the required votes.

5

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

16.     Mere weeks after closing the Bulk Sale, Fintiklis arranged a "lunch meeting" under false representations and pretence, purportedly to meet unit owners at the Hotel.  No notice of this meeting was given to the Council of Hotel TOC Foundation, the sole shareholder of Claimant, as required by Panamanian law.

17.     Despite the lack of notice, Fintiklis, together with Lundgren and an attorney from Morgan & Morgan – Claimant's Panama counsel in these proceedings – proceeded to have a purported set of board meetings of Hotel TOC and Hotel Foundation on October 14, 2017, and soon after the beginning of this supposed meeting, excluded Respondents' representative from such meeting, despite Respondents having Board representatives, owning the Hotel Administrative Unit of the Hotel and operating the Hotel for the benefit of all Owners.

18.     At this purported board meeting of Hotel TOC and Hotel Foundation, Fintiklis and his attorney and a John Doe under Fintiklis's control, purported to install themselves on the board of Claimant and Hotel Foundation and, following their installation, immediately and simultaneously declared an alleged Event of Default under the HMA by serving – that same day – a Notice of Default to Respondents which had been prepared well in advance of the meeting with the obvious assistance of counsel.  Additionally, that same day, October 14, 2017, Fintiklis, Lundgren and the Third Party Respondents caused Claimant to commence the instant arbitration proceedings, despite the contractual right of Operator to cure such alleged (sham) defaults over the next 30 days.

19.     The simultaneous orchestration on October 14, 2017 by Fintiklis, Lundgren and the Third Party Respondents of calling an "informal lunch" under false pretence, (1) which morphed into two purported Board meetings, (2) simultaneously produced a Notice of Default, with 30 days to cure but (3) which also simultaneously resulted in an immediate arbitration proceeding, is

6

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

evidence of the malicious intent, fraud and RICO conspiracy by and amongst the Third Party Respondents.

20.     Indeed, their unlawful conspiracy produced a lawless coup despite wielding less than the 75% super majority number of votes required to terminate Operator, and despite lacking an actual Event of Default to do so under the HMA. To be clear, Fintiklis, Lundgren, Ithaca and their Panama counsel Morgan & Morgan (who now, unsurprisingly, purports to represent Claimant in these proceedings) had prepared *in advance* of the October 14, 2017 Meeting documents seeking to terminate the HMA and commencing these proceedings. Moreover, Fintiklis, by and through, without limitation, his alter egos Ithaca I and Ithaca II and John Does 1-10, brazenly violated every covenant in the Consent to Bulk Sale Agreement upon which the purchase of his 200-plus Hotel Units was predicated including, but not limited to, voting his Units to terminate the HMA.

21.     Notably, the Notice of Default is signed by Fintiklis personally as the purported "Authorized Representative of Hotel TOC, Inc. and Hotel TOC Foundation" The Notice complains of, among other things, the purported collapse of occupancy levels "over the past few years" (and citing occupancy rankings from 2015 and 2016). The Notice of Default also relied on purported outperformance by other hotels in RevPAR "in May 2017."[3]

22.     The complaints in the Notice of Default, however, are a complete sham and a fraud upon this Honourable Tribunal as they are belied by the extensive pre-purchase due diligence performed by Fintiklis, Ithaca I and II, and their Panama lender Canal Bank in the weeks and months preceding service of the alleged Notice of Default. Moreover, despite reciting years-long decline in the property and concerns regarding the Hotel management, Third Party Respondent and co-conspirator Lundgren, as of February 2016, agreed in the Lundgren Settlement Agreement

---

[3] For the avoidance of doubt, Respondents hereby deny each and every claim asserted by Claimant in the Request.

7

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

– as evidenced by the Lundgren Settlement Agreement -- that there were no material breaches of the HMA. Indeed, Claimant and Third Party Respondents would have this Honourable Tribunal believe that Fintiklis and his alter egos Ithaca I and II – and Ithaca's investors – borrowed tens of millions from Canal Bank Panama for the Bulk Sale, without having done complete due diligence on the Hotel and its operations, costs, liabilities, assets, revenues, and profits. Simply stated, the Notice of Default is a complete and total fabrication by Fintiklis and the Third-Party Respondents, constituting a sham, as is Claimant's arbitration demand for which Operator shall hold the Third Party Respondents jointly and severally liable.

23.     Fintiklis's and Lundgren's striking and swift reversal concerning the management of the Hotel is damning evidence of their scienter and exposes Claimant and the Third Party Respondents to significant liability resulting from their attempts to terminate the HMA and injure Operator.

## ALL PARTIES TO THESE PROCEEDINGS

24.     **Claimant.**  Claimant Hotel TOC, Inc. is a Panamanian corporation with its principal place of business located at La Propriedad Horizontal P.H. TOC, Cuidad de Panamá, República de Panamá.

25.     Upon information and belief, Third-Party Respondents Fintiklis, Lundgren, Ithaca I and Ithaca II, together with others John Does 1-10, dominate and control Claimant and caused Claimant to take actions to benefit their own interests. Third-Party Respondents' domination of Claimant caused the damages complained of in the Counterclaims and Third-Party Claims in this proceeding and, as such, Third-Party Respondents are liable to Respondent for such damages.

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

26.    **Respondents.** Respondent Trump Panama Hotel Management LLC is a Delaware limited liability company with its principal place of business at 725 Fifth Avenue, New York, New York 10022.

27.    Respondent Trump International Hotels Management LLC is a Delaware limited liability company with its principal place of business at 725 Fifth Avenue, New York, New York 10022.

28.    Respondents are represented in these proceedings by Todd Soloway, Esq., Perry M. Amsellem, Esq., Bryan T. Mohler, Esq. and Marion R. Harris, Esq. of Pryor Cashman LLP, 7 Times Square, New York, New York 10036.

29.    **Third-Party Respondents.** Upon information and belief, Third-Party Respondent Orestes Fintiklis is a citizen of Cyprus, and a resident of Florida, and the president and principal of Third-Party Respondents Ithaca Capital Investments I, S.A. and Ithaca Capital Investments II, S.A., owners of various Units in the Hotel. Third-Party Respondent Fintiklis holds himself out personally as the "Authorized Representative" of Claimant Hotel TOC, Inc. and its sole shareholder, Hotel TOC Foundation pursuant to invalid and illegal activities at a meeting of Hotel TOC, Inc. on October 14, 2017. Upon information and belief, Third-Party Respondent Fintiklis receives notices at 520 W Ave #1502, Miami Beach FL 33139. Third-Party Respondent Hotel TOC Foundation ("Hotel TOC Foundation") is a private interest foundation under Panamanian law, the beneficiaries of whom are Hotel Unit Owners. Hotel TOC Foundation is the sole shareholder of Claimant. Upon information and belief, Hotel TOC Foundation receives notice through the Foundation Council Members, located at P.H. TOC, Panama City, Republic of Panama "real property two hundred and thirty four thousand two hundred and forty (234,240) . . . location Code eight seven zero eight (8708) of the Property Section., Panama Province, of the Public Registry . . . ." (Foundation Charter, Arts. 4(j) & 8). Upon information and belief, Hotel TOC Foundation's Resident Agent is the law firm Sucre, Arias &

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

Reyes, located at Building Ricardo Arango Ave and 61 Street, Obarrio Panama, Republic of Panama, P.O. Box 0816-01832.

30.     Upon information and belief, Third-Party Respondent Gary Lundgren is a resident of Panamá.  In violation of the HMA and Co-Ownership Regulations, Lundgren unlawfully obtained ownership of 50 Units at the Hotel through 35 separate entities that he owns, controls and dominates.[4]  Upon information and belief, Third-Party Respondent Lundgren receives notices at c/o Griselda L. Perez, Board of Directors of P.H. TOC, 5th Floor, Office Tower, Calle Punta Colón, Punta Pacífica, Ciudad de Panamá, República de Panamá.

31.     Upon information and belief, Third-Party Respondent Owners Meeting is a Panamanian company with its principal place of business in Panama City, Panama. Owners Meeting of P.H. TOC, through its Board of Directors, represents the interests of the Condominium Unit owners at the property.   Upon information and belief, Third-Party Respondent Owners Meeting receives notices at Torre Global Bank, Calle 50 & Calle 58 Este Oficina 3501-Piso 35, Ciudad de Panamá, República de Panamá.

32.     Upon information and belief, Third-Party Respondent Ithaca Capital Investments I, S.A. is a Panamanian corporation, and the alter ego of Third-Party Respondent Fintiklis who is the president and principal of Ithaca I and who controls and dominates Ithaca I.  Fintiklis, by and through Ithaca I and Ithaca II, entered into the February 15, 2017 Consent to Bulk Sale Agreement by and between Ithaca I, Ithaca II and Respondent Trump Panama Hotel Management LLC, by

---

[4] Those Lundgren-controlled entities owning Units in the Hotel are Ocean Two Properties S.A. (6 Units), John Galt Panama S.A. (11 Units), and Celestial 10, Inc. City Scape, S.A., Comercializadora Alderbaran S.A., Destiny 12-B, S.A., Grupo Comercial Julmar, S.A., Hubert Enterprises Corp, Inversiones TMMJ, S.A., John Galt Advisors, S.A., John Galt Company, S.A., John Galt Properties, S.A., Ocean Club 1618, Corp., Ocean Club 2016, Corp., Ocean Club 2120, Corp., Ocean Club 2414, Corp., Ocean Club 2422, Corp., Ocean Club 2426 Corp., Ocean Club 2616, Corp., Ocean Club 2810, Corp., Ocean Club 2823, Corp., Ocean Club Properties, S.A., Palmever, Corp., Panama TOC 010907, Inc., Phenomenal Alliance, Corp., TOC 2009, Corp., TOC 2811, Corp., TOC Condo Hotel Unit 2722, Corp., TOC Condo Hotel Unit 2819, Corp., TOC Condo Hotel Unit 2917, Corp., TOC Panama 2724, Inc., TOC2019, Inc., Trump Ocean Club 1918, Corp., Trump Ocean Club 3126, Corp. and TTC Service, Corp., each owning 1 Unit apiece.

which Fintiklis and his alter egos fraudulently obtained the necessary consent to purchase 215 Units in the Hotel. Upon information and belief, Respondent Ithaca I has its principal place of business at 2nd Floor, Humboldt Tower, East 53rd Street, Urb. Marbella, Panama.

33. Upon information and belief, Third-Party Respondent Ithaca Capital Investments II, S.A. is a Panamanian corporation dominated and controlled by Respondent Fintiklis who is the president and principal of Ithaca II. Fintiklis, by and through his alter egos, entered into the Consent to Bulk Sale Agreement on behalf of Ithaca I and Ithaca II with Respondent Trump Panama, only after misleading and fraudulently inducing and obtaining the consent of Operator. Upon information and belief, Ithaca II has its principal place of business at 2nd Floor, Humboldt Tower, East 53rd Street, Urb. Marbella, Panama.

34. Upon information and belief, Fintiklis dominates and controls Ithaca I and Ithaca II, exposing their investors and lenders to significant liabilities without their knowledge. Moreover, Fintiklis, through his domination and control of Ithaca I and Ithaca II, caused Ithaca I and Ithaca II to breach Respondents' contractual rights under the HMA and, as such, is liable for significant damages resulting therefrom.

35. As reflected in a November 13, 2017 Unit Owner Designation Form, Third-Party Respondent Ithaca I is represented by Claimant's counsel, Akerman LLP and Morgan & Morgan. Upon information and belief, Respondents Fintiklis, Lundgren and Ithaca II are similarly represented by Akerman LLP and Morgan & Morgan.

36. Third-Party Respondent Morgan & Morgan is a Panamanian law firm with offices at MMG Tower, 23rd Floor, Ave. Paseo del Mar, Costa del Este, Ciudad de Panamá, República de Panamá.

11

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

37.     Morgan & Morgan is Panama counsel to Claimant, Fintiklis, Ithaca I and Ithaca II. At the illegal board meetings on October 14, 2017, Morgan & Morgan, by and through attorney Orlando Tejeira ("Tejeira") purported to represent all beneficiaries of Hotel TOC Foundation, which Tejeira, described as "all of you" to the owners in attendance on October 14, 2017. Tejeira further unlawfully excluded Respondents and their representative from the illegally-noticed meetings of Hotel TOC and Hotel Foundation.

38.     At the time Morgan & Morgan, by and through Mr. Tejeira, made such false statements, none of the members of the Council of Hotel TOC Foundation were present. Tejeira's and Morgan & Morgan's statement that he represents "all of [the Hotel Unit Owners]" was knowingly false, and constitutes evidence of his (and, by virtue of his position, Morgan & Morgan's) knowing participation in the fraudulent scheme described herein and for which Respondents are entitled to significant damages.

39.     Upon information and belief, Respondents John Does 1-5 are individuals and/or legal entities, affiliated with Fintiklis and Lundgren, the names and addresses of which are presently unknown. At all relevant times, John Does 1-10 conspired with and participated in the fraudulent scheme orchestrated by Fintiklis and Lundgren to wrest control of the management of the Hotel from Respondents, causing damages to Respondents. Respondents reserve the right to amend this pleading as discovery progresses to identify John Does 1-10.

## JURISDICTION, VENUE AND GOVERNING LAWS

40.     **ICC Jurisdiction over all HMA Signatories.** Section 9.1 of the HMA provides that "all disputes, controversies, claims or disagreements arising out of or relating to the Agreement (singularly, a "Dispute", and collectively, "Disputes") shall be resolved in the following manner." Section 9.1.1 continues to provide that "Either Party may submit the Dispute

2761101

12

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

to the International Chamber of Commerce for binding arbitration under then existing ICC Commercial Arbitration Rules."

41.    Notably, this provision does not limit the jurisdiction of the ICC to hear disputes _only_ between the parties. Indeed, as described below, the Third-Party Respondents must be joined in these proceedings to prevent against inconsistent judgments issued by different courts, produce a fair and equitable result with joint and several liability and because the Third Party Respondents are closely related persons and entities that through their acts and conduct, as set forth herein, have created disputes, controversies, claims and disagreements which arise out of or are related to the HMA.

42.    Additionally, Section 9.1.1 of the HMA provides that "Each Party shall submit all Disputes then known to that party within the same arbitration proceeding and any such claim that is not submitted shall be barred."

43.    Accordingly, in the absence of the ICC's proper exercise and grant of its lawful jurisdiction, as set forth below under the laws of New York, Respondents shall under duress risk waiver of Disputes known and set forth by Respondents herein, despite the fact that these Disputes arise from or relate to the HMA.

44.    Claimant and Respondents are signatories to the HMA and the Claims and Counterclaims asserted in this Proceeding arise out of and relate to the HMA. Thus, such Claims and Counterclaims are properly before the ICC in this proceeding.

45.    In addition to those reasons listed herein and below, Third-Party Claimant Ithaca II is properly joined in these proceedings as it is bound to the HMA by virtue of its ownership of the Hotel Amenities Units. In Paragraph 3(A) of the Consent to Bulk Sale Agreement, Ithaca II specifically acknowledged that "[b]y virtue of its purchase of the Hotel Amenities Units, Ithaca II

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

shall be bound by the terms and conditions of the Hotel Management Agreement as successor to the Hotel Amenities Unit Owner (as such term is defined in the Hotel Management Agreement)."

46. **ICC's Proper and Lawful Jurisdiction over the Third Party Respondents that are not HMA Signatories.** Third-Party Respondents Ithaca I and Ithaca II are parties to the Consent to Bulk Sale Agreement annexed hereto as **Exhibit B**. Fintiklis signed on behalf of Ithaca I and Ithaca II, as he dominates and controls such entities which are alleged to be his alter egos. Exhibit A to the Consent to Bulk Sale Agreement enumerates and incorporates by reference all the Hotel-related agreements to which Ithaca I's purchase of Hotel Units and Ithaca II's purchase of the Hotel Amenities Units were and remain subject, including the HMA. As set forth above, Ithaca I and Ithaca II, as the material consideration to the Consent to Bulk Sale Agreement promised and covenanted that they:

> Shall not, directly or indirectly…take…any action (including legal action) that would interfere with or undermine the rights…of Operator under and in respect to any of the Hotel Agreements…

47. In short, Ithaca I and Ithaca II upon signing the Consent to Bulk Sale Agreement expressly incorporated by reference the Hotel Agreements and the HMA, as well as the arbitration agreement set forth therein, and promised to not interfere with Operator's rights under the HMA.

48. Accordingly, Ithaca I and Ithaca II are properly joined in this proceeding as they are subject to Section 9.1 of the HMA, such terms having been expressly incorporated in and by the Consent to Bulk Sale Agreement. *Progressive Cas. Ins. Co. v. C.A. Reaseguradora Nacional de Venezuela*, 991 F.2d 42, 46 (2d Cir. 1993) (finding that a non-signatory to an agreement to arbitrate was bound by arbitration when such agreement to arbitrate was incorporated by reference in a subsequent agreement with the non-signatory); *Pagaduan v. Carnival Corp.*, No. 16-465, 2017 WL 4117339, at *2-3 (2d Cir. Sept. 18, 2017) (affirming an order compelling an individual to

14

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

arbitrate where such individual signed an agreement that "does not contain an arbitration provision on its face. It does, however, reference secondary documents that . . . do call for arbitration.").

49.     As Respondents' claims asserted against Ithaca I and Ithaca II unquestionably arise from and relate to the HMA and the rights and responsibilities thereunder, Ithaca I and Ithaca II are properly included in this Proceeding and the third party claims against them set forth herein should proceed.

50.     Fintiklis is also properly before this Honourable Tribunal, the ICC's jurisdiction over him is lawful under New York law and the claims against him should proceed for three independent reasons:

(i)     First, as the Notice of Default dated October 14, 2017 evidences, Fintiklis holds himself out personally as the "Authorized Representative" of Claimant and Third-Party Respondent Hotel Foundation; Fintiklis, along with his alter egos Ithaca I and Ithaca II, together with Lundgren, dominate and control Claimant and Hotel Foundation for their own benefit, such that Claimant and Hotel Foundation, with respect to the acts described herein, are alter egos of Fintiklis and Lundgren, who are liable to the same extent as, and jointly and severally with, Claimant and Hotel Foundation. *See* The Notice of Default dated October 14, 2017 annexed hereto as **Exhibit E**.

(ii)    Second, Fintiklis, the President and principal of Ithaca I and Ithaca II, derives substantial benefit from his domination and control of Ithaca I and Ithaca II (which are bound to the HMA) and their ownership of Units; Fintiklis purports to be Owner representative for the Hotel Units owned by Ithaca I, which formed the basis for Fintiklis's illegal attempted coup of the Board of Claimant on October 14, 2017. Fintiklis knowingly exploited and benefited from the agreements to which Ithaca I and Ithaca II were bound, including the Consent to Bulk Sale Agreement and HMA; as such, Fintiklis is estopped as a matter of law from denying the jurisdiction of the ICC over him concerning disputes relating thereto. *Deloitte Noraudit A/S v. Deloitte Hasks & Sells, U.S.*, 9 F.3d 1060, 1064 (2d Cir. 1993) (compelling arbitration against a non-signatory to an agreement to arbitrate under estoppel doctrine because such non-signatory knowingly and directly benefitted from the agreement providing for arbitration); *Servaas Inc. v. Republic of Iraq*, 686 F. Supp. 2d 346, 355 (S.D.N.Y. 2010) ("Where a party derived a direct benefit from the contract containing an arbitration provision, . . . it will be estopped from 'raising any question of being a nonsignatory to the agreement.'"); *Alfa Laval U.S. Treasury Inc. v. National Union Fire Ins. Co. of Pittsburgh, Penn.*, 857 F. Supp. 2d 404, 415 (S.D.N.Y. 2012) ("The non-signatory plaintiffs have received a direct benefit from

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

> the Indemnity Agreements and are estopped from denying their obligation to arbitrate as the Agreements require."); *HD Brous & Co., Inc. v. Mrzyglocki*, No. 03 Civ. 8385, 2004 WL 376555, at *9 (S.D.N.Y. Feb. 26, 2004).

(iii)   Third, Fintiklis so dominates and controls Ithaca I and Ithaca II for his own benefit, that he knowingly caused Ithaca I and Ithaca II to take unlawful actions in breach of both the HMA and the Consent to Bulk Sale Agreement, which breaches are directly responsible for damages complained of by Respondents in this Proceeding. As such, under New York law, Respondents may pierce the veil of Ithaca I and Ithaca II, (which as discussed above are bound to the dispute resolution provisions of the HMA) to reach Fintiklis personally. *See Thomson-CSF, S.A. v. American Arbitration Ass'n*, 64 F.3d 773, 777-78 (2d Cir. 1995) (discussing that veil piercing/alter ego may be used to bind a non-signatory to an arbitration agreement).

51.   Lundgren is also properly before this Honourable Tribunal and the ICC has proper jurisdiction over him under New York Law. Lundgren, along with Fintiklis, dominated and controlled Claimant and its sole shareholder, Hotel Foundation, causing it to commit the illegal and tortious acts that have damaged Respondents and are the subject of the Third-Party Claims asserted in this proceeding. As such, Lundgren is personally liable to Respondents for the tortious actions he caused Claimant to take and which have caused injury to Respondents; Lundgren's inclusion as a party in this proceeding is both appropriate and necessary.

52.   Additionally, an independent basis for the ICC's lawful exercise of jurisdiction over Lundgren and Third-Party Respondent Owners Meeting is because both have expressly agreed to ICC jurisdiction; Lundgren and Owners Meeting are also being sued herein, *without limitation*, for breach of the Lundgren Settlement Agreement as it relates to the facts and claims set forth herein. Lundgren and Owners Meeting just last year, in 2016, settled an ICC proceeding arising out of Lundgren's bad actions concerning the Condominium portion of the property, captioned *Trump Panama Condominium Management LLC v. Owners Meeting of the P.H. TOC et al.*, Case No.

16

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

21415/RD.[5]  Specifically, in the Lundgren Settlement Agreement, Lundgren and Owners Meeting

made material promises which are at the heart of the current Dispute and Respondents' rights under

the HMA:

> neither P.H. TOC nor any current or future Board of Directors nor any current or
> future member of the Board of Directors (**including, without limitation, Mr.
> Lundgren**, Ms. Perez, Mr. Graser, Mr. Soloway and Mr. McGowan), whether
> acting in their capacity as a director or **individually, shall**, at any time, directly or
> indirectly, **take any action** (including, without limitation, exercising any voting
> rights as Members of the Board of Directors) **which could reasonably be expected
> to interfere or compete with the duties, services, functions, management
> responsibilities** (including the obligation to operate the Rental Program and the
> Hotel Amenities Unites (as defined in the Hotel Management Agreement)), **rights
> and responsibilities of Hotel Operator, whether under the Hotel Management
> Agreement or otherwise,** or which could otherwise be expected to damage the
> relationship between Hotel Operator and any parties with an interest in the
> Building.

Lundgren Settlement Agreement, Section 6, **Ex. D** hereto (emphasis added).

53.     Section 10 of the Lundgren Settlement Agreement provides, that "all disputes

relating to the performance of any term hereunder shall be decided in accordance with the

procedures set forth in Article 17 of the P.H. TOC Management Agreement."  Section 17.2

thereof,[6] provides that "all disputes, controversies, claims or disagreements arising out of or

relating to this Agreement (singularly, a "Dispute", and collectively, "Disputes") shall be resolved

in the following manner . . . Either party may submit the Dispute to the International Chamber of

Commerce for binding arbitration under the then existing ICC Commercial Arbitration Rules" –

identical to the language used in the HMA by Claimant to commence these proceedings. *Compare*

¶ 40 *supra* and Request for Arbitration ¶ 12 (quoting HMA Section 9.1).

---

[5] *See* **Exhibit C.** Respondents, the Hotel Operator, are affiliates of Trump Panama Condominium Management LLC,
a signatory to the Lundgren Settlement Agreement, and are expressly intended third-party beneficiaries of the
Lundgren Settlement Agreement, as Section 6 specifically references Hotel Operator and confers benefits/imposes
obligations with respect to Hotel Operator on the signatories to the Lundgren Settlement Agreement.
[6] A true and correct copy of the P.H. TOC Management Agreement is attached hereto as **Exhibit F.**

54.     Third-Party Respondent Owners Meeting, as a direct signatory to the Lundgren Settlement Agreement, is unquestionably bound by its terms and properly joined in this proceeding.

55.     Another independent basis for the lawful exercise of jurisdiction by the ICC over Third-Party Respondent Lundgren is that he has directly, knowingly and personally benefitted from the Lundgren Settlement Agreement and, as such, is bound by its terms, including ICC jurisdiction over any disputes arising from his breach of the Lundgren Settlement Agreement. *See* ¶ 50 above, (collecting cases concerning the binding of non-signatories who derive direct benefits from agreements containing arbitration provisions).

56. .   Moreover, the Lundgren Settlement Agreement which Lundgren signed specifically restricts Lundgren's actions with respect to Respondents' rights under the HMA and provides for resolution of any disputes arising from the Lundgren Settlement Agreement in proceedings before the ICC.  Thus, joinder of Third-Party Respondent Lundgren in the instant proceedings is appropriate.

57.     Joinder of Third-Party Respondent Morgan & Morgan is also lawful and justified because Morgan & Morgan acted as an agent of Third-Party Respondents Ithaca I, Ithaca II, and Fintiklis, each of whom is bound to arbitrate in these proceedings.  As set forth below, Morgan & Morgan, by and through the actions of (at least) Orlando Tejeira, deliberately acted in furtherance of a conspiracy to tortiously interfere with Respondents' rights under the HMA and the Hotel-related agreements.  As such, Morgan & Morgan is properly joined in these proceedings and the ICC has jurisdiction over same, because Morgan & Morgan is an agent of parties that are themselves bound to arbitrate in this proceeding.  *See, e.g., Thomson-CSF, S.A. v. American Arbitration Ass'n*, 64 F.3d 773, 776 (2d Cir. 1995) ("This Court has made clear that a nonsignatory

18
THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

party may be bound to an arbitration agreement if so dictated by the 'ordinary principles of contract and agency.'") (quoting *McAllister Bros., Inc. v. A & S Transp. Co.*, 621 F.2d 519, 524 (2d Cir. 1980)).

58.    Such joinder is particularly appropriate here since the HMA provides that all disputes relating to or arising from the HMA – which Morgan & Morgan's tortious conduct unquestionably does – must be brought in this proceeding or are barred.

59.    **Venue.** Section 9.1.5 of the HMA provides:

> The arbitration hearing shall be held in Panama City, Panama and, except for those procedures specifically set forth in this Section 9.1, including, without limitation, the application of the internal laws of the Republic of Panama or the State of New York (without regard to conflict of law principles), shall be conducted in accordance with the Commercial Arbitration Rules of the International Chamber of Commerce as in effect as on the date thereof. The seat of arbitration shall be in the State of New York, County of New York, and any action by any party challenging the validity of the arbitration award shall be filed in the appropriate federal or state court located in the State of New York, County of New York.

60.    **Governing Law.** The HMA, in Section 12.3, provides:

> This Agreement, all disputes relating to the performance or interpretation of any term of this Agreement and the validity of any arbitration awards issued in accordance with Section 9.1 of this Agreement, shall be construed under and governed by the internal laws of the State of New York (without regard to conflict of laws principles), except to the extent that the subject of the dispute arises out of or concerns the enforcement of rights where only local law is applicable such as Panama real estate or Panama real estate interests, employment, gaming and permitting from governmental entities or municipalities (such as liquor permits).

61.    The Lundgren Settlement Agreement, in Section 10, incorporates the dispute resolution provisions of Article 17 of the P.H. TOC Management Agreement, which, in Section 17.1.1, likewise provides:

> This Agreement, all disputes relating to the performance or interpretation of any term of this Agreement and the validity of any arbitration awards issued in accordance with Section 9.1 of this Agreement, shall be construed under and governed by the internal laws of the State of New York (without regard to conflict of laws principles), except to the extent that the subject of the dispute arises out of

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

or concerns the enforcement of rights where only local law is applicable such as Panama real estate or Panama real estate interests, employment, gaming and permitting from governmental entities or municipalities (such as liquor permits).

## APPOINTMENT OF ARBITRATORS

62.     **Constitution of Panel.**  Article 9 of the HMA provides that this proceeding shall be conducted by a panel of three arbitrators.

63.     **Qualifications of Arbitrators.**  The HMA further provides that the arbitrators for this proceeding shall be free of conflicts with the parties and their affiliates and experienced in the luxury hotel and condominium businesses.  Specifically:

> Each arbitrator shall have not fewer than 10 years of experience (at the time the request for arbitration is filed) in the luxury hotel business as construed under U.S. market standards (and no fewer than five years of experience in the luxury condominium business), shall be independent of the parties as provided by the ICC Commercial Arbitration Rules, and shall not be an Affiliate of or a Person who has any past (within the prior three years from the date the arbitration is filed), present, or currently contemplated future business or personal relationship with Owner, Promoter/Developer, any owner of 10% or more of the Hotel Units or any other category of Units, or Operator.  Each of Operator, on the one hand, and any one or more of the other Parties, on the other hand, shall propose on arbitrator by written notice incorporated into the request for arbitration and answering statement, to the other party, and the two arbitrators selected shall, within twenty (20) days after their appointment, select the third arbitrator.  If either Party does not select an arbitrator within twenty (20) days after the Dispute is submitted, then an arbitrator shall be selected for that party under the ICC Commercial Arbitration Rules.  In the event that the parties are unable to obtain the services of arbitrators which meet the qualifications set forth in this Section 9.1.1, the parties shall use diligent efforts to obtain the services of arbitrators whose qualifications are substantially similar to those set forth above.

HMA, Section 9.1.1.

64.     **Claimant's Proposed Appointment.**  Claimant, in its Request for Arbitration, purported to nominate Cecelia L. Fanelli, Esq. of Steptoe & Johnson LLP.  As addressed in Respondents' application and reply to challenge and disqualify attorney Fanelli, respectively dated and filed  November 8, 2017 and December 1, 2017 with the ICC, which are specifically

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

incorporated by reference herein (**Exhibit G**; **Exhibit H**), the nomination is improper as Ms. Fanelli is not qualified as an arbitrator under either the HMA or under New York law.

65.     **Respondents' Proposed Appointment.**  By letter dated November 8, 2017, Respondents notified the ICC and Claimant of its nomination of Mr. Bruce L. Goodwin as an arbitrator in these proceedings, such correspondence being incorporated herein by reference. (**Exhibit G**)  Mr. Goodwin's contact information is as follows:

> Goodwin & Associates
> 3027 Dalen Place
> San Diego, California 92122
> Tel: 858-558-4488
> goodwinassociates2@gmail.com

## FACTS COMMON TO ALL CLAIMS

### I.     LUNDGREN'S AND OWNERS MEETING'S PRIOR ICC PROCEEDINGS

66.     This is not the first proceeding before the ICC in which the Property and Hotel were featured.  In a proceeding commenced in 2015 and settled just last year in 2016, an Affiliate of Respondents commenced a proceeding in the ICC concerning the residential condominium portion of the Property.

67.     Specifically, the proceeding concerned Lundgren's unlawful seizure of control of the Board of Directors of Owners Meeting of P.H. TOC (the equivalent of the actions here with Fintiklis and his co-conspirators with respect to the Hotel Units) and purported to terminate Respondents' Affiliate's management agreement for the condominium units. History repeats itself.

68.     As alleged at the time, and true to this day, Gary Lundgren, over the course of his career, has never hesitated to engage in unlawful, devious and unethical business practices to line his pockets and advance his personal interests at the expense of anyone.

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

69.     In the United States, Lundgren, upon information and belief, has been the subject of numerous complaints, arrests and even criminal proceedings involving allegations of assault, resisting arrest, disorderly conduct, malicious destruction of private property and even domestic violence.  Moreover, Lundgren has faced a number of lawsuits and regulatory inquiries into his work in the U.S. securities industry.

70.     As a result, **Lundgren was censured by the National Association of Securities Dealers in 1983 and, as of February 2016, barred from affiliating with any securities firm that is a member of the Financial Industry Regulatory Authority (FINRA), a self-regulatory organization for broker-dealers in the United States.  In short, Lundgren is no stranger to fraud and criminality.**  Accordingly, it comes as no surprise that he and Fintiklis have unlawfully conspired to maliciously injure Operator's rights and interests through this sham proceeding and violations of law.

71.     Indeed, one of the facts giving rise to the prior ICC proceeding was Lundgren unilaterally appointing his wife, owner of a local property management company, as "Acting Interim President" of the Board of P.H. TOC.

72.     Ultimately, the 2015 ICC proceeding settled in 2016 pursuant to the Lundgren Settlement Agreement, in which the Respondents' Affiliate allowed the condominium management agreement to expire by its terms in exchange for material covenants from Owners Meeting of P.H. TOC and its board members, including Lundgren personally, which promises and covenants are directly related to the present Dispute before the ICC.

73.     Specifically, the Lundgren Settlement Agreement provided that Lundgren and Owners Meeting agreed as follows:

> neither P.H. TOC nor any current or future Board of Directors nor any current or future member of the Board of Directors (including, without limitation, Mr.

22

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

Lundgren, Ms. Perez, Mr. Graser, Mr. Soloway and Mr. McGowan), whether acting in their capacity as a director or individually, **shall, at any time, directly or indirectly, take any action (including, without limitation, exercising any voting rights as Members of the Board of Directors) which could reasonably be expected to interfere or compete with the** duties, services, functions, management responsibilities (including the obligation to operate the Rental Program and the Hotel Amenities Units (as defined in the Hotel Management Agreement)), **rights and responsibilities of Hotel Operator, whether under the Hotel Management Agreement or otherwise,** or which could otherwise be expected to damage the relationship between Hotel Operator and any parties with an interest in the Building.

Lundgren Settlement Agreement, Section 6 (emphasis added).

74.     Not surprisingly, following the agreed-upon expiration of the condominium management agreement, the property management company owned by Lundgren's wife was appointed, in a blatant self-dealing manner, to manage the residential condominium portion of the Property.

75.     Now, in a continuing pattern of RICO activities, Lundgren has subsequently conspired with Fintiklis and others, including the Third-Party Respondents and John Does 1-10, for a similar purpose and in violation of Respondents' rights under the HMA and law.

76.     Specifically, Lundgren, Fintiklis, Ithaca I and II and Morgan & Morgan, and the other Third-Party Respondents conspired to unlawfully acquire Hotel Units in the Property with the goal of ousting, by *ultra vires* acts, the Respondents as managers and Operator of the Hotel.

## II.    THE BULK SALE TO FINTIKLIS

77.     In 2016, Newland, the developer of the Property, commenced bankruptcy proceedings.

78.     In or about May 2016, Newland offered the remaining 202 Hotel Units and the 13 Hotel Amenities Units as a package for bid. Pursuant to the P.H. TOC Co-Ownership Regulations,

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

however, any sale of this size required consent from Respondents, as Hotel Operator and Licensor.[7] In addition, the HMA provides Respondents with the right to consent or reject any purchase or acquisition of more than 10 Units.

79.    On October 14, 2016, Fintiklis, operating by and through both of his Ithaca alter egos, came to Respondents' New York offices accompanied by Newland's representatives to meet about a potential purchase of those Units. Four days later, Fintiklis sent an email to those in attendance at the meeting, and stated that he (or, rather, Ithaca) "look[ed] forward to closing the transaction and working together to turning around this wonderful property." That was the beginning of a series of knowingly false representations made by Fintiklis to Respondents with the fraudulent intent that Respondents would rely upon the false statements to their detriment, which they did and which caused them resulting damages.

80.    Fintiklis intended to close the purchase, and did in fact close the purchase, using in part tens of millions of dollars in loan proceeds obtained from Canal Bank, a Panama entity. The extent to which Canal Bank has relevant information or was defrauded by Fintiklis or participated

---

[7] Article 75(D)(4) of the Co-Ownership Regulations provides:

> **4. NUMBER OF HOTEL UNITS.** No **OWNER** of a **HOTEL UNIT** may subdivide his / her **HOTEL UNIT**; no **OWNER** may purchase, possess or control, directly or indirectly through affiliates, related parties or in any other way, more than ten (10) **HOTEL UNITS**. For these effects, ownership or control of a **HOTEL UNIT** shall be considered to exist if said **HOTEL UNIT** belongs, directly or indirectly to the **OWNER**, a family member of the **OWNER**, any entity where the **OWNER** or the **OWNERS** family members may have an interest or are partners, or any partner, affiliate, controlling company or affiliate of any of the above. The limitation above shall not apply to the **LICENSOR** or any entity or purchaser buying more than ten (10) **HOTEL UNITS** from the **LICENSOR**, provided that any **OWNER** possessing or owning more than ten (10) **HOTEL UNITS** shall only be allowed to resell these **HOTEL UNITS** in one exclusive transaction. As an example, but not limiting, if the **LICENSOR** sells twenty (20) **HOTEL UNITS** to a buyer, said buyer shall only be allowed to resell those twenty (20) **HOTEL UNITS** to another purchaser in a single transaction.

Co-Ownership Regulations of the Building P.H. TOC (the "COR"), Art. 75(D)(4), attached hereto as **Exhibit I**.

24

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

in any manner in aiding and abetting this massive fraud and series of unlawful RICO acts shall be determined by and through discovery in this proceeding, and other proceedings in New York and Panama if and as necessary. Upon information and belief, as part of that financing transaction, Canal Bank performed extensive due diligence into the Property on which it was extending tens of millions in financing, as did Ithaca I and Ithaca II, the alter egos of Fintiklis.

81.    Fintiklis executed the first version of the Consent to Bulk Sale Agreement in or about January 2017 on behalf of Ithaca I and Ithaca II, which were incorporated in Panama and created to commit fraud and further an unlawful RICO scheme by and through the Bulk Sale. Before Respondents countersigned the Consent to Bulk Sale Agreement, Fintiklis requested further changes to it, specifically that the sale be bifurcated between his two alter egos: Ithaca I as the purchaser of the 202 Hotel Units, and Ithaca II as the purchaser of the thirteen Hotels Amenities Units.

82.    After making revisions requested by Fintiklis, Respondents – to avoid the very scenario giving rise to these sham proceedings conceived and commenced by Fintiklis and the Third-Party Respondents – clarified the language of Section 3(d) of the Consent to Bulk Sale Agreement.

83.    Simply stated, in exchange for allowing the Bulk Sale, Section 3(d) of the Consent to Bulk Sale Agreement is the main consideration that Respondents were to receive from Fintiklis and his alter egos: express covenants by Ithaca I and Ithaca II that they and their Affiliates shall not directly or indirectly take any actions to interfere with or undermine ANY of Respondents' rights under or in respect to ANY of the related Hotel Agreements, including specifically the HMA, including but not limited with respect to any voting rights to any of the Hotel Units, or Hotel TOC, or any and all components of the P.H. TOC.

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

84.     Section 3(d) states as follows:

Purchaser shall not, directly or indirectly through any Affiliates or otherwise: (w) take (or refrain from taking) any action (including any legal action) that would interfere with or undermine the rights or obligations of Operator under and in respect of any of the Hotel Agreements, (x) *exercise its vote with respect to any of the Hotel Units in any Owners Meeting or other constituent body of the P.H. TOC (or any of its components), including without limitation, Hotel TOC Inc., in any manner which is adverse to the interests of Operator and/or its Affiliates under and in respect of any of the Hotel Agreements,* (y) *take (or refrain from taking) any action (including any legal action) that could materially damage the relationship between Operator, its Affiliates and any other Person or* (z) make, issue, solicit or endorse any statement that would damage or undermine the reputation of Operator or any of its Affiliates.

Consent to Bulk Sale Agreement § 3(D) (emphasis added).

85.     Section 3(F) of the Consent to Bulk Sale Agreement further restrained Ithaca I and Ithaca II and its Affiliates from taking, directly or indirectly, any leadership positions within the P.H. TOC regime. That provision states in part that "Purchaser shall not seek or accept an appointment or election to the position of manager or administrator (or other similar leadership role) of the P.H. TOC." *Id.* § 3(F).

86.     In February 2017, Fintiklis personally executed the Consent to Bulk Sale Agreement, on behalf of his alter egos Ithaca I and Ithaca II, which were formed for the purpose of furthering the unlawful fraud and RICO scheme set forth herein. Respondents countersigned in good faith believing that Fintiklis was an honest businessman. Pursuant to the Consent to Bulk Sale Agreement, Operator's required Written Approval necessary for the purchase was deposited in escrow with Newland's attorney, with release pending acceptance of the Licensing Fee.

87.     On July 30, 2017, the P.H. TOC Board of Directors issued its Paz y Salvo (a certificate that the property is unencumbered by liens), allowing Newland to close the deal.

## III.   FINTIKLIS MAKES HIS NEXT MOVE IN FURTHERANCE OF HIS FRAUD AND UNLAWFUL RICO SCHEME

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

88.     On or about August 10, 2017, the deeds to the 202 Hotel Units and the 13 Hotel Amenities Units were recorded in the Panama Public Registry, reflecting Ithaca I as the owner of 202 Hotel Units, and Ithaca II as the owner of the 13 Hotel Amenities Units.

89.     On August 25, 2017, Operator received the License Fee pursuant to the Consent Agreement and, accordingly, Operator released its Written Approval of the Bulk Sale the same day. (**Exhibit J**)

90.     Following the transfer of ownership of the 202 Hotel Units and the 13 Hotel Amenities Units, Fintiklis again met with high-ranking members of Respondents on August 28, 2017, this time in Panama.  At this meeting Jeff Wagoner, EVP of Hotel Operations for Trump Hotels, made two presentations. The first presentation reviewed Respondents' sales and marketing strategies at the corporate level; and the second presentation discussed market highlights, financial performance, and key Hotel objectives at the property level.

91.     A little over a month later, on October 3, 2017, Fintiklis again met with five high-ranking members of Respondents, as well as the entire Hotel Executive Committee, in Panama. At that meeting, Jeff Wagoner again made a presentation (**Exhibit K**), this time concerning new initiatives and revenue strategies to mitigate the effects of the increasingly saturated high-end hotel market in Panama City, Panama, an issue that has been building over the past few years. The presentation also included a preview of the Hotel's budget for 2018.

## IV.     THE HOTEL TOC "LUNCH MEETING"

92.     On October 3, 2017 at 9:03 PM local Panama time—the same day Fintiklis met with the Respondents in Panama — Fintiklis sent a mass email to all Hotel Unit Owners requesting their attendance "at a meeting of the beneficiaries of Hotel TOC Foundation (*i.e.*, all Hotel Unit Owners) on 14 October 2017," declaring that it was an opportunity to meet as many Hotel Owners

as possible and "hear [Hotel Unit Owners'] thoughts and ideas." (**Exhibit L**)  This was another false statement made by Fintiklis and his alter ego entities which was designed to mislead Operator and Respondents and made to further the fraud, unlawful acts and RICO violations set forth herein.

93.     Upon learning of this proposed Hotel Unit Owners meeting, Respondents contacted Fintiklis directly to remind him of his obligations under the Consent to Bulk Sale Agreement— specifically the covenants and acknowledgements as laid out in Section 3, quoting subsections (D)–(E).  Specifically, Respondents noted that Ithaca I and II "expressly bound themselves and committed that they 'shall not seek or accept an appointment or election to the position of manager or administrator (or other similar leadership role) of the PH TOC.'"  Respondents further requested that its General Manager of the Hotel attend the meeting, and that Fintiklis notify Respondents of any future plans to convene Hotel Unit Owners.

94.     Fintiklis fraudulently responded to Respondents, and continued to make further knowingly false statements in furtherance of the fraud and RICO violations set forth herein.  Fintiklis wrote, "With regard to the second point, this is not a legal point.  So you prefer for the positions to continue to be vacant and hotel to continue to be exploited and extorted?  What is this business issue/detriment to your organization form us appoint the position we are entitled to the board of PH Toc under the PH condo docs?"  Fintiklis and his alter egos further confirmed their awareness of the provisions quoted, and claimed that the meeting was merely an informal lunch that he put together because he was being approached by Hotel Unit Owners and thought that a "lunch meeting" would be a good way to meet everyone. Fintiklis also agreed to have the General Manager in attendance, a knowingly false statement made with the intent that Respondents would rely upon it to their detriment and damage, which they did. At this point, Ithaca I had been the majority shareholder of the Foundation for a little under two months.

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

## V.    THE "OCTOBER 14 MEETINGS," NOTICE
   ## OF DEFAULT, AND REQUEST FOR ARBITRATION

95.    On Saturday, October 14, 2017, Fintiklis, Lundgren, Ithaca I and II, Morgan &
Morgan and John Does 1-10, met with Hotel Unit Owners at the Hotel, under the guise and deceit
of an informal lunch. The Hotel's General Manager, Carlos Abaunza, who is an employee and
representative of Respondents, was in attendance for the first 10 or 15 minutes of the meeting,
until he was forced to leave by the Third-Party Respondents.

96.    Fintiklis effectively started the meeting by declaring that "we called the meeting
because most of you have been telling us you are troubled by the fact that . . . every month you
have to reach into your pocket and make a payment to support what you thought was an otherwise
profitable investment, which is clearly not the case . . . ." He continued, "if we have the best hotel
why are we losing money [?] [S]o that's wh[y] we're here . . . to discuss . . . basically we think
and we heard from you . . . [t]he Operator is supposed to perform the functions of the Operator . .
. [but] the owner and the Operator have effectively been the same person." (**Exhibit M**) Those
statements are false, were knowingly false when made and were made in furtherance of the
unlawful fraud and RICO scheme set forth herein. Among other things, Fintiklis, and the Third
Party Respondents who participated and orchestrated this sham meeting know very well that
Operator has never been the Owner and never held itself out to be the Owner.

97.    Lundgren, through various corporate entities which had fraudulently obtained
ownership of 50 Hotel Units without the required consent of Respondents, was present and spoke
at the meeting as well in furtherance of the fraud and RICO scheme set forth herein.

98.    Orlando Tejeira, of Morgan & Morgan, was also in attendance at the meeting and
stated as follows:

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

Orlando Tejeira:    good afternoon ok so as I mentioned my name is Orlando Tejeira an attorney for Morgan and Morgan representing Ithaca and all of you. I just want to make sure that first of all and prior for me to reading the resolution that you are voting as beneficiaries of the foundation and as owners. I have to say that I am compelled by law to establish that this information that I am going to read is privileged and strictly confidential only for the beneficiaries of the foundation so everyone who is not an owner should please leave room for the next 10-15 minutes then can come in . . . .

*See* **Ex. M,** attached hereto.

99.    When Operator, by and through the General Manager of the Hotel, attempted to inform Fintiklis, Lundgren, the Ithaca alter egos and Morgan & Morgan that it had lawful proxies for votes, Fintiklis and the Third-Party Respondents ordered him – and effectively Respondents – out of the room. Morgan & Morgan's assertions that it and Tejeira represented all of the Beneficiaries (i.e., all of the Unit Owners) of the Foundation in this meeting is patently FALSE as he and Morgan & Morgan are not the Legal Representative of Hotel TOC Foundation and certainly could not have been at the time that statement was made, before any sham vote had even been taken. Moreover, Morgan & Morgan knew that no Board of Directors meeting had been properly noticed, and knew in fact it was falsely and deceptively called "a lunch meeting" for the purpose of orchestrating this fraud and series of RICO acts and violations. In fact, after Operator by and through its agent the Hotel's General Manager said "we were told this meeting was a simple meet and greet," Fintiklis said: **"Ok. It don't matter what was the purpose of the meeting now we have everybody here and I don't think people here have an issue."**

100.    Article 5 of Hotel TOC Foundation Charter (attached hereto as **Exhibit N**) establishes that the "Legal Representative of the Foundation shall be the President of the Council. In his absence, the legal representative shall be whomever is elected by the majority of the votes of the Members of the Council." (Foundation Charter, Art. 5). Before, as of and on October 14,

30

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

2017, the Legal Representative and President of the Foundation was Roger Khafif. Mr. Khafif, Hotel TOC Foundation's Legal Representative, did not receive notice of the meeting, nor did he attend.

101.    The failure to provide notice to Mr. Khafif was no mistake, but rather an intentional fraudulent act designed to ensure that Fintiklis, Lundgren, and Ithaca, together with the able assistance of Morgan & Morgan and John Does 1-10, could exercise their unlawful scheme without protest or bound by legal impediments, such as notice to and participation by the duly-installed Council of Hotel TOC Foundation, in violation of law.

102.    Tejeira of Morgan & Morgan continued aiding and abetting the fraud and RICO scheme set forth herein, claiming that Morgan & Morgan, as purported counsel to ALL hotel unit owners was duly "compelled by law to establish that [the resolution] that [Tejeira] is going to read is privileged and strictly confidential—only for the Beneficiaries of the Foundation," and thus all non-Hotel Unit Owners were required to leave. This purportedly included the Hotel's General Manager and Respondents' on-site representative, Carlos Abaunza.

103.    Under Article 11 of the Foundation Charter, meetings of the Beneficiaries may only be convened by the Foundation Council or upon written request of Beneficiaries representing 35% of Hotel Units, provided notice is given not less than 10, but no more than 60, days before the meeting. (Foundation Charter, Art. 11). Because the Foundation Council did not convene the meeting, because the meeting was held under the fraud and deceit of being an informal lunch and because no written request was made to have a board meeting, much less by any requisite percentage of Hotel Units, and because no member of the incumbent Foundation Council was notified about the October 14, 2017 meeting, the so-called "meeting" on October 14, 2017 was not a valid Meeting of the Beneficiaries as laid out in Article 11 and was merely one of several acts

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

orchestrated and enacted in furtherance of the fraud, RICO violations and unlawful acts set forth herein from which Respondents have suffered significant damages. In short, Fintiklis, Lundgren, Morgan & Morgan, Owners Meeting, Ithaca I, Ithaca II, and John Does 1-10 are engaged in a complete sham to usurp unlawful control of Hotel TOC and Hotel Foundation, in an effort to injure Respondents, which sham includes their commencement of this arbitration proceeding in violation of Section 487 of the New York Judiciary Law.

104.    After the Respondents, represented by the Hotel General Manager, were directed to leave, Fintiklis, and his alter egos Ithaca I and II represented at this meeting in person by Morgan & Morgan, together with Lundgren – in direct and knowing violation of their collective obligations under the Consent to Bulk Sale Agreement and the Lundgren Settlement Agreement – purported to hold an unlawful "Meeting of the Beneficiaries" to change the composition of the Foundation Council, and at the same time, an unlawful "Assembly of the Shareholders" to change the members of the Board of Claimant.

105.    The foregoing events occurred in furtherance of Fintiklis's, Lundgren's and Third-Party Respondents' fraud and RICO scheme, including for the purpose to wrongfully usurp control of Hotel TOC and its sole shareholder Hotel Foundation, remove Operator in violation of its rights under the HMA and remove from the Foundation Council the incumbent President James Petrus; the incumbent Secretary Michael Dieter Straube; and the incumbent Treasurer Charles Mark Stevenson; and to elect Fintiklis as President of the Foundation Council; Alfredo Guerra as Secretary; and Jamie Fernandez as Treasurer.

106.    The Minutes of the alleged October 14, 2017 Meeting of the Beneficiaries filed on October 16, 2017 with the Panama Public Registry (attached hereto as **Exhibit O**) confirms as much and states that:

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

[A] meeting of the Beneficiaries . . . of the Hotel TOC Foundation . . . was held on October 14, 2017 at 12:00 PM at the [H]otel . . . . Upon approval and designation of the Beneficiaries . . . Orestes Fintiklis, Director – President and Legal Representative of Ithaca Capital Investments S.A. I, a Panamanian corporation and Beneficiary of the Foundation, acted as President of this meeting. . . Upon approval and designation of the Beneficiaries, Orestes Fintiklis, Director – President and Legal Representative of Ithaca Capital Investments S.A. II acted as Secretary of this meeting. . . . The President of the meeting [Fintiklis] declared that there were present in person and/or duly represented by proxy at the meeting 284 of the 369 Beneficiaries of the Foundation and that notice of the meeting was sent and given to all the Beneficiaries of the Foundation pursuant to Article Eleventh of the Foundational Charter of the Foundation.

(Foundation Minutes, filed Oct. 16, 2017).

107.    The Foundation Minutes, which the Third-Party Respondents caused to be filed declaring that 284 of the 369 Beneficiaries of the Foundation were in attendance or represented by proxy and that proper notice was given pursuant to Article 11 of the Foundation Charter, are false, were knowingly false when made and were made in furtherance of the fraud and RICO scheme herein for which Respondents assert Counterclaims and Third Party claims and seek relief.

108.  · Fintiklis, acting as both ad-hoc President *and* Secretary of the meeting, (Foundation Minutes, Oct. 14, 2017), and blatantly disposing with any corporate formalities as it were, quickly "resolved" to remove the three aforementioned Council Members so as to elect himself and those under his control, including his lawyer Alfredo Guerra, to Council Member positions, enabling Fintiklis to control the Foundation Council, which is "responsible for the management, administration and representation of the Foundation." (Foundation Charter, Art. 4(k)).

109.    The Minutes of the alleged "Shareholder's Assembly Meeting" of October 14, 2017, filed with the Panama Public Registry on October 16, 2017 state that Fintiklis again acted as ad-hoc President and Secretary of the meeting. (Claimant Minutes, Oct. 14, 2017, attached hereto as **Exhibit P**). The alleged Shareholder Meeting Minutes go on to say that "[t]he President of the meeting [Fintiklis] declared in the presence and/or representation of all of the issued and

33
THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

outstanding shares of the company, the notice of call could be waived, and the quorum being in force, the meeting could proceed to deal with any matter submitted to it." *Id.*

110.    Again, as explained above, the assertion that all the issued and outstanding shares of the company were lawfully present and/or represented at the alleged October 14th Meetings is false, was knowingly false when made and was made in furtherance of an unlawful RICO and fraudulent scheme.

111.    The alleged Shareholder Minutes further state that Fintiklis, as ad-hoc President, informed the alleged Shareholders Assembly that it was resolved in the alleged Meeting of the Beneficiaries to (i) remove Mark Hawthorn (an employee of Operator), Charles Thierry Baurez and Carlos Abaunza (both Operator's representatives) as current Directors and Officers of the Corporation; and to, in turn, (ii) appoint Jaime Fernandez as Director and Treasurer; Fintiklis as Director and President, and Alfredo Guerra as Director and Secretary.  These are the same three people that were allegedly voted to the Foundation Council.

112.    Even though the General Manager of the Hotel, Carlos Abaunza, a Director of Claimant was present at the beginning of the "lunch meeting," Fintiklis and the Third-Party Respondents unlawfully excluded him from the alleged Shareholders Assembly Meeting by demanding that he leave before the alleged "Meeting of the Beneficiaries" and alleged votes took place, without disclosing that such an alleged Shareholders Assembly Meeting would be held in the next hour.  These acts were undertaken by and through the conspiracy of the Third Party Respondents in furtherance of the fraud and RICO scheme set forth herein.

113.    Upon information and belief, the Third Party Respondents caused Fintiklis to be wrongfully elected, together with those under his control, to the Foundation Council and

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

Claimant's Board of Directors to wrest control of the Hotel Management, injure Respondents, wrongfully terminate the HMA, and to effectuate the fraud and RICO scheme set forth herein.

114.    Under Panama law, the Foundation Charter would require an affirmative vote of 75% of all Beneficiaries (Hotel Unit Owners) or the written consent of all Beneficiaries to "[t]erminat[e] for cause, and/or decision not to renew any agreements entered into by the [Corporation] with any hotel operator and/or manager with respect to the operation of the Hotel." (Foundation Charter, Art. 10(b)(iv)). Even assuming the meetings had been properly noticed and called, which they were not, this additional legal requirement was not met.

115.    Moreover, under the express voting prohibitions of the Consent to Bulk Sale Agreement and Lundgren Settlement Agreement, neither Fintiklis nor his alter ego Ithaca entities, or Lundgren and his affiliated entities could take any vote or take any action adverse to Operator or which would undermine Operator's rights under the HMA. Accordingly, the decision orchestrated by Third Party Respondents to terminate the HMA, whether under Article 10(b)(iv) of the Foundation Charter or otherwise, is invalid.

116.    Tellingly, the same day these meetings – arranged by Fintiklis and Third-Party Respondents in furtherance of their fraud and RICO scheme – took place, Fintiklis, purporting to act as an authorized representative of Claimant Hotel TOC and Hotel Foundation, served Respondents with a seven-page sham Notice of Default under the HMA, dated October 14, 2017. That this Notice of Default was served the same day as the alleged meetings occurred is certainly no coincidence and was planned and conspired by the Third-Party Respondents in furtherance of their fraud and RICO scheme.  To the extent that unknown parties John Does 1-10, including lawyers and law firms, took part in this fraudulent scheme, they shall be discovered in the ICC proceedings and identified and sued in the place of John Does.

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

117.    Fintiklis and the Third-Party Respondents apparently convened these alleged October 14th Meetings without proper notice and obstructed the participation of Operator's representatives as well as the President and Legal Representative of the Foundation, to falsely claim that 75% of the Beneficiaries approved the termination of the HMA, prompting the simultaneous service of a sham Notice of Default and bogus ICC Arbitration filing dated *the exact same day*. This is fraud and a violation of RICO, without limitation.

118.    Even worse, the very same day that the alleged "Meetings" were held and the Notice of Default was sent, Fintiklis and John Does 1-10 caused the filing of a 47-page sham Request for Arbitration with the ICC pursuant to HMA § 9.1, purporting to act on behalf of Claimant the same day that Fintiklis fraudulently appointed himself to Claimant's Board of Directors.

119.    That these three events, (1) the fraudulent meeting; (2) the Notice of Default; and (3) the Request for Arbitration, all occurred on the same day, October 14, 2017, compels the conclusion that Fintiklis, and Lundgren, their controlled alter ego entities and affiliates, together with Morgan & Morgan and the Third-Party Respondents, including John Does 1-10, designed this fraud and RICO scheme to usurp control of the Hotel and to injure Operator's rights and interests under the HMA, long before October 14, 2017.

## VI.    THE SHAM DEFAULT NOTICE AND OPERATOR'S RESPONSE

120.    The Notice of Default, dated October 14, 2017 and signed personally by Fintiklis as an alleged "authorized representative of Hotel TOC, Inc. and Hotel TOC Foundation," purported to provide notice of the:

> ongoing, material defaults under the [HMA], in particular Operator's failure to comply with its contractual and fiduciary obligations to supervise, direct, and control the management, operation, and promotion of all aspects of the Hotel;

2761101

36

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

operate Hotel in accordance with the Operating Standard; and 'to maximize profitability and long term value of the Hotel.

(Notice of Default, at 2) (quoting HMA §§ 2.1, 2.2).

121.    The Notice of Default further alleges "Operator has provided Owners only sparse and deficient financial disclosure, all the while failing to make required distributions, develop an effective marketing plan to address Owners problems plaguing the Hotel caused by Operator's incompetence, and obtain Owner's consent to amend the Annual Plan." (*Id.* at 3) (citing HMA §§ 2.1—2.5, 4.2, 4.4, 4.6, 5.2(a), 5.2(e), 5.2(h)).

122.    Section 5.2.1 provides a list of example "events [that] shall constitute an 'Event of Default' by the party as to which such event occurs."

123.    Subsection 5.2.2 of the HMA provides the procedure by which a party to whom an "Event of Default" has occurred under the HMA may seek recourse:

> Upon the occurrence of any Event of Default pursuant to Section 5.2.1, the non-defaulting Party may, without prejudice to any other recourse at law or in equity which the non-defaulting Party may have, give to the defaulting Party notice of its intention to terminate this Agreement, which termination shall be effective no earlier than thirty (30) days and no later than ninety (90) days following the date the notice of termination is given.

HMA §5.2.2.[8]

124.    Fintiklis and Third-Party Respondents caused Claimant to issue the Notice of Default pursuant to Section 5.2.2 under the HMA, and required Operator to cure any defaults by November 20, 2017.

125.    However, because Fintiklis and the Third-Party Respondents caused Claimant to also file its Request for Arbitration on October 14, 2017, the same day of the sham Notice of Default (and sham "lunch meeting"), Section 5.2.4 was triggered which states:

---

[8] For the avoidance of doubt, Respondents deny each and every claim asserted by Claimant in the Request.

37

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

> Any termination notice given pursuant to Section 5.2.2 . . . **shall not result in the termination** of this Agreement **if a bona fide dispute with respect to any alleged Event of Default** . . . entitling a party to terminate this Agreement has arisen between the parties and such dispute has been submitted to resolution pursuant to Section 9.1.

*Id.* § 5.2.4 (emphasis added).

126.   Section 5.2.4 further clarifies that once a party submits the issue of whether an Event of Default under the HMA has occurred for resolution by the ICC pursuant to Section 9.1, the HMA requires the arbitrator to determine that an Event of Default has occurred and that the party seeking to terminate the Agreement is so entitled. The specific language of Section 5.2.4 is as follows,

> If an arbitrator determines that an Event of Default has in fact occurred or that any other event entitling a party to terminate this Agreement has in fact occurred . . . the party entitled to terminate this Agreement may give notice to the other party of its intention to terminate this Agreement upon a date to be specified in such notice, which date shall be not less than 30 days from the date of such determination. In the event such notice is given, this Agreement shall terminate upon the date specified in such notice.

*Id.*

127.   On November 7, 2017, Respondents duly responded to the Notice of Default ("Notice Response") a copy of which is annexed hereto as **Exhibit Q**.  In the Notice Response, Respondents asserted, in great detail, their rejection of the Notice of Default. As a matter of law, Fintiklis and the Third-Party Respondents have no authority to act on behalf of Claimant.  Thus, Respondents provided numerous examples of how the Notice of Default was clearly a contrived sham to mount baseless claims of nonperformance under the HMA.  In reality, no Event of Default exists.

128.   As a result of Respondents' November 7 letter, together with Respondents' instant pleading, the "Events of Default" alleged are certainly in dispute and have been submitted to

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

resolution by the ICC pursuant to Section 9.1 of the HMA. Consequently, even if Fintiklis could

establish under law that he is the authorized representative of Claimant, Claimant could not

lawfully terminate the Agreement until an arbitration has determined Claimant is so entitled.

### VII.    THE NOVEMBER 2017 TERMINATION LETTER

129.    In flagrant violation of Section 5.2.4 of the HMA, which expressly prohibits

termination of the HMA where a bona fide dispute has been submitted to arbitration, on November

21, 2017, Fintiklis and Third-Party Respondents furthered this fraud and RICO scheme when they

caused to be issued a purported letter notice of termination ("Termination Notice"), effective

December 22, 2017, attached hereto as **Exhibit R**. As explained above, this Termination Notice

is improper because the issue has already been submitted to the ICC pursuant to Section 9.1, and

thus the Claimant and the Third Party Respondents through which it acts must now wait until the

parties agree otherwise, or an arbitrator orders "the party entitled to terminate this Agreement [to]

give notice to the other party of its intention to terminate this Agreement upon a date to be specified

in such notice, which date shall be not less than 30 days from the date of such determination."

HMA § 5.2.4. On November 22, 2017, Operator responded,[9] rejecting the Termination Notice and

reminding Claimant of Section 5.2.4, confirming that there is a bona fide dispute concerning the

existence of an Event of Default that has been submitted to arbitration pursuant to Section 9.1.

130.    Neither Claimant, Fintiklis or his conspirator Third Party Respondents parading as

some "authorized representative" of Claimant, is entitled to terminate the HMA; despite this,

Fintiklis, masquerading as an "authorized representative" of Claimant, has sent Respondent

numerous—and often duplicative—notices and correspondence, alleging that Respondents'

continued alleged default under the HMA entitles Claimant to take further action under the HMA.

---

[9] A true and correct copy of the November 22, 2017 Response to Termination Notice is attached hereto as **Exhibit S**.

39

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

This is simply false, and these are additional acts undertaken in furtherance of the fraud and RICO scheme.

131.   In reality, the continued persistence of Fintiklis and the Third Party Respondents in threatening the immediate termination of the HMA in violation of its plain language and in the face of the sham proceeding they have commenced is part and parcel of the fraudulent RICO scheme devised by Fintiklis, Lundgren and the Third-Party Respondents, the goal of which is to injure Respondents and remove Respondents from the Property at all costs, contractual requirements and legal restrictions be damned.

132.   These actions alleged above and herein, however, themselves violate the HMA, New York and Panama laws and entitle Respondents to significant damages, including but not limited to treble damages for RICO violations and attorneys' fees.

## VIII.   DENIAL OF CLAIMANT'S CLAIMS

133.   Respondents hereby deny each and every Claim in the Request for Arbitration and all material allegations in support thereof.

## CLAIMS FOR RELIEF

### FIRST COUNTERCLAIM
### BREACH OF THE HMA

134.   Respondents repeat and reallege the foregoing as if fully set forth at length herein.

135.   Claimant Hotel TOC, Inc. and Respondents are party to the HMA, which has an initial term of 20 years.  Absent an Event of Default or performance-related issues under Section 5.3, the HMA may not be terminated.

136.   No such Event of Default exists and Claimant does not assert default under Section 5.3 of the HMA. Accordingly, Claimant's service of Notice of Default is a sham, designed to carry out an unlawful scheme and breaches the HMA.

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

137. Moreover, subsequent to commencing this arbitration, Claimant has notified Respondents of its unlawful intention to terminate Respondents as Hotel Operator and remove Respondents from the Hotel property. Such conduct blatantly violates the HMA.

138. Specifically, Section 5.2.4 of the HMA provides:

> Any termination notice given pursuant to Section 5.2.2, 5.3 or 5.4 **shall not result in the termination** of this Agreement **if a bona fide dispute with respect to any alleged Event of Default or other event entitling a party to terminate this Agreement has arisen between the parties and such dispute has been submitted to resolution pursuant to Section 9.1.**

139. A bona fide dispute clearly exists between Claimant and Respondents concerning the existence of an Event of Default (*see, e.g.*, ¶¶ 146 - 150 *supra*). Fintiklis, Lundgren and the Third-Party Respondents conspired to undertake unlawful *ultra vires* acts and have no authority to act on Claimant's behalf or to take any adverse actions against Operator, and all such Disputes arising under or related to the HMA have been submitted for resolution in this proceeding.

140. Accordingly, Claimant's persistent threats to terminate Respondents is a material and unequivocal repudiation and breach of the HMA, including, but not limited to, Section 5.2.4.

141. As a direct result of Claimant's breaches of the HMA, Respondents have suffered damages in an amount to be proven at the hearing in this proceeding, but in no event less than $50,000,000 [Fifty Million U.S. Dollars], exclusive of interest and attorneys' fees.

## SECOND COUNTERCLAIM
## DECLARATORY JUDGMENT

142. Respondents repeat and reallege the foregoing as if fully set forth at length herein.

143. There exists real and justiciable controversies affecting the rights of Respondents and Claimant that are ripe for determination.

144. The October 14, 2017 meeting of the Hotel TOC Foundation violated its Articles of Incorporation by failing to provide notice to all Beneficiaries and failing to achieve at least 75%

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

participation of Beneficiaries for the decisions undertaken. Because of this failure, Hotel TOC Foundation's actions with respect to the composition of the Board of Claimant are null and void, and Claimant's subsequent actions are *ultra vires*. Even assuming *arguendo*, that meeting had been called on proper Notice and even assuming 75% of those beneficiaries with valid ownership and valid voting rights had voted – which neither fact exists or occurred – Third Party Respondents Ithaca I and II, Fintiklis and Lundgren and the Lundgren-related affiliates and entities had zero right to vote or cause to be voted any matters undermining the Operator or averse to Operator's interests under the Consent to Bulk Sale Agreement and the Lundgren Settlement Agreement .

145. As a result of the *ultra vires* acts taken on and after October 14, 2017 by Claimant, Respondents are entitled to a declaration that:

(i) the removals and appointments purportedly made to the Foundation Council and Board of Claimant on October 14, 2017 are null and void;

(ii) Fintiklis, is not an authorized representative of Claimant, had no authority to issue the Notice of Default, and consequently, the Notice of Default is null and void;

(iii) any termination of the HMA authorized by Fintiklis or other persons purportedly appointed to the Foundation Council and the Board of Claimant during the October 14, 2017 Meeting is null and void;

(iv) the claims fraudulently asserted by Claimant in this Arbitration Proceeding are *ultra vires* and null and void.

### THIRD COUNTERCLAIM
### DECLARATORY JUDGMENT

146. Respondents repeat and reallege the foregoing as if fully set forth at length herein.

147. There exists real and justiciable controversies affecting the rights of Respondents and Claimant that are ripe for determination.

148. Absent an expiration of the HMA by the natural the passage of time, the HMA may only be terminated in an Event of Default (under Section 5.2) or performance-related issues (under

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

Section 5.3).[10]   Claimant's Notice of Default is predicated on the existence of alleged fictional Events of Default under the HMA.

149.    As demonstrated in the November 7 Response to the Notice of Default, no such Events of Default exist, however, and Respondents continue to perform their obligations under the HMA, as agreed by Lundgren and Owners Meeting in the Lundgren Settlement Agreement and as discovered by the Third Party Respondents, *i.e.*, Fintiklis, Ithaca I and Ithaca II, their lawyers Morgan & Morgan, John Does 1-10 and the lender of Fintiklis's alter egos, Canal Bank, during their extensive pre-purchase due diligence.

150.    Accordingly, because no Event of Default exists under the HMA, Respondents are entitled to a declaration that:

(i)    no Event of Default exists under the HMA;

(ii)    Claimant's Notice of Default is improper and ineffective under the HMA; and

(iii)    the claims fraudulently asserted by Claimant in this Arbitration Proceeding are ultra vires and null and void.

## FIRST THIRD-PARTY CLAIM
## VIOLATION OF RICO, 18 U.S.C. § 1962(c)
### *(against Ithaca I, Ithaca II, Fintiklis, Lundgren and Morgan & Morgan)*

151.    Respondents repeat and reallege the foregoing as if fully set forth at length herein.

152.    The Federal Racketeer Influenced and Corrupt Organization Act, 18 U.S.C. § 1961, *et seq.*, applies in New York by virtue of the supremacy clause of the U.S. Constitution (Art. IV, Clause 2). Courts in the State of New York have concurrent jurisdiction to hear actions under the Federal RICO Act. *Tafflin v. Levitt*, 493 U.S. 455 (1990). Accordingly, claims under the Federal RICO Act arising from or relating to the HMA are properly included in this proceeding.

---

[10] In effect, under the HMA and because of the failure to build out certain amenities, including the beach club, there is no performance test that can be violated under Section 5.3. In any event, no such violation is asserted in this proceeding by Claimant.

43

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.